UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

GREEKTOWN HOLDINGS, LLC, *et al.*,

       Debtors.

_____/

BUCHWALD CAPITAL ADVISORS, LLC, solely
in its capacity as Litigation Trustee to the
GREEKTOWN LITIGATION TRUST,

       Plaintiff,

v.

DIMITRIOS ("JIM") PAPAS, VIOLA PAPAS,
TED GATZAROS, MARIA GATZAROS,
BARDEN DEVELOPMENT, INC., LAC VIEUX
DESERT BAND OF LAKE SUPERIOR
INDIANS, SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS, KEWADIN CASINOS
GAMING AUTHORITY, and BARDEN
NEVADA GAMING, LLC,

       Defendants.

_____/

Case No. 08-53104
Chapter 11
Jointly Administered
Hon. Walter Shapero

Adv. Pro. No. 10-05712

### <u>OPINION DENYING DEFENDANTS DIMITRIOS ("JIM") PAPAS, VIOLA PAPAS, TED GATZAROS, AND MARIA GATZAROS' MOTION FOR SUMMARY JUDGMENT (DKT. 187)</u>

#### INTRODUCTION

    Plaintiff, as Litigation Trustee, seeks to avoid transfers made by a debtor corporation to

Defendants, arguing that the transfers were fraudulent transfers under applicable Michigan law.

Defendants moved for summary judgment on the basis that Plaintiff's action is an "impermissible

collateral attack" on the order of the Michigan administrative agency that investigated and approved the overall transaction, including the subject transfers to Defendants. The motion is denied.

**UNDISPUTED FACTS**

Prior to 2000, Dimitrios ("Jim") and Viola Papas (together, "the Papases") and Ted and Maria Gatzaros (together, "the Gatzaroses"), owned approximately 86% of the membership interests in Monroe Partners, LLC ("Monroe"). Monroe owned a 50% interest in Greektown Casino, LLC ("Greektown Casino"). Kewadin Greektown Casino, LLC ("Kewadin") owned the other 50% interest. Greektown Casino owned and operated a casino in downtown Detroit, Michigan. On or about July 28, 2000, by agreement, Monroe redeemed the membership interests of the Papases and the Gatzaroses (together, "Defendants") in exchange for specified installment payments. Incident thereto, Kewadin contemporaneously purchased equivalent membership interests in Monroe and agreed to make the installment payments on Monroe's behalf. Thus, in effect, Monroe and Kewadin became obligated, either directly or indirectly, to make the installment payments to Defendants. The casino opened in November 2000. By 2004, these payment obligations to Defendants were in default.

In 2005, the various parties negotiated a multi-faceted amended redemption agreement and financing arrangement ("the Transaction") whereby, among other things, (a) the Papases would agree to a discounted cash buyout of about $95 million and (b) the Gatzaroses would agree to a partial payment of about $55 million, leaving about $50 million outstanding. As part of the Transaction, Monroe and Kewadin would convey all their membership interests in Greektown Casino to a new special-purpose entity called Greektown Holdings, LLC ("Holdings"). Holdings was formed in September 2005 and its assets would be limited to a subsidiary corporation and the 100% interest in Greektown Casino.

The Transaction required the approval of the Michigan Gaming Control Board (MGCB), a state regulatory agency created by the Michigan Gaming Control and Revenue Act, Mich. Comp. Laws § 432.201 *et seq.* ("the Gaming Act"). The MGCB's authority is defined as "the powers and duties specified in this act and all other powers necessary and proper to fully and effectively execute and administer this act for the purpose of licensing, regulating, and enforcing the system of casino gambling established under this act." Mich. Comp. Laws § 432.204(1). Mich. Comp. Laws § 432.203(3) states "[a]ny other law that is inconsistent with this act does not apply to casino gaming as provided for by this act." Additionally, Mich. Comp. Laws § 432.204(17)(d) empowers the MGCB to promulgate appropriate rules, which are codified as Mich. Admin. Code r. § 432.1101 *et. seq.* Mich. Admin. Code r. § 432.1509 requires that a casino licensee "may not enter into any debt transaction affecting the capitalization or financial viability of its Michigan gambling operation or casino operation without first receiving the approval of the board."

Greektown Casino first began discussions with the MGCB regarding the Transaction around June 2005. Because the Transaction qualified as a "debt transaction," the MGCB conducted an investigation over several months, pursuant to its authority and procedures. *See* Mich. Admin. Code r. § 432.1509. The MGCB contemplated and understood that the discounted redemption payments to Defendants would be part of the Transaction, and that such funds would be sourced from Holdings issuing unsecured senior notes to qualified institutional buyers ("Noteholders").[1] The Transaction also included other financing and restructuring aspects, which need not be discussed in detail here. At these hearings before the MGCB, Merrill Lynch, Pierce, Fenner & Smith Inc., the issuer and

---

[1] Originally, the Transaction was structured so that Greektown Casino itself would incur the various financing debts, including the unsecured senior notes. The MGCB apparently suggested or requested that such debts be incurred by a newly-created entity, Holdings, which had no operating history or prior creditors.

initial purchaser of the senior notes and predecessor in interest to the Noteholders, participated in the discussions regarding the Transaction and advocated for its approval. The MGCB unanimously approved the Transaction and issued a written order on November 15, 2005 ("Order"). Dkt. 187 Ex. 5-A. On November 22, 2005, Holdings issued an Offering Memorandum for the senior notes, advising potential note purchasers that Holdings "will not be insolvent or rendered insolvent as a result of issuing the notes; we will be in possession of sufficient capital to run our business effectively; and we will have incurred debts within our ability to pay as the same mature or become due." Dkt. 187 Ex. 5-K, at 25. On December 2, 2005, the monetary transfers were made to Defendants via wire payments, together with other monetary transfers contemplated as part of the Transaction. More or less contemporaneously, Holdings acquired 100% ownership of Greektown Casino.

## THE BASIS OF THIS ADVERSARY PROCEEDING

After Greektown Casino, Holdings, Monroe, Kewadin, and other related entities filed their present Chapter 11 bankruptcies on May 29, 2008, the Litigation Trustee ("Plaintiff"), on behalf of the Noteholders and other creditors, sought to avoid the aspects of the Transaction whereby Holdings transferred money to Defendants and other persons.[2] Plaintiff brought this action under 11 U.S.C. §§ 544 and 550 and two provisions of the Michigan Uniform Fraudulent Transfer Act

---

[2] In an order entered on June 13, 2008 in the main Chapter 11 case (Case No. 08-53104, Dkt. 114), these several bankruptcies were consolidated for procedural purposes only and became jointly administered. In an order entered on April 22, 2010 in the main Chapter 11 case (Dkt. 2279), the Court granted the Official Committee of Unsecured Creditors ("Committee") authority to pursue bond avoidance claims on behalf of Holdings. In accordance with that order, the Committee initiated this adversary proceeding on May 28, 2010. Through a consent order entered in this adversary proceeding on August 14, 2010 (Adv. Pro. No. 10-05712, Dkt. 64), Buchwald Capital Advisors, LLC, solely in its capacity as Litigation Trustee for The Greektown Litigation Trust, substituted in for the Committee, and thereafter has prosecuted this action.

(MUFTA): Mich. Comp. Laws §§ 566.34 and 566.35. Plaintiff's principal allegation against Defendants is that Holdings did not receive fair consideration for these transfers to Defendants, thereby rendering Holdings insolvent or inadequately capitalized. Defendants moved for summary judgment on the basis that Plaintiff's action is an "impermissible collateral attack" on the MGCB's Order, which (a) approved the Transaction and (b) stated that the Transaction "has a low probability of having an adverse impact on the ongoing financial viability of [Holdings] and Greektown [Casino]." Dkt. 187 Ex. 5-A, at 3.

The starting point of Plaintiff's case is 11 U.S.C. § 544(b)(1), which provides:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable *under applicable law* by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

(emphasis added). In Plaintiff's complaint, "under applicable law" solely incorporates and alleges the pertinence of MUFTA. Thus, the Court's task is to determine the extent to which MUFTA is "applicable" to the present situation in light of the asserted arguments. If the Gaming Act renders MUFTA inapplicable here, as Defendants argue, then there exists no "applicable law" by which Plaintiff can avoid the transfers under § 544. At one point, Plaintiff contended that Defendants are improperly arguing that MUFTA limits the jurisdiction of federal courts, particularly regarding enforcement of § 544. However, the Court views Defendants' allegations as instead only attempting to define whether MUFTA is "applicable" in light of the asserted arguments. Similarly, Defendants argued that if Plaintiff's case is successful, it would allow federal action to improperly impinge upon the important state interests of regulating casinos, discussing *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994). Again, because the Court is only asked to determine the applicability of a state statutory cause of action, as it might be incorporated into this adversary proceeding, that argument is

irrelevant.

Plaintiff brings MUFTA allegations pursuant to Mich. Comp. Laws § 566.34, which states:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
> (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Plaintiff also brings makes MUFTA allegations pursuant to Mich. Comp. Laws § 566.35, which states:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Assuming that the transfers are avoided under either of these provisions, Plaintiff seeks recovery from Defendants pursuant to 11 U.S.C. § 550.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H). The Court has jurisdiction under 28 U.S.C. §§ 1334(b) and 157, and E.D. Mich. L.B.R. 83.50(a).

### SUMMARY JUDGMENT STANDARD

Fed.R.Civ.P. 56 provides the statutory basis for summary judgment, and is made applicable to adversary proceedings via Fed.R.Bankr.P. 7056. "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." *Kalamazoo River Study Group v. Rockwell Intern. Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) (internal citation omitted). The Court should draw all justifiable inferences in favor of the non-moving party and it should not determine credibility or weigh evidence. *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis original). "There is no genuine issue of material fact when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Williams v. Leatherwood*, 258 Fed. Appx. 817, 820 (6th Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

### DISCUSSION

I.  The Principal Arguments and an Overview of the "Impermissible Collateral Attack" Doctrine

Defendants assert the doctrine of "impermissible collateral attack" and allege that "Plaintiff is making a belated effort to have this Court second guess a debt transaction approved by the MGCB

and supplant its judgment for that of the administration agency specifically empowered to review and approve the transaction." Def. Reply to Pl. Sur-Reply, Dkt. 248, at 16. It is important to note that the basis for Defendants' motion is not collateral estoppel (nor apparently *res judicata*).[3] *Id.* Defendants view this action as, in effect, an improper and belated attempt to second guess the MGCB's Order or usurp the MGCB's exclusive original jurisdiction, whereas Plaintiff's proper recourse should have been to file an appropriate and timely appeal. *See generally Blue Cross & Blue Shield of Mich. v. Comm'r of Ins.*, 155 Mich. App. 723, 728-29 (1986) (outlining procedures for appealing administrative orders). Defendants stress that this action and the matter that was before the MGCB in 2005 share a common nucleus of facts and would require a very similar, if not identical, inquiry, i.e. the effect that the Transaction (particularly the transfers to Defendants) would have on Holdings' and Greektown Casino's capitalization and financial viability. Defendants' position is that Plaintiff's MUFTA action is "inconsistent" with the MGCB's Order approving the transaction and that, pursuant to Mich. Comp. Laws § 432.203(3), MUFTA is inapplicable.

The "impermissible collateral attack" doctrine has been described under various nomenclatures, including improper collateral attack, exclusive original jurisdiction, exhaustion of remedies, and preemption. Despite the various descriptive labels, the essential nature of the doctrine has been clearly described as follows: "Our second task… is to determine whether Woods's position in this proceeding is a collateral attack. It is well-established in Michigan that, assuming competent jurisdiction, a party cannot use a second proceeding to attack a tribunal's decision in a previous

---

[3] Under Michigan law, collateral estoppel applies to a prior decision if "(1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there was mutuality of estoppel." *People v. Trakhtenberg*, 493 Mich. 38, 48 (2012) (quoting *Estes v. Titus*, 481 Mich. 573, 585 (2008)).

proceeding[.]" *Dir., Workers Comp. Agency v. MacDonald's Indus. Products Inc.*, 2014 WL 1267304 (Mich. Ct. App. Mar. 27, 2014). Defendants contend that Michigan courts have clearly and consistently upheld this basic principle under the term "preemption." For example, in *Kraft v. Detroit Entm't, L.L.C.*, 261 Mich. App. 534, 543-46 (2004), that Court held that the Gaming Act "preempts" the plaintiff's common law claims of fraud and unjust enrichment. That Court noted that the use of "preemption" is something of a misnomer because "preemption" traditionally applies to a situation where federal law takes precedence over state law. *Id.* at 545 n.5. However, the *Kraft* Court noted that the Michigan Supreme Court has used the label "preemption" and, as a result, opined that "if a statute provides for an exclusive remedy or otherwise limits or bars application of other laws, including the common law, any conflicting common law simply cannot apply." *Id.* For the sake of consistency, this Court will also use the term "preemption" to mean any limiting or nullifying effect that the Gaming Act might have on Plaintiff's MUFTA action, either on the face of the statutes or as-applied in this case. In *McEntee v. Incredible Technologies, Inc.*, 2006 WL 659347 (Mich. Ct. App. Mar. 16, 2006), that Court opined that the Gaming Act "preempts" inconsistent statutory causes of action. In *Cowsert v. Greektown Casino, L.L.C.*, 2005 WL 1633725 (Mich. Ct. App. July 12, 2005), the Court held that where a plaintiff's asserted causes of action were within the exclusive jurisdiction of the MGCB, his failure to exhaust his remedies before the MGCB and subsequent filing of a civil suit caused the civil court to lack subject matter jurisdiction.

Plaintiff challenges the asserted "impermissible collateral attack" doctrine, both in theory and in application. In any event, Plaintiff stresses that it is not seeking to overturn or challenge the MGCB's Order, argue that the MGCB acted beyond its authority, or otherwise make any case that is inconsistent with the Order. Plaintiff instead views the MGCB's authority and jurisdiction to be narrowly limited to casino licensure, gambling regulation, and other related matters, but not

extending to the areas of fraudulent transfers and the adjudication and enforcement of MUFTA actions. Distilling these arguments, insofar as relates to the Transaction, the legal issue before the Court is: does the Gaming Act "preempt" MUFTA or create an inconsistency such that the Gaming Act renders MUFTA inapplicable here?

## II.    The Disputed Facts and Exhibits

To some extent, the parties take sharply conflicting factual positions on the MGCB's investigation into the Transaction. Defendants argue that the MGCB's investigation (a) was lengthy, meticulous, and thorough; (b) involved multiple requests for information, inquiries, amendments, and supplements; (c) required several meetings, including meetings open to the public; and (d) involved the MGCB retaining the accounting firm of Grant Thornton as its independent expert and reviewing a voluminous report authored by Grant Thornton. Plaintiff, however, argues that the MGCB's investigation was (a) delegated by the MGCB to its staff; (b) more administrative than adjudicative, meaning there was no service of process, formal admission of evidence, etc.; (c) largely confidential, given that the relevant substantive issues were not discussed at the brief public meetings; (d) essentially a one-sided presentation with no objection, opposition, or cross-examination; and (e) not as lengthy or as thorough as Plaintiff contends. In furtherance of their arguments, the parties' briefs include as exhibits the MGCB's meeting minutes and transcripts, copies of the materials presented to the MGCB, and the Grant Thornton report.

The Court will not consider the substance of these arguments or the exhibits offered in support. First, these arguments and exhibits present contested issues of determining facts and/or weighing evidence, which are both outside the scope of what the Court should consider in this summary judgment context. Second, they are essentially irrelevant to the dispositive legal issues, which relate

to statutory interpretation and a legal determination of the interplay between two statutory schemes. It is sufficient for the Court to simply note that the MGCB did in fact, as required, conduct an investigation into the Transaction and that such investigation included a review of the Grant Thornton report and an inquiry into how the Transaction would affect the capitalization and financial viability of Holdings and Greektown Casino. Those facts are undisputed and the Court need not here further consider the substance or specifics of the MGCB's investigation.

Further, Plaintiff objected to Defendants' apparent reliance on the Grant Thornton report, characterizing it as inadmissible hearsay that should not be considered because it is offered to prove that the Transaction was not a fraudulent transfer. *See Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001) (only admissible evidence may be considered in ruling on motion for summary judgment). Defendants argue that the report is not hearsay because it is instead offered to show that the MGCB undertook an exhaustive analysis. Regardless of whether or not the report is inadmissible hearsay, the Court will not now consider its substance because it is irrelevant to the narrower legal questions at hand. In any event, it is undisputed, as noted, that the MGCB conducted an investigation into the Transaction, as required, including reviewing the Grant Thornton report. There is no dispute that the MGCB was required to, and indeed did, pass upon the pertinent questions of capitalization and viability. A review of that report would add no germane facts (let alone *undisputed* germane facts) to the disposition of the relevant legal issues. If Defendants are able to admit the report into evidence at trial, it might be relevant to and probative of Defendants' argument that the Transaction was not a fraudulent transfer.

Similarly, Defendants attached as an exhibit a letter addressed to Defendants' counsel by which a division of the office of the Michigan Attorney General indicates its support for Defendants' motion for summary judgment. It summarizes the investigation the MGCB made into the

Transaction and states that the MGCB views its Order as a final order not subject to collateral attack. Plaintiff contends the letter is inadmissible hearsay. This brief letter likewise adds nothing material or germane to the disposition of the present issues. The Attorney General merely states that the MGCB has a certain view of the legal issue that is presently before the Court. Regardless of whether or not the letter is inadmissible hearsay, it would be inappropriate for the Court to now consider it for any intent or purpose.

### III.    The Gaming Act Does Not Explicitly Preempt or Limit MUFTA

The Gaming Act and MUFTA do not specifically refer to or limit one another in any way, which is a relevant consideration. *See Estes v. Titus,* 481 Mich. 573, 579 (2008) ("We note initially that the language of [MUFTA] does not exempt from its reach property transferred pursuant to divorce judgments."). This is in contrast to Michigan's Business Corporation Act, for instance, which explicitly states that "[t]he uniform fraudulent transfer act… does not apply to distributions governed by this act." Mich. Comp. Laws § 450.1122(3). Also, the Michigan Consumer Protection Act specifically limits itself from applying to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws Ann. § 445.904(1). Plaintiff argues the failure of the Michigan Legislature to explicitly limit MUFTA's application or make MUFTA submissive or deferential to the Gaming Act (despite having the clear ability to do so) indicates that it did not so intend to limit MUFTA. The Court finds this argument persuasive and agrees with Plaintiff on this point. "When construing a statute, we consider the statute's plain language and we enforce clear and unambiguous language as written." *In re Bradley Estate*, 494 Mich. 367, 377 (2013) (citation

omitted). Looking to the plain language of the statutes, the Court finds that the Gaming Act does not explicitly preempt or limit MUFTA.

IV.     The Gaming Act Does Not Implicitly or Effectively Preempt or Limit MUFTA

A deeper analysis is required to determine whether preemption is *implicit* in the purpose, substance, and effect of the two statutory schemes, either on their face or as-applied in this case. The standard for implicit repeal of a statute has been described as follows:

> The [Michigan] Supreme Court has stated that it is axiomatic that repeals by implication are disfavored, and that it is to be presumed in most circumstances "that if the Legislature had intended to repeal a statute or statutory provision, it would have done so explicitly." *Wayne Co. Prosecutor v. Dep't of Corrections*, 451 Mich. 569, 576, 548 N.W.2d 900 (1996), citing *House Speaker v. State Admin Bd.*, 441 Mich. 547, 562, 495 N.W.2d 539 (1993). Therefore, repeal by implication will not be found if any other reasonable construction may be given to the statutes, *Wayne Co Prosecutor*, *supra* at 576, 548 N.W.2d 900, such as reading in pari materia two statutes that share a common purpose or subject, or as one law, even if the two statutes were enacted on different dates and contain no reference to one another. See *State Treasurer v. Schuster*, 456 Mich. 408, 417, 572 N.W.2d 628 (1998), quoting *Detroit v. Michigan Bell Tel. Co.*, 374 Mich. 543, 558, 132 N.W.2d 660 (1965). However, a repeal of a statute may be inferred in two instances: (1) where it is clear that a subsequent legislative act conflicts with a prior act; or (2) when a subsequent act of the Legislature clearly is intended to occupy the entire field covered by a prior enactment.

*City of Kalamazoo v. KTS Indus., Inc.*, 263 Mich. App. 23, 36-37 (2004). That case did not specifically deal with a statute preempting certain causes of action, as is alleged here. Rather, it dealt with two conflicting statutes, one providing for a jury trial on a certain issue and the other not so providing. The Court stated that although it was "extremely hesitant" to find that the Legislature's enactment of the subsequent statute implicitly repealed the prior statute, that was a rare case where no reasonable harmonious construction could be otherwise given. *Id.* at 37. The question presented in this case is largely analogous. Here, the question is whether the Legislature's enactment of the Gaming Act, particularly the aspects granting the MGCB exclusive original jurisdiction over certain

matters, implicitly preempts or limits Plaintiff's ability to bring the present MUFTA action. As such, the Court will consider and incorporate into its analysis the two part *City of Kalamazoo* test.

### A. The Scope of the MGCB's Authority

Defendants' principal argument is that the MGCB had exclusive original jurisdiction over the Transaction, including the crucial matters of how the Transaction would impact Holdings' and Greektown Casino's capitalization and financial viability. Mich. Comp. Laws § 432.204(1) states: "The board shall have the powers and duties specified in this act and all other powers necessary and proper to fully and effectively execute and administer this act for the purpose of licensing, regulating, and enforcing the system of casino gambling established under this act." Mich. Comp. Laws § 432.203(3) states "[a]ny other law that is inconsistent with this act does not apply to casino gaming as provided for by this act."[4]

Given the scope of its defined jurisdiction and the various opinions of Michigan courts, it is clear that the MGCB at least has purview over matters related to acts of gambling and the persons engaging in such acts. That is uncontested by the parties. Thus, where a gambler claimed that a casino improperly refused to pay him the jackpot he claimed to have won, he was first required to exhaust his administrative remedies before the MGCB because it had exclusive jurisdiction over such a gambling dispute. *Cowsert*, 2005 WL 1633725. Similarly, gamblers may not file a civil suit against licensed casinos for allegedly fraudulent gambling games. *Kraft,* 261 Mich. App. 534.

---

[4] Mich. Comp. Laws § 432.202 defines some pertinent terms:
    (g) "Casino" means a building in which gaming is conducted.
    (w) "Gambling operation" means the conduct of authorized gambling games in a casino.
    (x) "Gaming" means to deal, operate, carry on, conduct, maintain or expose or offer for play any gambling game or gambling operation.
It should be noted that the Gaming Act does not define "gambling" as a standalone term and at times appears to use the terms "gaming" and "gambling" interchangeably. The Court does not intend to

Because the Michigan Consumer Protection Act does not apply to transactions specifically authorized by the Gaming Act and because the Gaming Act preempted the common law claims of fraud and unjust enrichment, the gamblers' proper remedy was to seek appropriate redress from the MGCB. *Id.* Similarly, in *McEntee,* 2006 WL 659347, it was held that the Gaming Act precluded the plaintiff's civil suit for money lost playing an arcade game that had a monetary reward because such dispute was within the MGCB's gaming jurisdiction.

Further, although Mich. Comp. Laws § 432.203(4) states "[t]his act and rules promulgated by the board shall apply to all persons *who are licensed or otherwise participate in gaming under this act*" (emphasis added), the Gaming Act also regulates the conduct of persons other than licensees and persons who are directly involved in acts of gaming, for example, it regulates the licensee's suppliers and vendors. Mich. Comp. Laws §§ 432.207a and 432.204a(1)(s).

The Michigan Appeals Court has held that "the Legislature vested the board with exclusive jurisdiction over all matters relating in any way to the licensing, regulating, monitoring, and control of the non-Indian casino industry." *Papas v. Michigan Gaming Control Bd.*, 257 Mich. App. 647, 658-59 (2003). Despite the broad language "over *all* matters relating *in any way*," it is clear that the Gaming Act does not preempt or curtail every single law or dictate that might apply to regulate or control casinos for any intent or purpose. *Id.* (emphasis added). Defendants concede that notwithstanding the breadth of the Gaming Act, casinos are not exempt from certain laws of general application, such as local health and safety codes. The Transaction itself contemplated some such regulations being applicable because Holdings' Offering Memorandum states:

> Generally, we are subject to a variety of federal, state and local governmental
> laws and regulations relating to safety and the use, storage, discharge, emission and
> disposal of hazardous materials. Failure to comply with such laws could result in the

make any distinction between the two terms.

> imposition of severe penalties or restrictions on operations by governmental agencies or courts that could adversely affect operations.

Dkt. 187 Ex. 5-K, at 17.

In fact, the MGCB's rules, which are promulgated pursuant to its authority under the Gaming Act, specifically indicate that other agencies also have some limited authority to regulate licensed casinos. For example, Mich. Admin. Code r. § 432.1306(3) requires that a casino license application shall include "[t]he status of all required governmental and regulatory permits and approvals and any conditions of all required governmental and regulatory permits and approvals" and "[o]ther information and documentation as may be required by the board concerning the applicant's plans for providing food and beverage and other concessions, the status of all relevant required governmental and regulatory permits and approvals, and any conditions of all relevant required governmental and regulatory permits and approvals." A request for approval of a debt transaction (such as the subject one that was before the MGCB) shall contain "[a]ll filings that must be submitted to any regulatory agency in association with the debt transaction." Mich. Admin. Code r. § 432.1509(3). A person notifying the MGCB of a public offering must provide "[a] statement of intended compliance with all applicable federal, state, local, and foreign securities laws." Mich. Admin. Code r. § 432.1403. "A casino licensee shall comply with all federal and state regulations for the withholding of taxes from winnings or the filing of currency transaction reports, or both." Mich. Admin. Code r. § 432.1820. A casino licensee that is a foreign corporation operating in Michigan shall provide to the MGCB upon request "a certificate of authority from the Michigan corporations and securities bureau authorizing it to do business in Michigan." Mich. Admin. Code r. § 432.11201. What can be distilled from these rules is that licensed casinos are regulated and controlled, to some extent, by authorities other than the MGCB and by laws of general application. Thus, not all laws that directly or

indirectly regulate or control a licensed casino are preempted by, or are necessarily inconsistent with, the Gaming Act. Rather, preemption applies only to laws that are at odds with the MGCB's prescribed statutory jurisdiction.

## B.  The MGCB had no Subject Matter Jurisdiction over a MUFTA Claim

Plaintiff argues that the MGCB has no jurisdiction or power relating to MUFTA claims, even if such claims directly involve licensed casinos. Plaintiff views the MGCB's jurisdiction as being limited predominantly to the licensure of casinos and the regulation of licensees. The MGCB has sweeping powers to regulate and control casinos, including the ability to appoint a conservator to take possession of a casino and sell it in bulk. Mich. Comp. Laws § 432.224(7). However, none of the MGCB's enumerated powers include undoing or recovering fraudulent transfers pursuant to MUFTA. Defendants have not directed the Court to any provision that would include MUFTA actions within the stated authority of the MGCB, i.e. "the powers and duties specified in this act and all other powers necessary and proper to fully and effectively execute and administer this act for the purpose of licensing, regulating, and enforcing the system of casino gambling established under this act." Mich. Comp. Laws § 432.204(1). Indeed, when reviewing a debt transaction such as the Transaction, Mich. Admin. Code r. § 432.1205 limits the scope of the MGCB's authority, providing:

> An action of the board regarding an applicant or licensee relates only to the applicant's or licensee's qualification for licensure under the act and these rules and does not indicate or suggest that the board has considered or passed on the qualifications or application of the applicant or licensee for any other purpose.

In this regard, Defendants' argument that the Gaming Act impliedly preempted MUFTA, as MUFTA might apply here, is unavailing. Defendants argue that various cases cited by Plaintiff

holding that licensed casinos are subject to personal injury and employment claims[5] are distinguishable because, unlike the present issue of financial viability, the MGCB did not have exclusive original jurisdiction over employment or personal injury claims and was not required to initially and exhaustively analyze such matters. Plaintiff argues that the present fraudulent transfer action is similarly outside the realm of the MGCB's jurisdiction. Plaintiff is correct. The MGCB has no jurisdiction over MUFTA claims, and certainly not *exclusive original* jurisdiction.

The conclusion that the MGCB has no subject matter jurisdiction over MUFTA claims (particularly when reviewing the Transaction) is an important one. "A collateral attack 'is permissible only if the court never acquired jurisdiction over the persons or the subject matter.'" *Dir., Workers Comp. Agency,* 2014 WL 1267304, at *7 (quoting *Edwards v. Meinberg*, 334 Mich. 355, 358 (1952)). In other words, if a legal issue is beyond the subject matter jurisdiction of the initial tribunal, raising that legal issue in a subsequent proceeding is not an impermissible collateral attack on the initial tribunal's order. Several cases illustrate this point. In *Cowsert,* a reason why the MGCB was deemed the appropriate tribunal for the gambling dispute was because the MGCB could fully redress the gambler's asserted claims of damages. 2005 WL 1633725. In *Estes*, a creditor alleged in a civil action that a prior divorce judgment was a fraudulent transfer under MUFTA because the divorcing parties had conspired to transfer nearly all the marital assets to the wife in order to prevent the creditor from collecting on a claim held solely against the husband. 481 Mich. at 577-78. The divorce court had properly refused to allow the creditor to intervene in the divorce proceeding because Michigan law strictly limits a divorce court's jurisdiction to the rights and obligations of the divorcing parties, and not of third parties. *Id.* at 582-83. The Michigan Supreme

---

[5] Pl. Sur-Reply Br. Dkt. 239, at 10-11 n.4.

Court found that the creditor's subsequent MUFTA action was not an impermissible collateral attack because it was not premised on any irregularity in the divorce proceedings, but rather was premised on the divorce court's lack of statutory authority to conduct a MUFTA analysis and offer the creditor appropriate relief. *Id.* at 588-89. That is akin to the situation here because the divorce court in *Estes* was as powerless to rule on the creditor's MUFTA claim as the MGCB was to rule on a MUFTA claim that any person might have brought.

Perhaps the best illustration of this principle is *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208 (2011), which is remarkably similar to the facts of this case. There, an insurance company proposed a substantial restructuring, which required the approval of the New York State Insurance Department Superintendent. The Superintendent thoroughly investigated the restructuring on an ex-parte basis, concluded it was fair to policyholders, and approved it. Subsequently, policyholders brought a state law fraudulent transfer action, alleging the restructuring left the insurer insolvent. The insurer contended the action was an "impermissible collateral attack" on the Superintendent's investigation into and approval of the restructuring. This argument was presented in the sense that the insurance laws preempted the fraudulent transfer laws. The Court opined:

> In this case, defendants essentially ask us to construe the Superintendent's exclusive original jurisdiction to approve the Transformation under the relevant provisions of the Insurance Law to mean that he is also the exclusive arbiter of all private claims that may arise in connection with the Transformation—including claims that the restructuring rendered MBIA Insurance insolvent and was unfair to its policyholders. Defendants' contention, taken to its logical conclusion, would preempt plaintiffs' Debtor and Creditor Law and common-law claims. We reject this argument and conclude that there is no indication from the statutory language and structure of the Insurance Law or its legislative history that the Legislature intended to give the Superintendent such broad preemptive power…

> If the Legislature actually intended the Superintendent to extinguish the historic rights of policyholders to attack fraudulent transactions under the Debtor and Creditor Law or the common law, we would expect to see evidence of such intent within the statute. Moreover, we would expect that, in such a situation, affected

policyholders, such as plaintiffs, would have notice and an opportunity to be heard before the Superintendent made his determinations. Here, we find no such intent in the statute. Nor do we see a provision that required the Superintendent to provide notice and an opportunity to be heard to plaintiffs before he approved the Transformation…

Defendants nonetheless look to Insurance Law § 326 (a) as a provision conferring exclusive authority on the Superintendent to adjudicate plaintiffs' private claims. Defendants' reliance on such provision, however, is entirely misplaced… A cursory reading of the plain language reveals that it does not vest the Superintendent with the power to consider causes of action such as plaintiffs'… The Superintendent's determinations, however, have never included the adjudication of claims like those plaintiffs have put forward in this action.

*Id.* at 224-25 (footnote omitted). Defendants seek to distinguish *ABN AMRO* because there, the Superintendent acted in confidentiality and the policyholders had no notice or opportunity to be heard. In the present case, however, the Noteholders (via their predecessor in interest) clearly had notice, substantially participated in discussions with the MGCB, and advocated for the Transaction. Defendants speculate that if the *ABN AMRO* Court was presented with the facts of this case, it would find the fraudulent transfer action to be an "impermissible collateral attack" because of the existence of notice and opportunity to be heard. That speculation is unfounded and unpersuasive. Defendants' argument ignores the emphasis that Court placed on the limited scope of the Superintendent's prescribed authority. A person's opportunity to be heard regarding a fraudulent transfer claim is of little value if the tribunal at which he is to be heard is completely powerless to adjudicate the fraudulent transfer claim or to grant appropriate relief. Thus, the *City of Kalamazoo* factors do not support an implicit preemption because there is no statutory conflict and the Gaming Act was not intended to occupy the field of fraudulent transfers at all, let alone to *entirely* occupy that field. 263 Mich. App. at 36-37. This is not one of the rare situations where one statute should be seen to implicitly preempt another.

### C. Plaintiff's MUFTA Action is not Inconsistent with the Gaming Act

The starting point of this analysis is Mich. Comp. Laws § 432.203(3), which states "[a]ny other law that is inconsistent with this act does not apply to casino gaming as provided for by this act." The term "inconsistent" is not defined in the statute. Black's Law Dictionary (9th ed. 2009) defines "inconsistent" as "[l]acking agreement among parts; not compatible with another fact or claim…" In addressing the existence of any inconsistency, the Court will consider whether MUFTA's purpose, subject, implementation, and effect can be reasonably construed as being compatible with the Gaming Act and not intruding upon its scope.

Defendants stress that the Legislature used the benchmark "inconsistent," rather than more stringent benchmarks such as "direct conflict" or "actual conflict." Defendants argue that this adversary proceeding presents a clear "inconsistency" with the MGCB's Order because of the overlap in the relevant inquiry into the capitalization and financial viability of Holdings and Greektown Casino as a result of the Transaction and the transfers to Defendants. Defendants contend that the MGCB appropriately fulfilled its duty to investigate the Transaction, including its pertinent effects. Indeed, Defendants are correct that the factual inquiry required in this adversary proceeding will be principally similar to that conducted by the MGCB. However, that alone is not sufficient for Defendants to meet their burden of proving inconsistency. The above quoted statute requires that the *law* be inconsistent with the Gaming Act, not just the inquiry that stems from that law. An overlap in the nucleus of facts and the inquiries involved is insufficient to find that two statutory schemes are inconsistent. For example, in *Estes*, the divorce court necessarily decided that awarding nearly all the marital assets to the wife was equitable between the spouses, but obviously did not pass upon the question of whether it was equitable as to the aggrieved non-party creditor. 481 Mich. at 584. The creditor was not precluded from subsequently pursuing a MUFTA action and alleging that the

property division was fraudulent, despite the fact that the divorce court had already conducted a related, if not identical, inquiry as to the suitability of the asset division.

For three reasons, the Court finds that MUFTA, as Plaintiff would employ it here, is not an "inconsistent" law vis-à-vis the Gaming Act. First, as previously discussed, the MGCB has no jurisdiction over MUFTA claims and cannot provide an appropriate remedy for such. "A tribunal's subject matter jurisdiction depends on the kind of the case before it, not on the particular facts of the case…" *Dir., Workers Comp. Agency,* 2014 WL 1267304, at *7. Pursuant to Mich. Admin. Code r. § 432.1205, the MGCB's purview and its Order were limited to licensure issues, which are not disputed in this adversary proceeding. Because the MGCB's scope of authority is thus limited, the Court holds that it is reasonable to see a vacancy in the legal landscape where MUFTA applies to licensed casinos without being inconsistent with the Gaming Act. In this case, the MGCB's lack of jurisdiction over MUFTA claims is in itself enough to create and preserve such a vacancy for another tribunal to occupy. This interpretation is well supported by the above quoted maxims that statutes should be interpreted harmoniously and consistently with one another unless such interpretation is impossible. This situation is not one of the rare exceptions to the rule described in *City of Kalamazoo* 263 Mich. App. at 36-37.

Second, Mich. Comp. Laws § 432.203(3) provides that "[a]ny other law that is inconsistent with this act does not apply *to casino gaming as provided for by this act*." (emphasis added). This MUFTA action, although it would affect a licensed casino, does not *per se* apply to "casino gaming" or to the scope of the Gaming Act. Defendant argues that although this MUFTA action might not necessarily and directly pertain to "casino gaming," it would inevitably have a serious impact on the gambling operations of a licensed casino. If Defendants' liberal reading of the term "inconsistent" is adopted, it might preclude a variety of causes of action pursuant to laws of general application that,

although they might apply to licensed casinos, at most have only an incidental relation to and impact on casino gaming. This statutory provision should be viewed narrowly as applying to casino gaming and to the specifically defined scope of the Gaming Act, for example, to matters over which the MGCB clearly has exclusive jurisdiction, such as allegations that a casino game is fraudulent. *E.g. Kraft,* 261 Mich. App. 534. MUFTA claims are simply outside this scope. If a law might apply to a licensed casino (whether the law pertains to corporate governance, taxation, securities, health and safety, etc.), it is not perforce inconsistent with the Gaming Act. Although the application of MUFTA here might have a substantial impact on a licensed casino (and perhaps even frustrate or defeat the casino's ability to carry out its essential gambling operations), the same might arguably be said regarding the penalties for a casino's noncompliance with the local fire or building codes. As previously discussed, the Gaming Act and the MGCB rules clearly indicate that licensed casinos are subject to a variety of regulations, including some that might pertain to debt transactions such as this.

Third, there would not necessarily be an inconsistency in the results. Plaintiff notes that the MGCB's Order specifically states that the Transaction "has a low probability of having an adverse impact on the ongoing financial viability of [Holdings] and Greektown [Casino]." Dkt. 187 Ex. 5-A, at 3. Plaintiff contends that this statement is merely a prediction, used as a prophylactic measure to further the public interest in ensuring that debt transactions are appropriate. The Court agrees with Plaintiff based on the clear language of the MGCB's Order. While it may have been a highly educated and thoroughly investigated prediction, it was still a prediction. The MGCB's Order also required Holdings and Greektown Casino to demonstrate their *ongoing* financial viability by meeting certain future benchmarks for as long as they remained indebted under the borrowing aspects of the Transaction. *Id.* at 7-9. This demonstrates their need for continued oversight and

compliance in order to avoid being rendered insolvent by the debts incurred by the Transaction. That tends to prove that the question of whether the Transaction rendered, or would subsequently render, the entities insolvent was not firmly answered on the date of the transfers, but rather depended on the unfolding of subsequent events, specifically, the success of the casino's operations. As such, MUFTA gives a creditor a fraudulent transfer cause of action even if the claim arose *after* the transfer was made. Mich. Comp. Laws § 566.34(1). Thus, it is possible for the MGCB to have made an accurate finding that, at the time of its Order, the transfers were unlikely to render the entities insolvent, but that subsequent events caused or contributed to the transfers becoming fraudulent transfers.

Holdings' Offering Memorandum, issued after the MGCB approved the Transaction, marketed the senior notes to potential Noteholders and thoroughly described the Transaction and the risks involved. Dkt. 187 Ex. 5-K. It stated in relevant part, "[o]ur substantial indebtedness could adversely affect our financial results and prevent us from fulfilling our obligations under the notes and our other outstanding indebtedness." *Id.* at 22. It further specified:

> A portion of the net proceeds from the notes will be distributed to our members. The incurrence of the indebtedness evidenced by the outstanding notes and the making of the distribution are subject to review under relevant federal and state fraudulent conveyance statutes in a bankruptcy or reorganization case or a lawsuit by or on behalf of creditors of [Holdings].…

> We believe that, after giving effect to the offering of the outstanding notes and the new credit facility and the distribution to us of a portion of the net proceeds therefrom, we will not be insolvent or rendered insolvent as a result of issuing the notes; we will be in possession of sufficient capital to run our business effectively; and we will have incurred debts within our ability to pay as the same mature or become due. There can be no assurance, however, as to what standard a court would apply to evaluate our intent or to determine whether we were insolvent at the time of, or rendered insolvent upon, the consummation of the offering of the notes and new credit facility, and the making of the distribution or that, regardless of the standard, a court would not determine that we were insolvent at the time of, or rendered

> insolvent upon, the consummation of the offering of the outstanding notes and the
> new credit facility, and the making of the distribution.

*Id.* at 25. Holdings itself recognized this possibility of insolvency, informed the prospective

Noteholders of it, and offered assurances that Holdings believed this possibility would be unlikely to

occur. Nonetheless, it was clear at that time that all parties recognized the possibility existed.

The Court finds that the MGCB left issues of potential MUFTA claims to a different date and to

a different tribunal. Plaintiff's adversary proceeding essentially seeks for the Court to determine

whether this contemplated possibility came to fruition. It is a retrospective action and seeks a

remedy after-the-fact. If Plaintiff is able to prove its case, this will produce a remedial result,

different from the prophylactic result produced by the MGCB. Thus, while the Court might engage

in a related factual inquiry as the MGCB, there is a clear distinction in the subject matter of the

inquiry, its purpose, its effect, and the perspective from which it is to be viewed. The Gaming Act

was not intended to entirely occupy the same field as MUFTA and the two statutes are consistent

and complementary. *See also Mathis v. Interstate Motor Freight Sys.*, 408 Mich. 164, 179 (1980)

("The Worker's Disability Compensation Act (WDCA) and the No-Fault Insurance Act are complete

and self-contained legislative schemes addressing discrete problems."). By way of further analogy, if

a doctor makes a well-reasoned prediction that a procedure poses low risk to a patient, but the

patient later dies, it is not "inconsistent" with the doctor's prediction for other persons to conduct an

autopsy or adjudicate a wrongful death claim. The Court does not find MUFTA to be inconsistent

with the Gaming Act or with the MGCB's Order, either on their face or as-applied to this case.

D.    <u>Defendants' Argument that Plaintiff's Sole Remedy was to Appeal the MGCB's Order is
        Unavailing</u>

Defendants argue that Plaintiff's sole remedy should have been timely appealing the MGCB's Order, rather than instituting this separate action. Defendants argue that the Gaming Act incorporates various procedures for appealing the MGCB's Order, which neither Plaintiff nor any other person pursued. Defendants cite *Womack-Scott v. Dep't of Corr.*, 246 Mich. App. 70, 80 (2001), which states:

> Considering the function that the [Civil Service Commission] serves to resolve employment disputes of state employees and the availability of a direct appeal to the circuit court from a CSC decision, we hold that a party aggrieved by a ruling of the CSC cannot file an independent action to seek redress of the claims made during the administrative process, but rather must pursue those claims through a direct appeal to the circuit court pursuant to the [Administrative Procedure Act].

Plaintiff contends that an appeal of the MGCB's Order would have been legally and factually impossible. The Court agrees. Plaintiff would not have had standing to appeal the MGCB's Order in 2005 because Plaintiff had yet to be appointed as trustee for the Litigation Trust and there was then no bankruptcy estate in existence for any trustee to represent. The Noteholders also likely faced a standing obstacle because, when the MGCB approved the Transaction, they were only *future* creditors of Holdings and did not yet have a cognizable claim of injury. On a more practical level, an appeal by any person would not have made sense because the unchallenged proponents of the Transaction, including the Noteholders, had received the exact licensure approval they sought from the MGCB (as opposed to a case where an applicant appeals the *denial* of what it requested, which could actually provide a rational appellate remedy). It would defy logic for a party to appeal a favorable ruling. *See Estes*, 481 Mich. at 591 ("If a debtor agrees to a transfer of substantially all the marital assets in order to defraud a creditor, he or she cannot be expected to appeal that transfer."). In any event, given the MGCB's lack of jurisdiction over a MUFTA claim, such an appeal likely would not have touched upon any potential MUFTA issues. *See ISB Sales Co. v. Dave's Cakes*, 258

Mich. App. 520, 532-33 (2003) (issue not raised at trial court is not preserved for appellate review). If the Noteholders were required to first exhaust their available appellate remedies, as Defendants claim, they clearly satisfied that requirement because there was no aggrievement to appeal. *Womack-Scott* is distinguishable because the plaintiff there had feasible appellate remedies available at the administrative level and could have obtained appropriate relief on appeal, but she failed to pursue those remedies. 246 Mich. App. at 79-80. Although the *Womack-Scott* court recognized the existence of avenues by which the plaintiff could have had the appellate court review constitutional issues that were beyond the original administrative agency's jurisdiction (such as by having the appellate court entertain legal briefs and take additional evidence), the other above-noted obstacles to functional appellate review would have precluded such avenues in this case. *Id.* at 80-81.

The Court concludes that an appeal of the MGCB's Order was not practical or feasible, and failed to provide an appropriate remedy (let alone the *sole* remedy) for parties who claim they are aggrieved by this allegedly fraudulent transfer. Not only did the MGCB lack jurisdiction over a MUFTA claim, but the identity of the parties, their lack of privity, and the distinct nature of the proceedings made an appeal an inoperable course of action for bringing any MUFTA claim. The lack of a functional appellate remedy strikes at the essence of Defendants' "collateral attack" allegation, particularly because the failure to appeal an initial ruling is an element of a "collateral attack" allegation. *See Dir., Workers Comp. Agency,* 2014 WL 1267304, at *6.

Insofar as Defendants argued that it would be unfair or inequitable for the Noteholders to attack the Transaction because they were originally proponents for and participants in it, such argument is better raised at trial on the merits of Defendants' defenses. It is beyond the narrower scope here, i.e. the availability and efficacy of an appellate remedy.

## CONCLUSION

The Court finds that Defendants have not met their summary judgment burden and their motion for summary judgment (Dkt. 187) is denied. Plaintiff shall present an appropriate order.

```
Signed on August 12, 2014
                                    /s/ Walter Shapero
                              _____
                              Walter Shapero
                              United States Bankruptcy Judge
```