UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

GREEKTOWN HOLDINGS, LLC, *et al.*,[1]

      Debtors.

_____/

BUCHWALD CAPITAL ADVISORS, LLC, solely
in its capacity as Litigation Trustee to the
GREEKTOWN LITIGATION TRUST,

      Plaintiff,

v.

DIMITRIOS ("JIM") PAPAS, VIOLA PAPAS,
TED GATZAROS, MARIA GATZAROS,
BARDEN DEVELOPMENT, INC., LAC VIEUX
DESERT BAND OF LAKE SUPERIOR
INDIANS, SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS, KEWADIN CASINOS
GAMING AUTHORITY, and BARDEN
NEVADA GAMING, LLC,

      Defendants.

_____/

Case No. 08-53104
Chapter 11
Jointly Administered
Hon. Walter Shapero

Adv. Pro. No. 10-05712

## OPINION GRANTING DEFENDANTS DIMITRIOS ("JIM") PAPAS, VIOLA PAPAS, TED GATZAROS, AND MARIA GATZAROS' MOTION FOR SUMMARY JUDGMENT (DKT. 266)

### INTRODUCTION

Plaintiff, as litigation trustee, seeks to avoid certain monetary transfers made to defendants by a

debtor corporation, alleging the transfers were constructively fraudulent transfers. Defendants

_____

[1] The Debtors in the jointly administered cases include Greektown Holdings, LLC; Greektown Casino, LLC; Kewadin Greektown Casino, LLC; Monroe Partners, LLC; Greektown Holdings II, Inc.; Contract Builders Corporation; Realty Equity Company Inc.; and Trappers GC Partner, LLC.

moved for summary judgment pursuant to the "safe harbor" provision of 11 U.S.C. § 546(e). The motion is granted.

## FACTS AND BACKGROUND

Prior to 2000, Dimitrios and Viola Papas (together, "the Papases") and Ted and Maria Gatzaros (together, "the Gatzaroses") collectively owned approximately 86% of the membership interests in Monroe Partners, LLC ("Monroe").[2] Monroe, in turn, owned a 50% interest in Greektown Casino, LLC ("Greektown Casino") and Kewadin Greektown Casino, LLC ("Kewadin") owned the other 50% interest. Greektown Casino owned and operated a casino in downtown Detroit, Michigan. By agreement dated on or about July 28, 2000 ("the 2000 Redemption"), Monroe purchased and redeemed the membership interests of the Papases and the Gatzaroses (together, "Defendants") in exchange for Monroe's agreement to pay Defendants specified future installment payments. Incident and contemporaneously thereto, Kewadin became the owner of equivalent membership interests in Monroe and also obligated itself to make these installment payments. Thus, as a result of the 2000 Redemption, Monroe and Kewadin became obligated to make the installment payments to Defendants. Such payments were indeed made for some time.

In 2005, the indicated parties entered into agreements that, among other things, provided for a settlement and payment of the balances then owing to Defendants ("the 2005 Transaction"). The Papases agreed to a discounted payment in full of about $95 million, and the Gatzaroses agreed to a partial payment of about $55 million, leaving an outstanding balance of about $50 million. The 2005 Transaction had other financial aspects. The most relevant aspect was that the source of the money to be used to pay Defendants the indicated sums would be obtained pursuant to a reorganization of Greektown Casino's corporate and financial structure. To that end, in September 2005, Monroe and Kewadin incorporated Greektown Holdings, LLC ("Holdings"), with Monroe and Kewadin each owning a 50% interest in Holdings, and with each transferring to Holdings all of their interests in

---

[2] The remaining interests were held by other minority interest-holders.

3

Greektown Casino. Aside from Greektown Casino, Holdings' only other asset was a wholly-owned subsidiary Greektown Holdings II, Inc. In the latter part of 2005, and incident to and in contemplation of the 2005 Transaction, the following events took place:

(a) Holdings issued approximately $182 million in unsecured senior notes ("Senior Notes") to be purchased by Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") pursuant to a Note Purchase Agreement;[3]

(b) Merrill Lynch sold the Senior Notes to certain qualified institutional purchasers;

(c) The net proceeds from the indicated sale of the Senior Notes was used (primarily, but not solely) to make the agreed-upon payments to Defendants;[4]

(d) On November 8, 2005, the Michigan Gaming Control Board (MGCB) approved by written order the transfer of Monroe and Kewadin's interests in Greektown Casino to Holdings. Dkt. 266 Ex. 5-A. Consummation of the 2005 Transaction required the MGCB's approval, as it is the Michigan state agency with jurisdiction over casino licensure and regulation. See Mich. Comp. Laws § 432.204(1); Mich. Admin. Code r. § 432.1509;

---

[3] Holdings' wholly-owned subsidiary Greektown Holdings II, Inc. was also a co-issuer of the Senior Notes, but for the sake of simplicity and consistent with their corporate structure, this Opinion will refer to the note issuer simply as "Holdings."

[4] Other contemplated and completed payments included:

(a) Payments to redeem the membership interests of current minority members of Monroe ($16.5 million);
(b) Reimbursement to the Sault Ste. Marie Tribe of Chippewa Indians (Kewadin's ultimate parent entity) for payments it made to Defendants on Kewadin's behalf ($6 million);
(c) Payment of estimated fees and expenses related to the 2005 Transaction ($3.7 million); and
(d) Holdings' general corporate purposes ($2.5 million).

Offering Memorandum, Dkt. 266, Ex. 5-C at 30. Certain other documents indicate somewhat different amounts, however, such have no impact on the analysis or outcome.

4

(e) On November 15, 2005, the MGCB also issued a written order approving the 2005 Transaction, including as a specific condition the referred-to payments to Defendants. Dkt. 266 Ex.5-B;

(f) On November 22, 2005, Holdings and Merrill Lynch issued an Offering Memorandum covering the Senior Notes. It specifically described the 2000 Redemption and further indicated that the proceeds of the offering would be distributed to effectuate the indicated and contemplated payments to Defendants (specifically, by way of a distribution to Monroe and Kewadin, which would then make distributions to Defendants). Dkt. 266, Ex. 5-C at 7. The Offering Memorandum's "Use of Proceeds" section indicated that "[c]oncurrently with the closing of the offering of the notes, [Holdings] will dividend" approximately $170 million to Monroe and Kewadin, which will use the funds to pay former members of Monroe (i.e. Defendants). Id. at 30. The November 22, 2005 Note Purchase Agreement between Merrill Lynch (on its own behalf and on behalf of the identified initial purchasers of the Senior Notes) and Holdings included a covenant providing that Holdings will use the net proceeds of the Senior Note sale as specified in the referred-to Offering Memorandum's "Use of Proceeds" section. Dkt. 266, Ex. 5-D at 11; and

(g) On December 2, 2005, Holdings issued the Senior Notes to Merrill Lynch and, on the same day, Holdings directly made those indicated payments by wire transfers from Merrill Lynch to the Papases' and Gatzaroses' bank accounts with Chase Manhattan Bank and Comerica Bank, respectively ("Wire Payments").[5]

---

[5] For what it is worth, the Flow of Funds Memorandum, which described the various distributions of money made pursuant to the 2005 Transaction, provided that "[e]ach of the following transactions shall be deemed to have occurred simultaneously:" and goes on to describe, among other things, (a) Holdings receiving approximately $182 million pursuant to the terms of the Note Purchase Agreement; (b) Holdings making various distributions from the proceeds of the Note Purchase

5

Greektown Casino, Holdings, Monroe, Kewadin, and other related entities filed their Chapter 11 bankruptcies on May 29, 2008. Following confirmation of a Chapter 11 plan on January 22, 2010, the Litigation Trustee ("Plaintiff"), appointed under the plan, sought to avoid, among other things, the Wire Payments that Holdings made to Defendants.[6] Plaintiff brought this action under 11 U.S.C. §§ 544 and 550 and two provisions of the Michigan Uniform Fraudulent Transfer Act: Mich. Comp. Laws §§ 566.34 and 566.35. Plaintiff principally alleges that Holdings did not receive fair consideration for these transfers to Defendants and that such were constructively fraudulent transfers. Defendants moved for summary judgment pursuant to the "safe harbor" provision of 11 U.S.C. § 546(e).

## JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H). The Court has jurisdiction under 28 U.S.C. §§ 1334(b) and 157, and E.D. Mich. L.B.R. 83.50(a).

---

Agreement to Monroe and Kewadin; (c) Kewadin making various distributions to Monroe; and (d) Monroe making distributions to the Papases of approximately $90 million and to the Gatzaroses of approximately $55 million. Dkt. 278 Ex. D. at 2-5. Notwithstanding these intermediary transfers described in the Flow of Funds Memorandum, the actual mechanics of the transaction was that Holdings directly made the payments by wire transfers from Merrill Lynch to the Papases' and Gatzaroses' bank accounts.

[6] In an order entered on June 13, 2008 in the main Chapter 11 case (Case No. 08-53104, Dkt. 114), these several bankruptcies were consolidated for procedural purposes only and became jointly administered. In an order entered on April 22, 2010 in the main Chapter 11 case (Dkt. 2279), the Court granted the Official Committee of Unsecured Creditors ("Committee") authority to pursue bond avoidance claims on behalf of Holdings. In accordance with that order, the Committee initiated this adversary proceeding on May 28, 2010. Through a consent order entered in this adversary proceeding on August 14, 2010 (Adv. Pro. No. 10-05712, Dkt. 64), Buchwald Capital Advisors, LLC, solely in its capacity as Litigation Trustee for The Greektown Litigation Trust, substituted in for the Committee, and thereafter has prosecuted this action.

## SUMMARY JUDGMENT STANDARD AND INITIAL PROCEDURAL ISSUE

Fed.R.Civ.P. 56 provides the statutory basis for summary judgment, and is made applicable to adversary proceedings via Fed.R.Bankr.P. 7056. "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." Kalamazoo River Study Group v. Rockwell Intern. Corp., 171 F.3d 1065, 1068 (6th Cir. 1999) (internal citation omitted). The Court should draw all justifiable inferences in favor of the non-moving party and it should not determine credibility or weigh evidence. *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis original). "There is no genuine issue of material fact when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Williams v. Leatherwood, 258 Fed. Appx. 817, 820 (6th Cir. 2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Initially, Plaintiff argues that Defendants have not complied with the procedural requirements of Fed.R.Civ.P. 56 because Defendants denied or failed to admit certain counts in Plaintiff's complaint, but thereafter relied on the substantive facts alleged in those counts and submitted exhibits that actually lend support to those allegations. Complaint, Dkt. 1 and Answer, Dkt. 10, ¶¶ 32, 37, 42, 46-48, 56. That includes critical (and presently undisputed) assertions such as Holdings having made the indicated monetary transfers to Defendants, which Defendants originally denied in their answer. Id. at ¶ 42. As such, Plaintiff argues there are no undisputed facts upon which Defendants can move

7

for summary judgment. Defendants' answer included the pertinent § 546(e) "safe harbor" defense. Affirmative Defenses, Dkt. 10, ¶ 26. Defendants' initial answers, to an extent, do appear inconsistent with Defendants' subsequent summary judgment arguments and their attached exhibits (some of which were also attached to Plaintiff's briefs). However, Fed.R.Civ.P. 8(e), which is made applicable here by Fed.R.Bankr.P. 7008(a), provides that "[p]leadings must be construed so as to do justice." As stated, for the purposes of this Motion, the Court should consider the record as a whole. Neither party now contests the authenticity of any exhibit or disputes the occurrence or essential details of the transactions evidenced thereby. There are no genuine disputes as to any material facts, only as to how those facts should be construed and their legal consequences. The Court therefore finds that the result of any inconsistency in Defendants' pleadings is that those initial denials and failures to admit contained in Defendants' answer have been subsequently and effectively waived or abandoned. That is the reasonable and proper reading of the pleadings given the nature and posture of this matter. The Court is therefore deciding the matter on the merits.

## DISCUSSION

The pertinent statute, § 546(e), provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

8

(emphasis added). Congress enacted § 546(e) in order to preempt a ripple effect in the commodities and securities markets in the event of a major bankruptcy. <u>Kaiser Steel Corp. v. Charles Schwab & Co.</u>, 913 F.2d 846, 849 (10th Cir. 1990). Defendants argue they are entitled to summary judgment because § 546(e) (based on the emphasized relevant portions of its above-quoted text) precludes Plaintiff's avoidance action because the Wire Payments qualify as (a) a transfer that is a settlement payment made by or to a financial institution and/or (b) a transfer made by or to a financial institution in connection with a securities contract. The establishment of either would warrant granting Defendants' summary judgment motion.

## I. "A Transfer that is a Settlement Payment Made by or to a Financial Institution"

### A. Were the Wire Payments a "Settlement Payment"?

Section 741(8) provides that "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade[.]" While one court bluntly described this definition as "completely unhelpful," <u>Crescent Resources Litig. Trust v. Duke Energy Corp.</u>, 500 B.R. 464 (W.D. Tex. 2013), the Sixth Circuit Court of Appeals has opined that although the definition is somewhat circular, it is nevertheless extremely broad. <u>In re QSI Holdings, Inc.</u>, 571 F.3d 545, 549 (6th Cir. 2009). In that connection and with respect to how that phrase should be interpreted, there are several guiding authorities. "[T]he term 'settlement payment,' as used therein, encompasses most transfers of money or securities made to complete a securities transaction." <u>Contemporary Indus. Corp. v. Frost</u>, 564 F.3d 981, 986 (8th Cir. 2009) (cited favorably by <u>QSI Holdings</u>, 571 F.3d at 549). "In the securities industry, a settlement payment is generally the transfer of money or securities made to complete a securities transaction." <u>Resorts</u>

Intern., Inc. v. Lowenschuss, 181 F.3d 505, 515 (3d Cir. 1999) (cited favorably by QSI Holdings, 571 F.3d at 549). "Section 546(e) merely requires a payment be made to complete a securities transaction, it does not limit payment or receipt to particular parties to a multiparty transaction." Crescent Resources, 500 B.R. at 474. The transfer of money and securities need not be simultaneous if its fundamental character is that of a securities transaction. In re Quebecor World (USA) Inc., 453 B.R. 201, 205-206 (Bankr. S.D.N.Y. 2011) (payments made weeks or months before some notes were delivered).

In the context of defining a "settlement payment," "security" or "securities" is defined by § 101(49) to include a note, stock, or other claim or interest commonly known as "security." The Sixth Circuit has held that § 546(e) also applies to privately held securities, including those involved in a leveraged buyout, and in the course of doing so stated "[w]hen construing a statute we look first to its text. Where that language is plain, 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" QSI Holdings, 571 F.3d at 549-50 (quoting Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004). In other cases, parties have argued that privately and/or closely-held securities do not present the same systemic risk to the securities market and, for legislative intent or policy reasons, they should not be granted safe harbor under § 546(e). This Court feels it inappropriate to go beyond the plain and unambiguous language of the statute and, in so doing, agrees with yet other courts who have similarly opined, to wit:

> The district court came to different conclusions based not on the text of § 546(e) but on policy grounds, concluding that Congress could not have intended the safe harbor provisions to apply to the circumstances of this case… We understand the district court's powerful and equitable purpose, but its reasoning runs directly contrary to the broad language of § 546(e)… We also do not see any persuasive reason to depart from the deliberately broad text of § 546(e).

10

Grede v. FCStone, LLC, 746 F.3d 244, 253 (7th Cir. 2014); U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc., 892 F. Supp. 2d 805, 816 (N.D. Tex. 2012) ("The plaintiff also insists that Congress did not intend for Section 546(e) to apply to the transfers in this case… However, many courts have expressed reluctance to create an extra-textual exception to Section 546(e)."). So preliminarily, it must be concluded for purposes of this decision that the Senior Notes, because they are in fact notes, must be considered securities and the 2005 Transaction must be considered a securities transaction. The Court does not rely on or give dispositive weight to the fact that the Note Purchase Agreement refers to the Senior Notes as "the Securities."

Defendants argue that the Wire Payments made to them by Holdings were "settlement payments" relative to the 2005 Transaction. The starting point of the analysis is the language of § 546(e), and because the term "settlement payment" has been interpreted to be extremely broad, Defendants' position is that the Wire Payments were settlement payments because they were transfers of money made to effectuate and complete the Senior Note transaction.

   i.   *Plaintiff's View of the 2005 Transaction as it Relates to the "Settlement Payment" Issue*

Plaintiff's primary argument is that the Wire Payments cannot be a "settlement payment" relative to a securities transaction because the complex multi-step 2005 Transaction should not be viewed as a single, integrated transaction, but rather one that must be broken down or separated into its components, and thusly evaluated. Plaintiff argues that just because a securities transaction is identified somewhere in a complex multi-step process, that does not transform every associated component or aspect transaction into a settlement payment relative to the securities transaction. Plaintiff notes that § 546(e) states that "the trustee may not avoid a *transfer*" (in the singular form) and not to a set of transfers or an overall transaction. The Court concludes that the exchange of the

Senior Notes and money between Holdings and Merrill Lynch was a settlement payment because it was a direct exchange of money and securities. But Plaintiff would have this Court separately analyze *that* part of the total transaction from the part where Holdings thereafter made the Wire Payments to Defendants using that same money from the Senior Note issuance. Plaintiff thus argues that, considered separately, the Wire Payments were not settlement payments, but rather were dividends or gifts that Holdings made without receiving any consideration, and therefore, as such, are not granted safe harbor under § 546(e).[7] Plaintiff's asserted view of the 2005 Transaction requires this Court to engage in a dual analysis as to (a) whether the Wire Payments should be analyzed separately from the overall transaction; and (b) whether the Wire Payments were in fact dividends or gifts, rather than settlement payments. Those two inquiries are interdependent and, lest there be any doubt, the outcome of this Opinion would be the same regardless of the order in which the Court analyzes those two inquiries.

  ii.   *The Wire Payments Were Not Dividends or Gifts, But Rather Were Settlement Payments*

   Plaintiff argues that the Wire Payments to Defendants were either (a) dividends that Holdings transferred to its parent entities, Monroe and Kewadin, and which Monroe and Kewadin paid to Defendants; or (b) "naked gifts" that Holdings directly made to Defendants. In either case, Plaintiff argues the Wire Payments made to Defendants were without any consideration. The focus of this analysis is whether the Wire Payments were indeed gratuitous transfers for no consideration, or were or involved exchanges of consideration. Generally, a "dividend" is a distribution of the net income

---

[7] See In re Global Crossing, Ltd., 385 B.R. 52 n.1 (Bankr. S.D.N.Y. 2008) (citing Weinman v. Fidelity Capital Appreciation Fund, 198 B.R. 352, 360 (Bankr. D. Colo. 1996) and opining that Congress did not broaden § 546(e) to include an exemption for payment of dividends).

of a corporation to its shareholders in proportion to their holdings. Allied Supermarkets, Inc. v. Grocer's Dairy Co., 45 Mich. App. 310, 314 (1973), aff'd 391 Mich. 729 (1974). "Gift" means "something given voluntarily without payment in return[.]" Sands Appliance Servs., Inc. v. Wilson, 463 Mich. 231, 241 (2000) (citing Random House Webster's College Dictionary). Black's Law Dictionary (9th ed. 2009) defines "gratuitous" to mean "[d]one or performed without obligation to do so; given without consideration in circumstances that do not otherwise impose a duty[.]"

The Court has no dispute with Plaintiff's argument that a traditional corporation-to-shareholder dividend may not be a "settlement payment" within the plain meaning of § 546(e) because it is a one-way distribution that occurs without commensurate consideration. See Weinman v. Fidelity Capital Appreciation Fund, 198 B.R. 352 (Bankr. D. Colo. 1996) (parent company's distribution of subsidiary's stock to parent company's shareholders was not a settlement payment because there was no exchange and no consideration). In a § 546(e) inquiry, it is irrelevant whether or not the consideration is reasonably equivalent. Crescent Resources, 500 B.R. at 475 n.4 (citing In re Lancelot Investors Fund, L.P., 467 B.R. 643, 655 (Bankr. N.D. Ill. 2012) ("The problem for the Trustee is that Congress decided to protect constructive fraudulent transfers, transfers where the consideration is not reasonably equivalent."), aff'd sub nom. Peterson v. Somers Dublin Ltd., 729 F.3d 741 (7th Cir. 2013). Similarly, Michigan contract law generally defines "consideration" to be a bargained-for exchange of a benefit or detriment, irrespective of the adequacy of that consideration. Gen. Motors Corp. v. Dep't of Treasury, Revenue Div., 466 Mich. 231, 238-41 (2002).

Plaintiff repeatedly stresses that Holdings had absolutely no obligation to pay Defendants and thus the Wire Payments were "gratuitous dividends" that Holdings made, not for its own benefit, but for the benefit of (and at the request of) its parent entities, Monroe and Kewadin. While Holdings

13

may have afforded a favor to the parent entities who brought it into this world, the Wire Payments Holdings made were not gratuitous because Holdings received consideration in exchange. The 2005 Transaction was for all intents and purposes akin to a novation, which Black's Law Dictionary (9th ed. 2009) defines as:

> 1. The act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party. A novation may substitute (1) a new obligation between the same parties, (2) a new debtor, or (3) a new creditor.

> 2. A contract that (1) immediately discharges either a previous contractual duty or a duty to make compensation, (2) creates a new contractual duty, and (3) includes as a party one who neither owed the previous duty nor was entitled to its performance.

Under Michigan law, a novation requires "(1) parties capable of contracting; (2) a valid obligation to be displaced; (3) the consent of all parties to the substitution based upon sufficient consideration; (4) the extinction of the old obligation and the creation of a valid new one." Perry Drug Stores v. CSK Auto Corp., 93 Fed. Appx. 677, 681 (6th Cir. 2003) (citations omitted). This novation analogy is a helpful tool for identifying and mapping the flow of consideration and addressing Plaintiff's arguments, although it is not required or dispositive here, and although no party explicitly made such analogy.

As part and parcel of the 2005 Transaction, there existed a clear triangular exchange of benefits and burdens, each aspect being reciprocal and supported by consideration. Holdings, although not bound to do so, voluntarily and by the consent of all the involved parties, undertook the obligation to settle and assume Monroe and Kewadin's prior obligations to Defendants using the Senior Notes proceeds. In exchange for undertaking this burden, Holdings benefitted by obtaining from Monroe and Kewadin a 100% interest in Greektown Casino, which constitutes consideration that Holdings

14

received. Although Monroe and Kewadin surrendered to Holdings their direct ownership interests in Greektown Casino, they benefitted by being relieved of their obligations to pay Defendants on the debts from the 2000 Redemption. Defendants settled the installment amounts owing to them and benefitted by being paid immediately.

Plaintiff, in defending its theories, accuses Defendants of "disregarding corporate formalities," noting that the Wire Payments were not made by Monroe and Kewadin, the parties that originally owed Defendants the money stemming from the 2000 Redemption (an agreement that had long since closed, but for the installment payments still due), but rather were made by Holdings, a newly created entity that owed Defendants no obligations whatsoever. This argument fails for the same reason. If Holdings had no obligation to pay Defendants for such debts, but it voluntarily undertook that obligation by shared agreement and with all parties receiving consideration, then there is no serious argument that the Wire Payments were gratuitous or lacked consideration. On the contrary, one might argue that Plaintiff is itself disregarding corporate formalities by failing to appreciate the indicated consideration that Holdings received as part of the 2005 Transaction.

Plaintiff also argues that nothing was directly exchanged between Holdings and Defendants. However, such is not a requirement in the settlement payment analysis and does not support Plaintiff's dividend theory because Holdings otherwise received consideration for the Wire Payments. Section 546(e) states no requirement as to the identity of the transferor or transferee of the settlement payment. Crescent Resources, 500 B.R. at 474 ("Section 546(e) merely requires a payment be made to "complete" a securities transaction, it does not limit payment or receipt to particular parties to a multiparty transaction.").

The Court is not persuaded by Plaintiff's argument that the Wire Payments to Defendants were

15

gratuitous because they were dividends that Holdings transferred to its parent entities, Monroe and Kewadin, and which Monroe and Kewadin paid to Defendants. Even accepting that a traditional corporation-to-shareholder dividend is a gratuitous transfer lacking consideration, such a transfer loses that gratuitous character when it is actually exchanged for consideration. Thus, even if the funds would have been gratuitous in the sense that they would have been a one-way transfer from Holdings to its parent entities, the funds perforce ceased to be gratuitous when exchanged in the above-described triangular exchange of consideration for value. Plaintiff's "naked gift" theory fails for similar reasons because Holdings' purported "gift" was exchanged for or involved consideration.

It is not of decisive importance either that certain documents such as the Offering Memorandum referred to the Wire Payments as "dividends" or, if true, that Holdings may have accounted for the Wire Payments on its books as "dividends" to Monroe and Kewadin. Other courts have so opined and concluded, specifically:

> The nomenclature of the Board of Directors did not determine the essence or nature of the action taken. Calling it a dividend did not make it so. The qualities and properties of a thing define and mark it. The name applied is no part of the thing itself and should not influence a court in classifying it. And book entries are merely evidentiary, not conclusive of the nature of the action taken.

Inland Dev. Co. v. Comm'r of Internal Revenue, 120 F.2d 986, 989 (10th Cir. 1941) (citations omitted); Crescent Resources, 500 B.R. at 473 ("But Duke's accounting tactics do not alter the nature of the 'securities transaction' described by the Formation and Sale Agreement.").

Plaintiff also argues that the 2005 Transaction was not a settlement payment because it simply amounted to a repayment of an existing debt.[8] That argument is simply not persuasive. In the 2000

---

[8] Plaintiff's argument relied primarily on Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651 F.3d 329, 337 (2d Cir. 2011).

Redemption, Defendants gave up their membership interests in Monroe in exchange for installment payments. The 2000 Redemption had been consummated and what remained to be done was for Monroe and Kewadin to make the required installment payments. The 2005 Transaction was designed to restructure and to (at least partially) pay such existing debts. The pertinent focus required by the plain language of § 546(e) relates to *the means* by which the 2005 Transaction accomplished this end, i.e. whether or not it was accomplished by a settlement payment, and its language is sufficiently unambiguous to preclude inquiry into its intent or purpose. The totality of the undisputed record therefore supports a finding that Defendants have met their summary judgment burden that the Wire Payments were not dividends, and were settlement payments because they were transfers of money made to complete the 2005 Transaction, which was a securities transaction.

iii.  *Should or Should Not the 2005 Transaction be Separated into its Components and Evaluated on that Basis?*

Relevant to the analysis, though not necessarily decisive to the result, is the extent to which, for § 546(e) purposes at least, one views the 2005 Transaction as either (a) an integrated, related, or whole transaction; or (b) a series of component but separately evaluable transactions or events. Plaintiff argues that the Court should deconstruct or bifurcate the 2005 Transaction. Thus, rather than viewing it as the above-described triangular exchange, Plaintiff would have the Court view it as a binary exchange in which (a) Monroe and Kewadin gave their respective 50% ownership interests in Greektown Casino to Holdings; and (b) Holdings gave ownership interests in itself to Monroe and Kewadin. Plaintiff thus argues that the Wire Payments made to Defendants were detached from any form of reciprocal exchange, and thus outside the definition of "settlement payment."

17

This argument in essence invokes the step transaction doctrine, which is a judicial doctrine that has been traditionally applied in the tax context, has been also applied to fraudulent transfers, corporate governance, and contract interpretation. It is substantially discussed in Brown v. United States, 782 F.2d 559 (6th Cir. 1986) and In re Big V Holding Corp., 267 B.R. 71 (Bankr. D. Del. 2001). "Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." Big V Holding Corp., 267 B.R. at 92 (quoting Commissioner v. Clark, 489 U.S. 726, 738 (1989)); see Brown, 782 at 564. Considering that doctrine is helpful in addressing Plaintiff's argument regarding deconstructing the 2005 Transaction into its separate components.

Courts have developed three tests for determining whether to apply the step transaction doctrine. First, is the end result test, which is the most common and provides: "[i]f a series of closely related steps in a transaction are merely the means to reach a particular result, the court will not separate those steps, but instead treat them as a single transaction." Big V Holding, 267 B.R. at 92; Brown, 782 F.2d at 563-64. Second, the interdependence test requires an inquiry as to whether, on a reasonable interpretation of objective facts, the steps are so interdependent that the legal relations created by one transaction would be fruitless without a completion of the series of transactions. Big V Holding, 267 B.R. at 92-93; Brown, 782 at 564. The most restrictive and least utilized test is the binding commitment test, which requires the court to make an objective determination as to, when the first step was conducted, whether there was a binding legal commitment to conduct the later steps. Big V Holding, 267 B.R. at 93; Brown, 782 F.2d at 564.

The Court concludes that all three of the "step transaction" tests weigh strongly against Plaintiff's argument. This is further evidenced by the various transactional documents previously

18

discussed in greater detail. The Offering Memorandum specifically indicated that the Senior Note proceeds will be used to make distributions to Defendants in satisfaction of the agreed-upon discounted installment payments. The Note Purchase Agreement included a covenant providing that Holdings will use the Senior Notes proceeds as specified in the Offering Memorandum's "Use of Proceeds" section. As noted, the Flow of Funds Memorandum provides that "[e]ach of the following transactions shall be deemed to have occurred simultaneously" and goes on to describe, among other things, (a) Holdings receiving approximately $182 million pursuant to the terms of the Note Purchase Agreement; and (b) ultimately, the Papases receiving from those proceeds approximately $90 million and the Gatzaroses approximately $55 million.

Additionally, when seeking the approval of the MGCB to enter into the 2005 Transaction, counsel for Greektown Casino and Holdings explained the contemplated proposal, including the issuance of the Senior Notes and the intended purposes of the proceeds. Specifically, a "Request for Approval of Permanent Financing" letter to the MGCB dated October 26, 2005 stated:

> The sources and uses of the funds to be received by [Holdings] pursuant to the issuance of the [Senior] Notes are as follows. Please note that the proceeds from the Senior Notes (for which Greektown [Casino] is not liable), rather than the proceeds from the New Credit Agreement, will be used to satisfy the redemption obligations to the Papases and the Gatzaroses. Under the proposed Financing Arrangements, the direct and indirect owners of Greektown [Casino] are merely replacing the obligations to the Papases and Gatzaroses with obligations to a set of institutional investors, with no direct recourse against Greektown [Casino].

Dkt. 278 Ex. B at 6 (emphasis removed). The letter then stated that proceeds from the Senior Note issuance will be used, among other things, to make payments to the Papases and Gatzaroses of approximately $93 million and $60 million, respectively. Id. On November 15, 2005, the MGCB issued a written order approving the 2005 Transaction and providing:

Additionally, [Merrill Lynch] has agreed to purchase $185 million in senior unsecured subordinated notes (Senior Notes) issued by [Holdings] and Greektown Holdings II…. The Senior Notes, described in the offering memorandum as the "$185,000,000 [Holdings], Greektown Holdings II, Inc., __% Senior Notes due 2013," will be used to provide cash on the balance sheet, to make certain payments to former and current members of [Monroe] to reimburse the Sault Ste. Marie Tribe of Chippewa Indians (Sault Tribe) for payments recently made to former members of [Monroe], and to pay financing fees and transaction expenses.

[Merrill Lynch] has agreed to serve as Initial Purchaser of the Senior Notes. [Merrill Lynch] intends to resell the notes to qualified institutional buyers[.]

Dkt. 266 Ex.5-B at 2-3 (footnote omitted). It required that Greektown Casino and Holdings only use the obtained funds as described in the "Request for Approval of Permanent Financing" letter. Id. at 6. It further provided that if Defendants were not paid for whatever reason, then the Sault Ste. Marie Tribe of Chippewa Indians, which was Kewadin's ultimate parent entity, must pay Defendants within 30 days. Id. at 7. Otherwise, the MGCB's "Sale Transaction process" would be triggered, whereby the casino would be effectively sold in bulk subject to the MGCB's approval, or otherwise the MGCB would pursue conservatorship proceedings pursuant to Mich. Comp. Laws § 432.224. Id. at 7, 9.

What must be concluded from these undisputed occurrences is that the Senior Note transaction, from its inception, was principally intended to restructure and pay Monroe and Kewadin's debts owed to Defendants. Whether viewed subjectively or objectively, the Wire Payments to Defendants were a, if not the, primary contemplated end result of the Senior Note securities transaction and a predominant and inextricable aspect thereof. In a sense, the Wire Payments made to Defendants were more or less the 2005 Transaction's *raison d'être*, and no other component would have been contemplated or would have occurred without the Wire Payments. As to the binding commitment test, Plaintiff argues that Defendants were not parties to the Note Purchase Agreement, which, as

20

noted, provided that the Senior Note proceeds be used to make the Wire Payments. Because the first step in the 2005 Transaction was the exchange of the Senior Notes and money between Holdings and Merrill Lynch, the relevant focus should be on whether that step created a legal obligation on Holdings to use that money to make the Wire Payments. The source of the obligation and the identity of the obligor are of minor relevance at best, and in any event serve only as non-dispositive contextual facts. It is clear that Holdings was legally obligated to use the proceeds as stated, lest it be in breach of its obligations to the noteholders or in violation of the MGCB's order. Insofar as Plaintiff argued that such obligations were always subject to amendment and without Defendants' consent, that argument is irrelevant because the perspective of the Court's analysis (which is confirmed by the binding commitment test) is when the first step of the transaction occurs, not at some later hypothetical date and under different hypothetical circumstances. Even this stringent and infrequently utilized test weighs strongly against Plaintiff's deconstruction/bifurcation argument.

The Court is therefore not persuaded by Plaintiff's arguments, which do not serve to raise any genuine issues of material fact. The Court's opinion should not be seen as formally merging or amalgamating separate component transactions, but rather as simply and appropriately seeing them as components of as a single whole.

### iv. *Discussion of Case Law Relied on by the Parties*

Plaintiff relies upon In re Qimonda Richmond, LLC, 467 B.R. 318 (Bankr. D. Del. 2012), which was based upon the following facts. The debtors borrowed money by issuing bonds, pursuant to an indenture. In order for the debtors to collateralize their obligation to pay the bondholders, the debtors' bank, Citibank, issued a letter of credit in favor of the indenture trustee. In exchange, the debtors agreed to reimburse Citibank if the letter of credit was drawn upon and gave Citibank liens

on certain assets. Citibank then decided it would not renew the letter of credit, a decision that entitled the indenture trustee to draw upon the letter of credit. The debtors directed the indenture trustee to redeem the bonds and the debtors deposited money into their Citibank account for various purposes, including to satisfy their obligation to reimburse Citibank under the letter of credit. Citibank debited from this account and transferred money to the indenture trustee, who retired the bonds. The litigation trustee sought to avoid as preferences two transfers made by the debtors to Citibank: (a) the debtors' deposit of funds into the Citibank account, which gave Citibank a security interest in favor of such funds; and (b) the debit of those funds by Citibank from the debtors' account. Citibank argued that these transfers are subject to safe harbor under § 546(e) and moved to dismiss the complaint. The Court agreed with the litigation trustee and opined:

> The Court agrees that Citibank has failed to establish that the Deposit and Debit are settlement payments protected by section 546(e). The instant case is easily distinguishable from Quebecor [453 B.R. 201 (Bankr. S.D.N.Y. 2011)] where the only purpose of the transfer was to complete a securities transaction and there was no other independent obligation between the debtor and the financial institution. Here the Debtors made the payments to Citibank to fulfill an obligation independent from any securities transaction. The Debtors paid Citibank in order to collateralize Citibank's exposure under the [letter of credit]. This transaction is separate and discrete from any payment of the Bonds. Further, Citibank has not proven that payment on a letter of credit is considered a settlement payment in the securities industry or is a commonly used payment structure in a securities transaction. The payment of a letter of credit is specifically excluded from the definition of a security and thus any payment on a letter of credit cannot comprise a settlement payment. 11 U.S.C. § 101(49)(B)(i).

Id. at 322-23 (internal citations omitted). That court's analysis parallels the end result and interdependence tests of the step transaction doctrine. Qimonda is distinguishable from the present case because, here, there is no separate and independent non-security obligation, such as a letter of credit, that can be appropriately isolated from the securities transaction.

Plaintiff also relies on In re Mervyn's Holdings, LLC, 426 B.R. 488 (Bankr. D. Del. 2010). There, Target owned the debtor, and decided to sell its interests in the debtor. Target entered into an agreement with a group of private equity firms ("PE Sponsors"), who formed Mervyn's Holdings. In order to spin-off the debtor's valuable real estate assets from the debtor, the PE Sponsors formed MDS Companies. The agreement between Target and the PE Sponsors required Target to convey its 100% ownership interest in the debtor to Mervyn's Holdings in exchange for $1.175 billion. In order to fund the transaction, the PE Sponsors and Mervyn's Holdings borrowed using the debtor's real estate as collateral. The debtor received no residual interest in its own real estate and Target obtained all or substantially all of the loan proceeds. Mervyn's Holdings leased the real estate back to the debtor at substantially higher rates. The debtor alleged that Mervyn's Holdings engaged in a fraudulent transfer and sued to avoid the sums Target received as part of the overall transaction. Target moved for summary judgment but failed to persuade the court that §546(e) applies to the transfers it received. The Court opined:

> Second, although "settlement payments" include non-publicly traded securities, section 546(e) does not apply to the other transactions surrounding the sale because they do not fall within the section 741 definition of "settlement payment." The Court firmly believes that because of the multiple conveyances made surrounding the 2004 Sale, section 546(e) does not apply. Target's attempt to have this Court apply section 546(e) to a single conveyance within the entire transaction is not persuasive. In the Motion, Target represents to the Court that the 2004 Sale involved only transferring the loan proceeds from MDS to Target. Target fails to recognize that this was only one part of the 2004 Sale. The other transactions to this sale do not fall within the parameters of section 546(e). For instance, when Debtor transferred its real estate assets to MDS for virtually no consideration, this was not a conveyance of a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment or any other similar payment commonly used in the securities trade." The conveyance was conditioned on the subsequent transaction of MDS securitizing the real estate assets to obtain financing.

Id. at 500. That court's opinion parallels the end result and interdependence tests of the step transaction doctrine. Mervyn's is distinguishable on the grounds that the transfer of real estate to MDS Companies was "for virtually no consideration," whereas here the Court concludes that the Wire Payments that Holdings made to Defendants were supported by consideration.

Plaintiff also cites Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC), 470 B.R. 289 (D. Del. 2012). There, certain private equity parties owned a controlling stake in Orchard Brands. Orchard Brands wholly owned other debtor corporations further down its corporate structure. The private equity parties wished to have Orchard Brands merge with a company called Blair in a leveraged buyout and, to that end, needed to pay Blair's shareholders for their shares. The private equity parties borrowed $158 million using Blair's assets as security, but also included within that transaction another component: a dividend recapitalization that would allow certain private equity parties to realize an immediate return on investment without selling their equity stake. The private equity parties acquired approximately $650 million in this borrowing and used $158 million to buy out Blair's shareholders, $138 million to pay off existing debt, $310 million as the indicated dividend, and relatively small sums to pay transaction and financing fees. Haband, a wholly owned subsidiary of Orchard Brands (and later a co-debtor) paid this dividend up the corporate ladder and ultimately to the private equity parties, though the intermediary transfers between the rungs happened only on paper. Ultimately, the debtors filed for bankruptcy and the litigation trustee claimed that the $310 million dividend to the private equity partners was avoidable as a fraudulent transfer. The Court found § 546(e) inapplicable and denied a motion to dismiss the complaint, opining:

> Although the Third Circuit has held that a payment for shares during a leveraged buyout is a settlement payment, see Lowenschuss v. Resorts Int'l, Inc. (In re Resorts

24

Int'l, Inc.), 181 F.3d 505, 515–16 (3d Cir.1999), those transactions involved security exchanges. The necessary implication is that both parties exchanged some value.

Here, by contrast, the dividend transaction was not an exchange, but a one-way payment. See Black's Law Dictionary 547 (9th ed. 2009). As alleged, Debtors received nothing in exchange for the dividend. While the Blair leveraged buyout may fall within the meaning of a settlement payment, the Blair acquisition cannot be conflated with the payment of the dividend. In other words, even if § 546(e) were to apply to the Blair acquisition in this multifaceted transaction, the dividend would not automatically be exempt as well. See Mervyn's LLC v. Lubert–Adler Group IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 500 (Bankr.D.Del.2010) (Defendant's "attempt to have this Court apply section 546(e) to a single conveyance within the entire transaction is not persuasive ... The other transactions to this sale do not fall within the parameters of section 546(e).").

470 B.R. at 302 (footnote omitted). The Court is not persuaded by Plaintiff's reliance on this case. The dividend paid to the private equity parties in Michaelson was clearly not exchanged for securities, unlike the Wire Payments made to Defendants. In Michaelson, some aspects of the overall transaction could be seen as a settlement payment (the exchange of $158 million for the Blair stock), whereas the separate $310 million dividend that, in a manner of speaking "sweetened the deal," was not part of the direct exchange. In the case at hand, the settlement payment and the purported "dividend" are one and the same (i.e. the "dividend" was not a separate and additional aspect, but was *itself* the commensurate consideration). The Michaelson court's holding was that what was more or less a "pure dividend" cannot itself constitute a settlement payment, even if it is combined with or concealed within an actual settlement payment. Unlike Holdings, Haband, the debtor entity that paid the purported one-way dividend, did not appear to receive consideration in exchange. Id. at 294-95.

Defendants rely on Crescent Resources, 500 B.R. 464, in which that court was presented with the following facts. Certain parent entities, collectively referred to as "Duke," wholly owned Crescent Resources. Duke entered into a transaction whereby it formed Crescent Holdings, transferred Crescent Resources to Crescent Holdings, and sold interests in Crescent Holdings to

25

investors. These transfers of ownership were coupled with substantial borrowing. Crescent Resources entered into a credit agreement and borrowed $1.225 billion. From that amount, Crescent Resources distributed $1.187 billion to Crescent Holdings, which was then distributed up the Duke corporate ladder to Duke's parent entity. Crescent Holdings, Crescent Resources, and various subsidiaries filed bankruptcy and sought to avoid the $1.187 billion transfer to Duke as a fraudulent transfer. The litigation trust asserted the § 546(e) defense, contending that the transfer should be viewed in isolation, and is thus a dividend rather than a settlement payment. The Court rejected that position and found that the transactional documents (a) listed the various exchanges in corporate ownership interests and (b) indicated that the $1.187 billion transfer would be distributed "simultaneously" with those securities transfers. Id. at 473. The court described the litigation trust's view of the transaction "myopic" and further opined:

> The Trust first argues there was no settlement payment made in this case because Crescent Resources simply made "[a] one-way distribution or dividend" to Duke and received nothing in return. In the Trust's view, the transfer of the bulk of the term loan proceeds to Duke was essentially a gift (or perhaps an extortion payment), not an exchange of value indicating the completion of any securities transaction.
> ***
> The first problem the Trust encounters is its own strained reading of the 2006 Duke Transaction. The Formation and Sale Agreement designed a large transaction involving multiple moving parts, but each part was to be moved before the transaction was considered closed.
> ***
> The Trust would have the Court ignore everything except the distribution of funds to Duke. Such a reading is contrary to the plain language of the painstakingly crafted contractual documents prepared by the parties. There is simply no factual basis for extracting a single aspect of the 2006 Duke Transaction and analyzing it divorced from its context and relationship to the actual transaction. If the distribution had not been made to Duke, the entire transaction would not have closed. If Duke had simply wanted to extract a payment from Crescent Resources unrelated to the transfers of ownership interests between the four parties to the transaction, it could have done so without adding the payment in as a part of the larger transaction.
> ***

26

By viewing the payment in context, Crescent's payment becomes a necessary transfer in the completion of the securities transaction described in the Formation and Sale Agreement.

Id. at 472-74. That court's opinion parallels the end result and interdependence tests of the step transaction doctrine. The court also criticized the decisions in Michaelson and Mervyn's as not providing any legal basis for bifurcating or deconstructing those transactions. Id. at 474. The applicable lesson from Crescent Resources is that, when there exists a more or less *quid pro quo* exchange, it is improper to view the *quo* in isolation. Plaintiff tries to do exactly that, focusing on one aspect of the triangular exchange of consideration, while ignoring the corresponding reciprocal aspects.

Defendants also rely on U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc., 892 F. Supp. 2d 805 (N.D. Tex. 2012), in which Verizon sought to "spin-off" IIS, its telephone directories business. Verizon created a holdings company called Idearc and transferred a 100% ownership interest in IIC to Idearc. In exchange, Idearc transferred to Verizon $7.15 billion in note debt, $2.4 billion in cash, and shares of Idearc's own stock. When Idearc filed bankruptcy, the litigation trustee sought to avoid the $2.4 billion transfer as a fraudulent transfer. Verizon asserted a § 546(e) defense and the court granted summary judgment to Verizon, opining:

> In this case, Section 546(e) bars the plaintiff from recovering the $2.4 billion in cash as a fraudulent transfer. First, the cash that Idearc paid to VFS [a Verizon defendant] at the time of the spin-off was a settlement payment, because it "completed a securities transaction." In the spin-off, Verizon gave Idearc the directories business, in the form of stock in Idearc Information Services, LLC ("IIS"), and in return Idearc gave Verizon cash, debt, and Idearc stock. This was a securities transaction, because the IIS stock, Idearc stock, and Idearc debt are all securities. *See* 11 U.S.C. § 101(49) (defining that the term "security" to include "note[s]," "stock[s]," and "bond[s]").

27

The court rejected the litigation trustee's argument that the transfers were merely "non-arm's-length intercompany transactions between Verizon and Idearc." That opinion adds little else new to the discussion, other than that the purpose or nature of an exchange and the identities of the transferor and transferee are irrelevant, as long as the transaction otherwise qualifies as a "settlement payment."

In sum, the Court concludes the Wire Payments were settlement payments. The foregoing analysis of the consideration Holdings received and a discussion of the aforementioned cases support this conclusion, and there exists no genuine issue of material fact or persuasive legal argument to the contrary, as might have precluded summary judgment on that issue.

## B. Were the Wire Payments "Made by or to a Financial Institution"?

There is no factual dispute that the Wire Payments were made by way of a wire transfer from Holdings (via its account with Merrill Lynch) to Defendants' respective bank accounts with Chase Manhattan Bank and Comerica Bank. Defendants argue that the "made by a financial institution" requirement is satisfied because Merrill Lynch is a "financial institution." Section 101(22)(A) defines "financial institution" to mean:

> a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer[.]

The "made by a financial institution" requirement has been interpreted literally:

> Here, the securities passed from Lowenschuss's broker, Merrill Lynch, to the transfer bank, Chase Manhattan. Resorts wired funds to Chase which Chase then forwarded them to Merrill Lynch who paid Lowenschuss. Although no clearing agency was

28

involved in this transfer, two financial institutions—Merrill Lynch and Chase—were. Under a literal reading of section 546, therefore, this was a settlement payment "made by ... a financial institution."

In re Resorts Intern., Inc., 181 F.3d at 515; Mervyn's, 426 B.R. at 499 ("So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'"). Both of these two cases were cited favorably by the Sixth Circuit in QSI Holdings, 571 F.3d at 551.

Defendants argue that, in addition to disbursing the Senior Note proceeds, Merrill Lynch also acted as the underwriter, initial purchaser, depository, and exchange agent of the Senior Notes. Defendants stress that the previously quoted Note Purchase Agreement and the Offering Memorandum, to which Merrill Lynch was a party, required that the Senior Note proceeds be used to pay Defendants.[9] Defendants also argue that federal law permits only banks to make wire transfers, citing In re Loranger Mfg. Corp., 324 B.R. 575, 585-86 (Bankr. W.D. Pa. 2005) (discussing 12 C.F.R. § 229.2(ll), which provides "Wire transfer means an unconditional order to a bank to pay…" and 12 C.F.R. § 229.2(e) which defines "bank"). Plaintiff argues that, notwithstanding the language of § 546(e), Merrill Lynch was not or should not be considered as acting as a "financial institution" in conducting the 2005 Transaction. Plaintiff admits that Merrill Lynch acted as a "financial institution" as defined by § 101(22)(A), but only with respect to its dealings with Holdings and *not* with respect to its disbursement of the Wire Payments to

---

[9] Defendants also argue that Merrill Lynch represented itself to the public as an "investment banking entity," enclosing what is described as Merrill Lynch's 2006 Annual Report. Dkt. 266, Ex. 5-E, pg. 64. Plaintiff objected to Defendants' reliance on this exhibit on the grounds that it is inadmissible hearsay. See Smoot v. United Transp. Union, 246 F.3d 633, 649 (6th Cir. 2001) (only admissible evidence may be considered in ruling on motion for summary judgment). Regardless of whether it is hearsay or not, any arguments based upon this exhibit are tangential, not dispositive, and do not weigh materially in this Court's analysis or conclusion.

Defendants.[10] Plaintiff argues that as soon as Merrill Lynch and Holdings exchanged the Senior Notes and the money, Merrill Lynch's role as a financial institution terminated. Plaintiff contends that, going forward from that point, Merrill Lynch was simply maintaining the money of its client (Holdings) in a client account and paying that money to whomever that client requested. Plaintiff contends that, just because the Wire Payments were *made from* Merrill Lynch, does not mean they were *made by* Merrill Lynch for the purposes of § 546(e). Plaintiff would have the Court disassociate (a) the aspect of the Senior Note transaction whereby Holdings obtained money; and (b) Holdings' explicitly contemplated, interrelated, and legally binding utilization of that money, i.e. to pay Defendants. This is a peculiar, strained, and somewhat metaphysical distinction that finds no support in the plain language of § 546(e), the indicated case law, or logic. Section 546(e) does not require (or even imply) the distinctions that Plaintiff wishes to have this Court make.

On this point, Defendants principally rely on QSI Holdings, a leveraged buyout case where the Sixth Circuit found that a bank acted as a "financial institution." 571 F.3d at 548. The bank had multiple roles, including receiving money from the acquiring entities, collecting the shares of the target entity from shareholders, transferring those shares to the acquiring entities, and distributing money and/or stock as settlement payments to the former shareholders of the target entity. Id. Plaintiff argues that QSI Holdings is distinguishable because the bank there was far less involved than Merrill Lynch was in the present case. That argument is unpersuasive because, even if a relatively higher degree of bank involvement was present in QSI Holdings and was deemed

---

[10] Although it is not factually clear whether the subject funds were transferred from Merrill Lynch itself, or by some bank account that a third party maintained on Merrill Lynch's behalf, this would not be relevant because, in any event, Merrill Lynch would be effectively and functionally "making" the transfers, either personally or through such third party agent, and would nevertheless satisfy the "making" requirement.

*sufficient* to meet the statutory standard, that does not mean such is a *necessary minimum* in this case. Section 546(e), what the Court reads is its plain language, would grant Defendants safe harbor if that settlement payment was "made by a financial institution." As such, the financial institution need not act in any particular role. The Wire Payments were indeed "made by" Merrill Lynch.

Plaintiff diminishes Merrill Lynch's role in making the Wire Payments as that of a mere conduit, relying on In re Munford, Inc., 98 F.3d 604 (11th Cir. 1996), which opined:

> True, a section 546(e) financial institution was presumptively involved in this transaction. But the bank here was nothing more than an intermediary or conduit. Funds were deposited with the bank and when the bank received the shares from the selling shareholders, it sent funds to them in exchange. The bank never acquired a beneficial interest in either the funds or the shares.

Id. at 610. However, this holding has been explicitly rejected by multiple Circuit Courts of Appeals, including the Sixth Circuit, and thus is neither applicable nor persuasive. QSI Holdings, 571 F.3d at 551 (6th Cir.); In re Resorts Int'l, Inc., 181 F.3d at 516 (3d Cir.); Contemporary Indus. Corp., 564 F.3d at 986–87 (8th Cir.); Quebecor, 719 F.3d 94, 98 (2d Cir. 2013) cert. denied, 134 S. Ct. 1278 (U.S. 2014).

Furthermore, although no party specifically made this argument, the Court also finds that, as an alternate and independent basis, the "financial institution" requirement may very well be satisfied by the identities of the entities to whom Merrill Lynch transferred the funds. As noted, § 546(e) applies to transfers "made by *or to* a financial institution" (emphasis added). There is no factual dispute that Merrill Lynch transferred the funds to Defendants' respective accounts with Chase Manhattan Bank and Comerica Bank. There would appear to be no genuine issue of material fact that these transferees each qualify as "an entity that is a commercial or savings bank" thus included in the

31

definition of "financial institution" stated in § 101(22)(A). <u>See</u> <u>In re Resorts Intern., Inc.</u>, 181 F.3d at 515 (finding that Chase Manhattan Bank was a financial institution for purposes of § 546(e)).

To conclude on this point, Defendants have met the necessary requirements of § 546(e) and have proven that Plaintiff cannot avoid the Wire Payments because they are settlement payments made by or to a financial institution.

## II.  "A Transfer that is Made by or to a Financial Institution in Connection with a Securities Contract"

Defendants assert as an alternate and independent basis for safe harbor under § 546(e) that the Wire Payments were "a transfer made by a financial institution in connection with a securities contract." Defendants argue that the Note Purchase Agreement is the relevant "securities contract." Section 741(7)(A) defines "securities contract," in relevant part, to include:

> (i) a contract for the purchase, sale, or loan of a security… a group or index of securities… or option on any of the foregoing, including an option to purchase or sell any such security…

> (v) any extension of credit for the clearance or settlement of securities transactions…

> (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

> (viii) any combination of the agreements or transactions referred to in this subparagraph[.]

Because the Court has previously concluded that the Senior Notes were "securities," the Note Purchase Agreement is thus a "securities contract" because it is a contract for the purchase and sale of securities. The Court has also previously concluded that the Wire Payments were "transfers made by or to a financial institution." Thus, the only remaining issue is whether the Wire Payments were "in connection with" the Note Purchase Agreement. Plaintiff concedes that the exchange of the

32

Senior Notes and money between Holdings and Merrill Lynch was "in connection with a securities contract," but argues that the Wire Payments to Defendants were not so in connection.

The Bankruptcy Code does not define the phrase "in connection with." Picard v. Flinn Invs., Inc., 463 B.R. 280, 285-86 (S.D.N.Y. 2011). However, that phrase has been interpreted very broadly:

> The "in connection with" requirement of section 546(e) does not contain any temporal or existential requirement that a transfer must be "in connection with" then-outstanding legal exposure. Indeed, section 546(e) does not include any language that refers either to exposure or timing. The formulation is quite simple: a transfer is safe-harbored if it is "in connection with" a securities contract. And the words "in connection with" are to be interpreted liberally.

In re Lehman Bros. Holdings Inc., 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) (internal citations omitted); see Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 2013 WL 1609154 *9 (S.D.N.Y. Apr. 15, 2013) ("in connection with" means "related to" and does not depend on the debtor's involvement in the securities contract); Quebecor, 480 B.R. at 479 n.8 ("After all, on its face, Section 546(e) requires only that the transfer be made 'in connection with a securities contract,'… it does not require that the transfer be made in connection with the purchase or sale itself."). Outside the bankruptcy context, the Sixth Circuit has held that the phrase "in connection with" means "related to." Morse/Diesel, Inc. v. Provident Life and Acc. Ins. Co., 166 F.3d 1214, *4 (6th Cir. 1998) (unpublished). Black's Law Dictionary (6th ed. 1990) defines "connection" to mean "[t]he state of being connected or joined; union by junction, by an intervening substance or medium, by dependence or relation, or by order in a series." "When construing a statute we look first to its text. Where that language is plain, 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" QSI Holdings, 571 F.3d at 549 (quoting Lamie, 540 U.S. at 534).

33

Plaintiff attempts to persuade this Court that "in connection with" should be interpreted narrowly, contending:

> The transfers at issue must have <u>as their sole purpose the completion of the securities contract</u> in order to qualify as being "in connection with" a securities contract. <u>See</u> <u>Qimonda</u>, 467 B.R. at 323 (transfer made in connection with letter of credit that was itself intended to credit enhance a bond was still not a transfer "in connection with a securities contract" as defined by section 741(7)). The transfers made by [Holdings] to the Papases and Gatzaroses were not made to complete the securities contract with Merrill Lynch, which contract had already been completed.

Br. Pl.'s Opp'n Mot. Summ. J. Dkt. 278 at 23 (emphasis added). Plaintiff thus reasons that there is no "connection" between the Wire Payments and the Note Purchase Agreement because (a) the "securities contract" was comprised of Holdings and Merrill Lynch exchanging the Senior Notes and money; (b) the "connection" must be solely to complete the securities contract; and (c) the securities contract was already completed by the time the Wire Payments to Defendants were made. The emphasized portion of the above quote is an integral part of Plaintiff's argument, but the Court finds that it has no meritorious basis. Neither the directed-to citation, the context from which it is taken, nor <u>Qimonda</u> as a whole, support that position. First, the <u>Qimonda</u> court did not find that a securities contract even existed, so it could not find that the transfer was "in connection with a securities contract." 467 B.R. at 323. Second, that court was dealing with separate issues that are not relevant in this case. Third, <u>Qimonda</u> was discussing <u>Quebecor</u>, whose use of the phrase "made to complete a securities transaction" was with regard to the "settlement payment" prong, not the "in connection with a securities contract" prong. <u>Qimonda</u>, 467 B.R. at 322-23 (citing <u>Quebecor</u>, 453 B.R. at 215). Fourth, even if that case did hold what Plaintiff contends it holds, this Court would simply not be persuaded by that proposition because it is plainly inconsistent with what this Court finds to be the

plain, unambiguous, and unmistakably broad language of § 546(e). Thus, § 546(e) requires a "connection" and nothing more.

As noted, the Wire Payments were described and contemplated in the Note Purchase Agreement as transfers that were to occur "concurrently" with the Senior Note transaction, and the Flow of Funds Memorandum deemed the several transactions to have occurred "simultaneously." Holdings was legally bound to use the Senior Note proceeds to pay Defendants. In other words, the "connection" not only existed, it was a thoroughly contemplated and mandatory connection. Thus, Defendants make a strong case that the Wire Payments were made "in connection with a securities contract."

To avoid that conclusion, Plaintiff first directs the Court to Section 14 of the Note Purchase Agreement, which provides that such agreement is for the sole and exclusive benefit of Holdings and the initial note purchasers (i.e. to the exclusion of Defendants). That is irrelevant because the pertinent inquiry does not require Defendants to have any sort of direct benefit in or privity to the securities contract, only that the transfer be "made in connection" with the securities contract. Even if the Wire Payments and the Note Purchase Agreement are viewed as formally separate or distinct, as Plaintiff argues, such does not preclude the existence of a connection or relation between the two.

As to Plaintiff's argument that the Wire Payments cannot be "in connection with" the Note Purchase Agreement because that securities transaction (Holdings and Merrill Lynch exchanging the Senior Notes and money) had already been concluded by the time Holdings made the Wire Payments using the Senior Note proceeds, Plaintiff cites no authority in support of this proposition and there is no legal or logical reason why something cannot be "in connection with" a recently concluded event.

Plaintiff also argued that the Wire Payments are actually only "in connection with" other agreements by which Defendants compromised their claims with Monroe and Kewadin and agreed to the payments to be made the following day. These other agreements, which Plaintiff argues are not securities contracts, were executed December 1, 2005, the day before the Wire Payments were made, and Holdings was not party to such agreements. Plaintiff's argument is meritless because a transfer can certainly be in connection with more than one thing. In re Casa de Cambio Majapara S.A. de C.V., 390 B.R. 595, 598 (Bankr. N.D. Ill. 2008) (discussing the similar provision of § 546(g), which provides "in connection with a swap agreement"). Insofar as Plaintiff argues that these other agreements might have severed the connection between the Wire Payments and the Note Purchase Agreement, the Court finds that argument legally and logically untenable, and thus unpersuasive.

The Wire Payments were transfers made by a financial institution in connection with a securities contract: the Note Purchase Agreement, and therefore there exists no genuine issue of material fact or persuasive legal argument to the contrary. Accordingly, Defendants are entitled to summary judgment on this basis and Plaintiff cannot avoid the Wire Payments.[11]

### CONCLUSION

The Court finds that Defendants have met their burden and their Motion for Summary Judgment (Dkt. 266) is granted. Defendants shall present an appropriate order.

---

[11] At various times, Defendants made some arguments that the Wire Payments are also safe harbored because *the 2000 Redemption* itself meets the elements of § 546(e). Given the Court's conclusions and the other facts, the Court will not opine on such arguments.

Signed on November 24, 2015

                                    _____
                                         /s/ Walter Shapero
                                    Walter Shapero
                                    United States Bankruptcy Judge