# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION – DETROIT

In re:

GREEKTOWN HOLDINGS, LLC, et al.,

          Debtors.

_____/

Case No. 08-53104
Chapter 11
Jointly Administered
Hon. Maria L. Oxholm

BUCHWALD CAPITAL ADVISORS, LLC, solely
in its capacity as Litigation Trustee to the
GREEKTOWN LITIGATION TRUST

          Plaintiff,

v.

DIMITRIOS ("JIM") PAPAS, VIOLA PAPAS,
TED GATZAROS, MARIA GATZAROS
BARDEN DEVELOPMENT, INC., LAC VIEUX
DESERT BAND OF LAKE SUPERIOR
INDIANS, SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS, KEWADIN CASINOS
GAMING AUTHORITY, and BARDEN
NEVADA GAMING, LLC,

          Defendants.

_____/

Adv. Proc. No. 10-05712

## OPINION DENYING DEFENDANTS DIMITRIOS ("JIM") PAPAS, VIOLA PAPAS, TED GATZAROS, AND MARIA GATZAROS' MOTION FOR SUMMARY JUDMGENT (ECF No. 266)

### I. INTRODUCTION

Before the Court is Defendants Dimitrios ("Jim") Papas, Viola Papas, Ted Gatzaros, and

Maria Gatzaros' ("Defendants," "Papases" or "Gatzaroses") Motion for Summary Judgment

pursuant to Federal Rule of Civil Procedure 56, made applicable pursuant to Federal Rule of

Bankruptcy Procedure 7056, arguing that there is no genuine issue of material fact that the safe

1

harbor provision of 11 U.S.C. § 546(e) bars this adversary complaint. Plaintiff Buchwald Capital Advisors LLC, solely in its capacity as Liquidating Trustee for the Greektown Litigation Trust, ("Plaintiff") filed this adversary proceeding seeking to avoid transfers from the debtor Greektown Holdings, LLC ("Holdings") to the Papases and Gatzaroses under 11 U.S.C. § 544 and to recover the transferred funds or the value of those funds from the Papases and Gatzaroses under 11 U.S.C. § 550. In this motion, Defendants assert that the transfers are protected from avoidance by the § 546(e) safe harbor provision. For the reasons that follow, the Court denies Defendants' motion for summary judgment.

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This adversary proceeding seeks to avoid and recover prepetition transfers as fraudulent and therefore is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(H).

## III. PROCEDURAL HISTORY

While this adversary proceeding has a lengthy history dating back to 2010, the Court will only focus on the procedural background as it relates to this motion. This motion was originally filed and argued before this Court's predecessor, the Honorable Walter Shapero (Retired), who granted Defendants' motion on November 24, 2015. [ECF No. 685]. In doing so, Judge Shapero made numerous findings based on then binding Sixth Circuit precedent, *In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009) (abrogated by *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S.Ct. 883 (2018)). The Court's opinion was affirmed by the District Court on January 24, 2018. [ECF No. 745]. Plaintiff subsequently appealed the decision to the Sixth Circuit. Pending appeal, the United States Supreme Court issued a decision in *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S.Ct. 883 (2018) that directly addresses the issues in this case. As a result,

on April 22, 2019, the Sixth Circuit issued an order vacating and remanding this case for reconsideration.[1] [ECF No. 748; Filed on May 8, 2019].

The parties have filed supplemental briefs addressing the motion in light of *Merit Management*. In their supplemental brief, Defendants maintain that this Court should not re-evaluate several of its earlier conclusions that were not implicated by *Merit Management* arguing that they are beyond the instructions of the Sixth Circuit's remand, and the law of the case doctrine dictates that they should not be disturbed. These conclusions include: (1) "a single component transfer of the 2005 Transaction cannot be isolated when conducting a Section 546(e) analysis: the transaction must be evaluated as an integrated whole"; (2) Merrill Lynch is a financial institution; (3) the challenged transfers were settlement payments; and (4) the challenged transfers were made in connection with a securities contract. [ECF No. 794, p.1].

Defendants raise three separate arguments in support of their summary judgment motion: (1) Judge Shapero already conducted the factual and legal analysis required by *Merit Management*, that the transaction must be viewed in its entirety; (2) the transfers were for the benefit of Merrill Lynch; and (3) Holdings is by 11 U.S.C. § 101(22)(A) deemed to be a "financial institution" because Merrill Lynch was acting as an agent or custodian for its customer Holdings in making the transfers.

---

[1] The Sixth Circuit's order provided as follows:

> On February 27, 2018, two weeks after this appeal was filed, the United States Supreme Court decided *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), and in the process resolved a circuit split over the correct interpretation of Section 546(e) of the Bankruptcy Code—the safe harbor provision at issue in this case. *Merit Management* squarely addresses the dispositive issue in this case and abrogated the Sixth Circuit precedent on which both the bankruptcy court and district court relied, *see In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009). Accordingly, we hereby vacate the district court's judgment and remand the case to the bankruptcy court for reconsideration in accordance with the Supreme Court's recent decision in *Merit Management*. *See In re Markowitz*, 190 F.3d 455, 458 (6th Cir. 1999).

[ECF No. 748].

In response, Plaintiff asserts that in addition to the Sixth Circuit's mandate to reconsider this case in light of *Merit Management*, this Court is free to examine the prior grant of summary judgment under one of the three exceptions to the "law of the case" doctrine, citing to *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006). Plaintiff first claims that defining the transfer at issue is directly implicated by *Merit Management*. Plaintiff next argues this Court should reconsider the following: (1) the transfers were not settlement payments; (2) the transfers were not made in connection with a securities contract; and (3) Merrill Lynch is not a financial institution. Finally, Plaintiff contends that Defendants fail to establish that Holdings meets the requirements of § 101(22)(A) to be deemed a "financial institution."

After a hearing on November 21, 2019, the parties filed post hearing briefs to clarify the different Merrill Lynch entities involved and their roles in the relevant transfers. The parties also analyzed the definition of a "financial institution" under § 101(22)(A) and whether Holdings, itself, qualifies as a "financial institution" by virtue of its status as a "customer" of Merrill Lynch. [ECF Nos. 782, 788, and 794].

### III. SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56, incorporated by Fed. R. Bankr. P. 7056 provides that

> summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2509–10 (1986). "[S]ubstantive law will identify which facts are material[,]" and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

10-05712-mlo    Doc 838    Filed 10/19/20    Entered 10/19/20 17:41:07    Page 4 of 61

summary judgment." *Id*. at 248, 106 S. Ct. at 2510.  Moreover, the disputed material fact must be "genuine."  *Id*.  "[A] material fact is 'genuine,' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id*.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2552. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at 324.  Thereafter, "the nonmoving party [has] to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."  *Id*.

## IV. ANALYSIS

### a. Findings of Fact

#### i. Predecessor's Findings

Before turning to *Merit Management* and the Sixth Circuit's order, it is important to understand this Court's predecessor's opinion granting Defendants' motion for summary judgment ("Opinion") [ECF No. 685]. A summary follows.

Significantly, in its Opinion, the court noted that "[n]either party . . . contests the authenticity of any exhibit or disputes the occurrence or essential details of the transactions evidenced thereby. There are no genuine disputes as to any material facts, only as to how those facts should be construed and their legal consequences." *Id*. at 8.

In terms of factual findings, defendants Papases and Gatzoroses collectively owned approximately 86% of the membership interests in Monroe Partners, LLC ("Monroe") who, in turn, owned a 50% interest in Greektown Casino, LLC ("Greektown Casino").[2] [ECF No. 685, p. 3]. The other 50% interest in Greektown Casino was owned by Kewadin Greektown Casino, LLC ("Kewadin"). *Id*.

On July 28, 2000, Defendants and Monroe entered into an agreement ("the 2005 Redemption") wherein "Monroe purchased and redeemed the membership interests . . . of Defendants in exchange for Monroe's agreement to pay Defendants specified future installment payments." *Id*. Contemporaneous to this agreement, "Kewadin became the owner of equivalent membership interests in Monroe and also obligated itself to make these installment payments" to Defendants. *Id*. The installment payments were made for some time. *Id*.

In 2005, the parties entered into a series of agreements ("the 2005 Transaction") that provided for a settlement and payment of the balances then owing to Defendants. *Id*. "The Papases agreed to a discounted payment in full of about $95 million, and the Gatzaroses agreed to a partial payment of about $55 million, leaving an outstanding balance of about $50 million." *Id*. Pursuant to the 2005 Transaction, "the source of the money to be used to pay Defendants the indicated sums would be obtained pursuant to a reorganization of Greektown Casino's corporate and financial structure." *Id*. Accordingly, "in September 2005, Monroe and Kewadin incorporated Greektown

---

[2] "Greektown Casino owned and operated a casino in downtown Detroit, Michigan." [ECF No. 685, p. 3].

Holdings, LLC ("Holdings"), with Monroe and Kewadin each owning a 50% interest in Holdings, and with each transferring to Holdings all of their interests in Greektown Casino." *Id*. at 3-4. "Aside from Greektown Casino, Holdings' only other asset was a wholly-owned subsidiary Greektown Holdings II, Inc." *Id*. at 4.

The Opinion also outlined the relevant events that took place as part of the 2005 Transaction. They are,

(a) Holdings issued approximately $182 million in unsecured senior notes ("Senior Notes") to be purchased by Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") pursuant to a Note Purchase Agreement;

(b) Merrill Lynch sold the Senior Notes to certain qualified institutional purchasers;

(c) The net proceeds from the indicated sale of the Senior Notes was used (primarily, but not solely) to make the agreed-upon payments to Defendants;

(d) On November 8, 2005, the Michigan Gaming Control Board (MGCB) approved by written order the transfer of Monroe and Kewadin's interests in Greektown Casino to Holdings. Dkt. 266 Ex. 5-A. Consummation of the 2005 Transaction required the MGCB's approval, as it is the Michigan state agency with jurisdiction over casino licensure and regulation. See Mich. Comp. Laws § 432.204(1); Mich. Admin. Code r. § 432.1509;

(e) On November 15, 2005, the MGCB also issued a written order approving the 2005 Transaction, including as a specific condition the referred-to payments to Defendants. Dkt. 266 Ex.5-B;

(f) On November 22, 2005, Holdings and Merrill Lynch issued an Offering Memorandum covering the Senior Notes. It specifically described the 2000 Redemption and further indicated that the proceeds of the offering would be distributed to effectuate the indicated and contemplated payments to Defendants (specifically, by way of a distribution to Monroe and Kewadin, which would then make distributions to Defendants). Dkt. 266, Ex. 5-C at 7. The Offering Memorandum's "Use of Proceeds" section indicated that "[c]oncurrently with the closing of the offering of the notes, [Holdings] will dividend" approximately $170 million to Monroe and Kewadin, which will use the funds to pay former members of Monroe (i.e. Defendants). Id. at 30. The November 22, 2005 Note Purchase Agreement between Merrill Lynch (on its own behalf and on behalf of the identified initial purchasers of the Senior Notes) and Holdings included a covenant providing that Holdings will use the net proceeds of the Senior Note sale as specified in the

7

referred-to Offering Memorandum's "Use of Proceeds" section. Dkt. 266, Ex. 5-D at 11; and

(g) On December 2, 2005, Holdings issued the Senior Notes to Merrill Lynch and, on the same day, Holdings directly made those indicated payments by wire transfers from Merrill Lynch to the Papases' and Gatzaroses' bank accounts with Chase Manhattan Bank and Comerica Bank, respectively ("Wire Payments").

[ECF No. 685, p. 4-5].

On May 29, 2008, Greektown Casino, Holdings, Monroe, Kewadin, and other related entities filed their Chapter 11 bankruptcies. [ECF No. 685, p. 6]. This adversary proceeding followed.

With regard to the legal conclusions in the Opinion, two issues were presented: (1) whether § 546(e) precludes Plaintiff's avoidance action because the Wire Payments qualify as a transfer that is a settlement payment made by or to a financial institution; and (2) whether § 546(e) precludes Plaintiff's avoidance action because the Wire Payments qualify as a transfer made by or to a financial institution in connection with a securities contract. Section 546(e) provides,

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

§ 546(e).

## 1. Wire Payments were a "settlement payment" made by or to a "financial institution"

For the first issue, the court held that the Wire Payments were a "settlement payment" made by or to a "financial institution." The court noted that case law interpreted the term "settlement

payment" in 11 U.S.C. § 741(8)[3] broadly to "encompass[ ] most transfers of money or securities made to complete a securities transaction[,]" citing to *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986 (8th Cir. 2009); *In re QSI Holdings, Inc.,* 571 F.3d at 549; *Crescent Resources Litig. Trust v. Duke Energy Corp.* 500 B.R. 464 (W.D. Tex. 2013); and *Resorts Intern., Inc. v. Lowenschuss*, 181 F.3d 505, 515 (3rd Cir. 1999). The Court thereafter turned to 11 U.S.C. § 101(49), which defines "security" or "securities" "to include a note, stock, or other claim or interest commonly known as "security." [ECF No. 685, p. 10]. In applying these definitions, the court reasoned that "the Senior Notes, because they are in fact notes, must be considered securities and the 2005 Transaction must be considered a securities transaction." [ECP No. 685, p. 11]. Accordingly, the Court concluded "that the exchange of the Senior Notes and money between Holdings and Merrill Lynch was a settlement payment because it was a direct exchange of money and securities." [ECF No. 685, p. 11-12].

The court disagreed with the Plaintiff that the Wire Payments were either dividends that Holdings transferred to its parent entities (Monroe and Kewadin), who thereafter paid Defendants, or were "naked gifts" that Holdings made to Defendants. In distinguishing the transfers from dividends or gifts, the court opined that the transfers of money were made to complete the 2005 Transaction. [ECF No. 685, p. 17].

In comparing the 2005 Transaction to a novation, the court relied on a test cited in *Perry Drug Stores v. CSK Auto Corp.,* 93 Fed. Appx. 677, 681 (6th Cir. 2003) to prove novation under

---

[3] § 741(8) defines settlement payment as:

> **(8)** "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade;

§ 741(8).

Michigan law. [4]  Under this test, the following elements must be established: "(1) parties capable of contracting; (2) a valid obligation to be displaced; (3) the consent of all parties to the substitution based upon sufficient consideration; (4) the extinction of the old obligation and the creation of a valid new one."  [ECF No. 685, p. 14].

The Opinion does not explicitly conclude on all the elements; rather, it focuses on the consideration exchanged by the parties.  The court explained the consideration exchanged by the parties as follows,

> As part and parcel of the 2005 Transaction, there existed a clear triangular exchange of benefits and burdens, each aspect being reciprocal and supported by consideration. Holdings, although not bound to do so, voluntarily and by the consent of all the involved parties, undertook the obligation to settle and assume Monroe and Kewadin's prior obligations to Defendants using the Senior Notes proceeds. In exchange for undertaking this burden, Holdings benefitted by obtaining from Monroe and Kewadin a 100% interest in Greektown Casino, which constitutes consideration that Holdings received. Although Monroe and Kewadin surrendered to Holdings their direct ownership interests in Greektown Casino, they benefitted by being relieved of their obligations to pay Defendants on the debts from the 2000 Redemption. Defendants settled the installment amounts owing to them and benefitted by being paid immediately.

[ECF No. 685, p. 14-15].

The court also dismissed Plaintiff's argument that Defendants are disregarding corporate formalities in that "the Wire Payments were not made by Monroe and Kewadin [([]the parties that originally owed Defendants the money stemming from the 2000 Redemption . . .[)] but rather were made by Holdings, a newly created entity that owed Defendants no obligations." *Id*.  at 15.  The

---

[4] Court cited to Black's Law Dictionary (9th ed. 2009), which defines "novation" as:

> 1. The act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party. A novation may substitute (1) a new obligation between the same parties, (2) a new debtor, or (3) a new creditor.
> 2. A contract that (1) immediately discharges either a previous contractual duty or a duty to make compensation, (2) creates a new contractual duty, and (3) includes as a party one who neither owed the previous duty nor was entitled to its performance.

[ECF No. 685, p. 14].

court reasoned that "[i]f Holdings had no obligation to pay Defendants for such debts, but it voluntarily undertook that obligation by shared agreement and with all parties receiving consideration, then there is no serious argument that the Wire Payments were gratuitous or lacked consideration." *Id.* The court emphasized that § 546(e) "merely requires a payment to be made to 'complete' a securities transaction, it does not limit payment or receipt to particular parties to a multiparty transaction"— it did not matter that nothing was directly exchanged between Holdings and Defendants. *Id.* Finally, the court held that "[e]ven accepting that a traditional corporation-to-shareholder dividend is a gratuitous transfer lacking consideration, such a transfer loses that gratuitous character when it is actually exchanged for consideration."[5] *Id.* at 16. The Opinion additionally includes a case law discussion which also led the court to conclude that the Wire Payments were settlement payments.[6] *Id.* at 21-28.

The court additionally concluded that the 2005 Transaction should be considered as a whole, and not be separated into its component parts. *Id.* at 17-21. The court utilized the step transaction doctrine that provides that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction[,]" citing to *In re Big V Holding Corp.*, 267 B.R. 71, 92 (Bankr. D. Del. 2001). Per *In re Big V Holding Corp.*, three tests were developed for determining whether to apply the step transaction doctrine: (1) the end result test; (2) the interdependent test; and (3) the binding commitment test. After analyzing all three tests, the court found that all three compelled the court to view the separate component transactions as "components of a single whole." *Id.*

---

[5] For same reasons the Court dismissed Plaintiff's "naked gift" theory. *Id.* at 16.
[6] The Court relied on *Crescent Resources Litig. Trust v. Duke Energy Corp.*, 500 BR 464 (W.D. Tex. 2016). The Court distinguished *In re Qimonda Richmond, LLC*, 467 BR 318 (Bankr. D. Del. 2012) and *In re Mervyn's Holdings, LLC*, 426 BR 488 (Bankr. D. Del. 2010) from the case at bar and was unpersuaded by *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 BR 289 (D. Del. 2012). [ECF No. 685, p. 21-28].

Next, the court held that the Wire Payments were "made by or to a financial institution." *Id*. at 32. The court concluded that "[t]here is no factual dispute that the Wire Payments were made by way of a wire transfer from Holdings (via its account with Merrill Lynch) to Defendants' respective bank accounts with Chase Manhattan Bank and Comerica Bank." *Id*. at 28. Relying on *QSI Holdings,* the court agreed with Defendants who argued that the Wire Payments were made by Merrill Lynch, which is a financial institution as defined in § 101(22)(A).

Of significance, the court dismissed Plaintiff's argument that "just because the Wire Payments were *made from* Merrill Lynch, does not mean they were *made by* Merrill Lynch for the purposes of § 546(e)." *Id*. The court found Plaintiff's argument to be "a peculiar, strained, and somewhat metaphysical distinction that finds no support in the plain language of § 546(e), the indicated case law, or logic. Section 546(e) does not require (or even imply) the distinctions that Plaintiff wishes to have this Court make." *Id*. at 30. The court further elaborated in a footnote,

> Although it is not factually clear whether the subject funds were transferred from Merrill Lynch itself, or by some bank account that a third party maintained on Merrill Lynch's behalf, this would not be relevant because, in any event, Merrill Lynch would be effectively and functionally 'making' the transfers, either personally or through such third party agent, and would nevertheless satisfy the 'making' requirement.

[ECF No. 685, p.30, fn. 10].

The court also rejected Plaintiff's argument that "Merrill Lynch was not or should not be considered as "acting as" a "financial institution" in conducting the 2005 Transaction." Plaintiff maintained that Merrill Lynch's role as a financial institution terminated when Merrill Lynch and Holdings exchanged the Senior Notes and the money. *Id*. at 29-30. Thus, Plaintiff claimed that Merrill Lynch was not acting as a financial institution with respect to its disbursement of the Wire Payments to Defendants. *Id*. Rather, "Merrill Lynch was simply maintaining the money of its client (Holdings) in a client account and paying that money to whomever that client requested."

*Id*. at 30.  The court was not persuaded and opined that § 546(e) only requires that the settlement payment was "made by a financial institution"—and it "need not act in any particular role."  *Id*. at 31.

Notably, the court further disagreed with Plaintiff's argument that Merrill Lynch was acting as a mere conduit and rejected *In re Munford, Inc.,* 98 F.3d 604 (11 Cir. 1996) (relied on by Plaintiff).  The court concluded that the Eleventh Circuit's holding in *In re Munford, Inc.*— that § 546(e) was inapplicable to transfers in which a financial institution acted only as an intermediary--has been explicitly rejected by multiple Circuit Courts of Appeals including the Sixth Circuit, *QSI Holdings*, 571 F.3d at 551.  In fact, the court went further to hold,

> Furthermore, although no party specifically made this argument, the Court also finds that, as an alternate and independent basis, the "financial institution" requirement may very well be satisfied by the identities of the entities to whom Merrill Lynch transferred the funds. As noted, § 546(e) applies to transfers "made by *or to* a financial institution" (emphasis added). There is no factual dispute that Merrill Lynch transferred the funds to Defendants' respective accounts with Chase Manhattan Bank and Comerica Bank.

[ECF No. 685, p.31].

Accordingly, the court concluded on the first issue that "Defendants have met the necessary requirements of § 546(e) and have proven that Plaintiff cannot avoid the Wire Payments because they are settlement payments made by or to a financial institution."  *Id*. at 32.

### 2. Wire Payments qualify as a transfer made by or to a financial institution "in connection with a securities contract"

Turning to the second issue, the court also ruled in Defendants' favor on their alternative basis for applying the safe harbor provision and found that the Wire Payments were transfers made by a financial institution in connection with a securities contract. Having concluded that the Senior Notes were "securities," the Note Purchase Agreement was a "securities contract," and the Wire Payments were transfers made by or to a financial institution, the remaining issue for the court to

13

determine was whether the Wire Payments were "in connection with" the Note Purchase Agreement. [ECF No. 685, p. 32]. Here, Plaintiff conceded that "the exchange of the Senior Notes and money between Holdings and Merrill Lynch was 'in connection with a securities contract,' but argue[d] that the Wire Payments to Defendants were not so in connection." *Id*. at 32-33.

In its analysis, the court noted that the Bankruptcy Code does not define "in connection with," but that case law interprets the phrase broadly, citing to *In re Lehman Bros. Holdings Inc.,* 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012); *Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154 *9 (S.D.N.Y. Apr. 15, 2013); *Quebecor*, 480 B.R. at 479 n.8; and *Morse/Diesel, Inc. v. Provident Life and Acc. Ins. Co.,* 166 F.3d 1214, *4 (6th Cir. 1998) (unpublished). The court rejected Plaintiff's argument that the phrase should be interpreted narrowly to require that the transfers must have as their sole purpose the completion of the securities contract, as provided in *In re Qimonda Richmond, LLC,* 467 B.R. 318, 323 (Bankr. D. Del. 2012). The court explained that § 546(e) requires "a" connection and nothing more, further indicating that there is no temporal or existential requirement and that a transfer can be in connection with more than one thing. *Id*. at 34-35.

The court held that "Holdings was legally bound to use the Senior Note proceeds to pay Defendants. In other words, the 'connection' not only existed, it was a thoroughly contemplated and mandatory connection." *Id*. Therefore, the court determined that the Wire Payments were transfers made by a financial institution in connection with a securities contract – the Note Purchase Agreement.

Thus, the court ruled that Plaintiff could not avoid the transfers. *Id*. at 35-36. The court's conclusions on both issues were affirmed by the District Court. [ECF No. 745].

*ii. The Court's Additional Findings on Remand*

The following are additional findings of facts necessary for the determination of the third issue regarding whether Holdings qualifies as a "financial institution" because Merrill Lynch was acting as an agent or custodian for its customer Holdings. For this issue, the parties cited the Court to (1) the Commitment Letter; (2) the Strategic Alternatives Letter; (3) the Note Purchase Agreement; (4) the New Credit Agreement; and (5) the Flow of Funds Memorandum. The facts are contained in these documents. For clarity, the Court will provide the relevant excerpts identifying the parties for each agreement, as the roles of some of the parties changed throughout this transaction. Additionally, the acronym "Merrill Lynch" is used for Merrill Lynch Capital Corporation in some of the agreements and Merrill Lynch Pierce Fenner & Smith in other agreements.[7] Also, most of these agreements were referenced by the Court's predecessor using different ECF citations. These documents were originally filed under seal and the parties reattached them to their supplemental briefs on remand. For correlation with their new arguments, the Court uses the parties' citations as identified in their latest supplemental briefs.

The first agreement signed on September 23, 2005 is titled "$290,000,000 Senior Credit Facility Commitment Letter ("Commitment Letter") and is signed by Merrill Lynch Capital Corporation, identified as "Merrill Lynch" and Greektown Casino, L.L.C. ("Operating Company"). [ECF No. 817-1; Exh. A, pg. 2]. Merrill Lynch and the Operating Company, along with other parties, were parties to a then Existing Credit Agreement that was to mature on December 31, 2005. *Id.* In this Commitment Letter, the Operating Company seeks a commitment from Merrill Lynch to establish a new senior secured credit facility for the newly formed Michigan

---

[7] The Opinion does not distinguish between the different Merrill Lynch entities involved in the 2005 Transaction. The Opinion identifies MLPFS as Merrill Lynch. [ECF No. 685, p. 4].

Limited Liability Company ("Company," this is Holdings) in the amount of $290,000,000. *Id.* at 3. The Commitment Letter additionally indicates that "the Operating Company and Merrill Lynch, Pierce, Fenner & Smith ('MLPFS') have entered into that certain letter agreement dated September 23, 2005 (the 'Strategic Alternatives Letter') pursuant to which the Operating Company has given MLPFS the mandate to arrange an offering of senior unsecured notes." *Id.*[8] Of significance, this Commitment Letter states that "[t]he agreements between the Operating Company and MLPFS with respect to such mandate, and the offering of the Senior Notes and the obligations of MLPFS with respect thereto, are set forth in the Strategic Alternatives Letter and are governed thereby." *Id.*

On September 24, 2005, MLPFS, identified as "Merrill Lynch," entered into a signed agreement with Greektown Casino, L.L.C. ("Greektown") "to act as exclusive financial advisor to . . . Greektown and Greektown Holdings, L.L.C. ('Holdings') in connection with exploring Strategic Alternatives" ("Strategic Alternatives Letter"). [ECF No. 809-6; Exh. D, p. 2]. The strategic alternatives are specifically defined in the letter.[9] *Id.* The time frame for this engagement

---

[8] The Strategic Alternatives Letter was actually signed on September 24, 2005.

[9] The Engagement Letter defines strategic alternatives covered by the agreement,

> Strategic Alternatives. As used in this Agreement, the term **"Strategic Alternatives",** includes whether effected directly or indirectly in one or a series of transactions (i) any public offering or private placement of securities, including debt securities, any security that is convertible or exchangeable into common stock or preferred stock, any other securities involving any refinancing, tender or restructuring of existing indebtedness, any recapitalization, extraordinary dividend, spin-off or divestiture, or any other transaction or series of transactions directly or indirectly involving Greektown, Holdings, Monroe Partners, L.L.C. and/or any of their respective direct and indirect subsidiaries existing on the date hereof or hereafter formed (the **"Greektown Entities"**) for the purpose of creating or increasing value to Greektown or the Greektown Entities, (ii) the commitment or placement of any bank, bridge or similar debt financing or the placement thereof, (iii) any arrangement or funding of new money needs of Greektown and/or one or more of the Greektown Entities, (iv) any derivative or hedging program, (v)' any joint venture or other similar business combination of Greektown and/or one or more of the Greektown Entities, (vi) any merger, consolidation (other than any merger or consolidation between or among any of the Greektown Entities), negotiated purchase, tender or exchange or redemption offer by Greektown and/or one or more of the Greektown Entities (including restructuring of existing redemption and subscription agreements) or (vii) any other

16

is from September 24, 2005 until July 31, 2006. *Id.* at 3. Pursuant to the Strategic Alternatives

Letter,

> If, during such period, (i) Greektown or one or more of the Greektown Entities or (ii) solely with respect to any Strategic Alternative related to the Temporary Casino or the Permanent Casino (each, as defined in the Commitment Letter), Kewadin Casinos Gaming Authority (the **"Authority"**), the Sault Ste. Marie Tribe of Chippewa Indians (the **"Tribe"**) or any instrumentality of the Authority or the Tribe on behalf of one or more of the Greektown Entities proposes to effect any Strategic Alternative, ***each of the Greektown Entities agrees and, if appropriate, agrees to cause the Tribe and the Authority to engage Merrill Lynch (or one or more of its affiliates as designated by Merrill Lynch) as its sole lead administrative agent, sole lead bookrunning manager, sole lead managing underwriter, sole tender and placement agent, sole dealer-manager, sole lead arranger or principal counterparty or exclusive financial advisor, as the case may be, in connection with any such transaction*** on customary terms mutually acceptable to Merrill Lynch, Holdings and Greektown (including without limitation, as applicable, representations, warranties, covenants, conditions, indemnities and fees) for such transactions at such time; provided, however, that Merrill Lynch may decline any such engagement in its sole and absolute discretion.

[ECF No. 809-6; Exh. D; ¶ 2] (emphasis added). The Strategic Alternatives Letter further

clarifies that "any such engagement of Merrill Lynch shall only become a commitment by

Merrill Lynch to assume such engagement when such engagement is set forth and agreed to by

Merrill Lynch *in a separate underwriting, financing, placement agency, dealer-manager,*

---

investment or venture by Greektown and/or one or more of the Greektown Entities that is not funded from cash flows from operations of Greektown and/or one or more of the Greektown Entities. Merrill Lynch acknowledges and agrees that none of the following shall constitute a Strategic Alternative: (a) any capital contributions to any of the Greektown Entities or any loans or other monies advanced to any of the Greektown Entities from any of the direct or indirect owners of any of the Greektown Entities as of the date hereof, other than loans or advances obtained by any of the Greektown Entities from an unaffiliated third party for the purpose of funding loans made by such Greektown Entity to Greektown, (b) any offering of membership interests of any of the Greektown Entities required by that certain Development Agreement, dated as of August 2, 2002, by and among Greektown, the City of Detroit and The Economic Development Corporation of the City of Detroit or (c) the Incremental Facility (as defined in that certain commitment letter, of even date herewith, by and between Greektown and Merrill Lynch Capital Corporation (the **"Commitment Letter"**)).

[ECF No. 809-6; Exh. D; ¶ 1].

*commitment or other applicable type of agreement*." *Id.* (Emphasis added). Thus, the Strategic Alternatives Letter "is not intended to constitute[ ] … an agreement or commitment" by Merrill Lynch to act as underwriter, placement agent, arranger or financial advisor in connection with any Strategic Alternative." *Id.* Notably, the Strategic Alternatives Letter provides that "Merrill Lynch has been retained to *act solely as financial advisor* to Greektown and the Greektown Entities. In such capacity, Merrill Lynch shall *act as an independent contractor, and any duties of Merrill Lynch arising out of its engagement pursuant to this Agreement shall be owed solely to Greektown and the Greektown Entities*." [ECF No. 809-6; Exh. D; ¶ 7] (emphasis added).

On November 22, 2005, Holdings (as Issuer) and MLPFS (as Initial Purchaser) entered into a purchase agreement ("Note Purchase Agreement") identifying,

> Greektown Holdings, L.L.C., a Michigan limited liability company, as issuer (the "Company") and Greektown Holdings II, Inc., a Michigan corporation, as co-issuer ("Greektown Holdings" and, together with the Company, the "Issuers") confirm their agreement with Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner, & Smith Incorporated ("Merrill Lynch") and each of the other Initial Purchasers named in Schedule A hereto (collectively, the "Initial Purchasers", which term shall also include any initial purchaser substituted as hereinafter provided in Section 11 hereof) for whom Merrill Lynch is acting as representative (in such capacity, the "Representative") with respect to the issue and sale by the Issuers and the purchase by the Initial Purchasers, acting severally and not jointly, of the respective principal amounts set forth in Schedule A attached hereto of $185,000,000 aggregate principal amount of the Issuers' 10 ¾ % Senior Notes due 2013 (the "Securities"). . . .

[ECF No. 809-7; Exh. E; p. 1].[10] The agreement provides, in pertinent part,

> The Issuers acknowledge and agree that … (ii) *in connection with the offering contemplated hereby and the process leading to such transaction, the Initial Purchasers are and have been acting solely as principals and are not the agents or fiduciaries of the Issuers or any of their creditors, employees or any other*

---

[10] Schedule A lists the Initial Purchasers and the principal amount of securities purchased by each: MLPFS $166,500,000, Wachovia Capital Markets, LLC $9,250,000, and NatCity Investments, Inc. $9,250,000. [ECF No. 809-7; Exh. E; Sch A-1].

*party*, (iii) the ***Initial Purchasers have not assumed and will not assume an advisory or fiduciary responsibility in favor of the Issuers with respect to the offering contemplated hereby or the process leading thereto*** (irrespective of whether the Initial Purchasers have advised or are currently advising the Issuers on other matters) and the ***Initial Purchasers have no obligation to the Issuers with respect to the offering contemplated hereby except the obligations expressly set forth in this Agreement,*** (iv) ***the Initial Purchasers and their affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Issuers*** and (v) the Initial Purchasers have not provided any legal, accounting, regulatory or tax advice with respect to the offering contemplated hereby and the Issuers have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deeded appropriate.

[ECF No. 809-7; Exh. E; p. 2] (emphasis added).

On December 2, 2005, certain parties entered into a credit agreement ("New Credit Agreement") as follows,

> Credit Agreement, dated as of December 2, 2005, among Greektown Holdings, L.L.C. ("Greektown Holdings") and Greektown Holdings II, Inc. ("Greektown Corporation"), as the Borrowers, various financial institutions, as the lenders, Merrill Lynch Pierce, Fenner and Smith Incorporated ("MLPFS"), as the sole Lead Arranger and the Sole Bookrunner, and the syndication agent, Merrill Lynch Capital Corporation, as the Administrative Agent ("MLCC"), and documentation agent(s) party thereto (the "New Credit Agreement).

[ECF No. 817-4; Exh. C – New Credit Agreement, p. 13]. As to MLCC's role as the Administrative Agent, section 9.1 (a) and (b) states,

> (a) ***Each Lender hereby designates MLCC to act as the Administrative Agent under and for purposes of this Agreement and the other Loan Documents and authorizes MLCC, in its capacity as the Administrative Agent, to act on behalf of such Lender under this Agreement and the other Loan Documents.*** Subject to the terms and conditions hereof, ***MLCC accepts such appointment and agrees to act as the Administrative Agent on behalf of the Lenders and to perform the duties of the Administrative Agent*** in accordance with the provisions of this Agreement and the other Loan Documents. ***Each Lender agrees that the Administrative Agent, at its option, may delegate its duties, rights and powers, and that each sub-agent shall implement all such duties, rights and powers on behalf of the Administrative Agent*** that are required of the Administrative Agent on behalf of the Lenders. The Administrative Agent and such sub-agent may perform any and all of their duties and exercise their rights and

19

powers through their respective Affiliates, directors, officers, employees, agents and advisors. The exculpatory provisions of <u>Section 9.3</u> shall apply to such sub-agent and each such Affiliate, director, officer, employee, agent and advisor and to their respective activities. The Administrative Agent may replace such sub-agent upon consent of the Required Lenders and the exculpatory provisions of <u>Section 9.3</u> shall apply to such replacement sub-agent.

(b) Each Lender authorizes the Administrative Agent to act on behalf of such Lender under this Agreement and the other Loan Documents and, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, except as otherwise provided in this Section or as otherwise advised by counsel in order to avoid contravention of applicable law), to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Administrative Agent, by the terms hereof and thereof, together with such powers as may be reasonably incidental thereto.

[ECF No. 817-4, Exh. C, p. 124-25, § 9.1(a) and (b)] (emphasis added). With regard to MLPFS, section 9.9 of the New Credit Agreement provides,

<u>The Sole Lead Arranger, the Sole Book Runner, the Syndication Agent and the Co-Documentation Agents.</u> ***The Sole Lead Arranger, the Sole Book Runner, the Syndication Agent and the Co-Documentation Agents hereunder shall not have any right, power, obligation, liability, responsibility or duty under this Agreement (or any other Loan Document) other than those applicable to it in its capacity as a Lender to the extent it is a Lender hereunder.*** Without limiting the foregoing, the Lender so identified as the "**Sole Lead Arranger**" the "**Sole Book Runner**", the "**Syndication Agent**", and the "**Co-Documentation Agents**" shall not have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on the Lender so identified as the "**Sole Lead Arranger**" the "**Sole Book Runner**", the "**Syndication Agent**" or the "**Co-Documentation Agents**" in deciding to enter into this Agreement and each other Loan Document to which it is a party or in taking or not taking action hereunder or thereunder.

[ECF No. 817-4; Exh. C – New Credit Agreement, §9.9].

Also dated December 2, 2005 is the Flow of Funds Memorandum, which "sets forth the fund transfer procedures followed in connection with" the 2005 Transaction. [ECF No. 809-11; Exh. G; p. 1]. This Memorandum lists the principal documents related to the 2005 Transaction and

the specific transactions that are deemed to have occurred simultaneously. [ECF No. 809-11; Exh. G; p. 2-3]. This includes the transaction expenses. "Greektown Holdings paid $3,838,007.88 in the aggregate for transaction fees at the closing as set forth in more detail in paragraph E below." [ECF No. 809-11; Exh. G; p. 3; §2A]. As it relates to MLPFS and MLCC only, paragraph E provides,

1. Note Purchase Agreement Fees and Expenses. Greektown Holdings paid the following fees and expenses pursuant to the Note Purchase Agreement:

   - MLPFS Fee. $3,700,000.00 in immediately available funds was transferred by Greektown Holdings to MLPFS for placement fees pursuant to the terms of the Note Purchase Agreement.

   - MLPFS Expenses. $96,157.88 in immediately available funds was transferred by Greektown Holdings to MLPFS for expenses incurred pursuant to the terms of the Note Purchase Agreement.
     …

2. New Credit Agreement Fees and Expenses. Greektown Holdings paid the following fees and expenses pursuant to the Note Purchase Agreement:

   - MLCC Fees. $5,075,000.00 in immediately available funds was transferred by Greektown Casino to MLCC for closing fees pursuant to the terms of the New Credit Agreement and related agreements.

   - MLCC Administrative Fees. $100,000.00 in immediately available funds was transferred by Greektown Casino to MLCC for administrative agent fees pursuant to the terms of the New Credit Agreement and related agreements.

   - MLCC Expenses. $89,240.60 in immediately available funds was transferred by Greektown Casino to MLCC for expenses pursuant to the terms of the New Credit Agreement and related agreements.
     ...

[ECF No. 809-11; Exh. G; p. 5-6; §E]. Finally, the Flow of Funds Memorandum includes an account transfers section wherein the parties acknowledge that the actual net transfers summarized in a chart were made. [ECF No. 809-11; Exh. G; p. 6-7]. Of relevance, (1) $90,491,741.62 from MLPFS (transferor) to Papases (recipient); and (2) $55,000,000 from MLPFS (transferor) to

Gatzaroses (recipient). [ECF No. 809-11; Exh. G; p. 6-7]. MLPFS, as transferor, additionally made eight other transfers in the aggregate amount of $23,804,162.40 to different entities and/or individuals. [ECF No. 809-11; Exh. G; p. 7-8]. MLCC, as transferor, also made eight transfers in the aggregate amount of $184,735,486.48 to different entities and/or individuals. [ECF No. 809-11; Exh. G; p. 8-9]. The Flow of Funds Memorandum does not contain any provision modifying either MLPFS' or MLCC's relation to Holdings as provided in other agreements.

### b. Conclusions of Law

#### i. Merit Management

*Merit Management* resolved a circuit split by ruling in favor of the minority circuits that "the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid." *Id*. *Merit Management* overruled *In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009). The Supreme Court in *Merit Management* was tasked with "determin[ing] how the safe harbor operates in the context of a transfer that was executed via one or more transactions, *e.g.,* a transfer from A → D that was executed via B and C as intermediaries, such that the component parts of the transfer include A → B → C → D." *Merit Management*, 138 S. Ct. at 888. The issue as framed provides,

> If a trustee seeks to avoid the A → D transfer, and the § 546(e) safe harbor is invoked as a defense, the question becomes: When determining whether the § 546(e) securities safe harbor saves the transfer from avoidance, should courts look to the transfer that the trustee seeks to avoid (*i.e.,* A → D) to determine whether that transfer meets the safe-harbor criteria, or should courts look also to any component parts of the overarching transfer (*i.e.,* A → B → C → D)?

*Id*. Per *Merit Management*, the safe harbor will not insulate a transfer merely because a qualified intermediary acted as a conduit between the debtor and the transferee.

By way of background, debtor Valley View Downs, LP's ("Valley View") and Bedford Downs were competing for a limited harness-racing license in the state of Pennsylvania.

Ultimately, the two companies agreed that Bedford Downs would withdraw as a competitor for the license and in exchange Valley View would "purchase all of Bedford Downs' stock for $55 million after Valley View obtained the license." *Id.* As planned, after Valley View was awarded the license, it proceeded with the corporate acquisition. The actual transfer occurred as follows,

> Valley View proceeded with the corporate acquisition required by the parties' agreement and arranged for the Cayman Islands branch of Credit Suisse to finance the $55 million purchase price as part of a larger $850 million transaction. Credit Suisse wired the $55 million to Citizens Bank of Pennsylvania, which had agreed to serve as the third-party escrow agent for the transaction. The Bedford Downs shareholders, including petitioner Merit Management Group, LP, deposited their stock certificates into escrow as well. At closing, Valley View received the Bedford Downs stock certificates, and in October 2007 Citizens Bank disbursed $47.5 million to the Bedford Downs shareholders, with $7.5 million remaining in escrow at Citizens Bank under the multiyear indemnification holdback period provided for in the parties' agreement. Citizens Bank disbursed that $7.5 million installment to the Bedford Downs shareholders in October 2010, after the holdback period ended. All told, Merit received approximately $16.5 million from the sale of its Bedford Downs stock to Valley View. Notably, the closing statement for the transaction reflected Valley View as the "Buyer," the Bedford Downs shareholders as the "Sellers," and $55 million as the "Purchase Price." App. 30.

*Id.* Despite securing the last harness-racing license, "Valley View never got to open its racino" and consequently filed for Chapter 11 bankruptcy. *Id.*

In the adversary proceeding, the trustee of the litigation trust, FTI Consulting, Inc. ("FTI"), sought to avoid Valley View's allegedly fraudulent transfers of $16,503,850 to transferee Merit Management Group, LP ("Merit") pursuant to 548(a)(1)(B). *Id.* at 891. Merit argued that "the Court should look not only to the Valley View–to–Merit end-to-end transfer, but also to all its component parts."[11] Under this view, Merit claimed that the safe harbor provision of § 546(e)

---

[11] *Merit Mgmt.,* 138 S. Ct. at 892,

> Here, those component parts include one transaction by Credit Suisse to Citizens Bank (*i.e.,* the transmission of the $16.5 million from Credit Suisse to escrow at Citizens Bank), and two transactions by Citizens Bank to Merit (*i.e.,* the transmission of $16.5 million over two installments by Citizens Bank as escrow agent to Merit). Because those component parts include transactions by and to financial institutions, Merit contends that § 546(e) bars avoidance.

applied to bar the avoidance action "because the transfer was a 'settlement payment … made by or to (or for the benefit of); a covered 'financial institution'—here, Credit Suisse and Citizens Bank." *Id*. at 891-92. "FTI, by contrast, maintain[ed] that the only relevant transfer for purposes of the § 546(e) inquiry is the overarching transfer between Valley View and Merit"; and "[b]ecause that transfer was not made by, to, or for the benefit of a financial institution," the safe harbor does not apply. *Id*.

The full language of § 546(e) provides,

> ***Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a*** margin payment, as defined in section 101, 741, or 761 of this title, or ***settlement payment***, as defined in section 101 or 741 of this title, ***made by or to (or for the benefit of) a*** commodity broker, forward contract merchant, stockbroker, ***financial institution***, financial participant, or securities clearing agency, ***or that is a transfer made by or to (or for the benefit of) a*** commodity broker, forward contract merchant, stockbroker, ***financial institution***, financial participant, or securities clearing agency***, in connection with a securities contract***, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, ***except under section 548(a)(1)(A) of this title.***

*Id.* (Emphasis added).

After analyzing "[t]he language of § 546(e), the specific context in which that language is used, and the broader statutory structure[,]" the Supreme Court determined that "all support the conclusion that the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." *Id*. at 892-93. In so ruling, the Supreme Court emphasized that § 546(e) is a limitation on an otherwise avoidable transfer,

> The transfer that the "the trustee may not avoid" is specified to be "a transfer that *is* " either a "settlement payment" or made "in connection with a securities contract." § 546(e) (emphasis added). Not a transfer that involves. Not a transfer that comprises. But a transfer that is a securities transaction covered under § 546(e).

The provision explicitly equates the transfer that the trustee may otherwise avoid with the transfer that, under the safe harbor, the trustee may not avoid. In other words, to qualify for protection under the securities safe harbor, § 546(e) provides that the otherwise avoidable transfer itself be a transfer that meets the safe-harbor criteria.

*Id*. at 894.

The Supreme Court explained that "it is only logical to view the pertinent transfer under § 546(e) as the same transfer that the trustee seeks to avoid pursuant to one of its avoiding powers." The *Merit Management* court emphasized, however, that "the trustee is not free to define the transfer that it seeks to avoid in any way it chooses. Instead, that transfer is necessarily defined by the carefully set out criteria in the Code." *Id*. Thus, once an avoidance action is filed, a defendant "is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer." *Id*. However, "[i]f a trustee properly identifies an avoidable transfer, . . . the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power[.]" *Id*. at 894–95. Thus, because Merit did not argue "that FTI improperly identified the Valley View–to–Merit transfer as the transfer to be avoided," the Supreme Court held that "the Credit Suisse and Citizens Bank component parts are simply irrelevant to the analysis under § 546(e)." *Id*. at 895. Ultimately, "[b]ecause the parties d[id] not contend that either Valley View or Merit is a 'financial institution' or other covered entity, [the Supreme Court concluded that] the transfer falls outside of the § 546(e) safe harbor." *Id*. at 897.

The Supreme Court disagreed with petitioner that by adding "the 2006 addition of the parenthetical '(or for the benefit of)' to § 546(e)[ ] … Congress meant to abrogate the 1998 decision of the Court of Appeals for the Eleventh Circuit in *In re Munford, Inc.,* 98 F.3d 604, 610 (1996) (*per curiam* ), which held that the § 546(e) safe harbor was inapplicable to transfers in

which a financial institution acted only as an intermediary." *Id*. Rather, "Congress' addition of this language … is rooted in the text of the statute as a whole" and meant to "ensure[ ] that the scope of the safe harbor matched the scope of the avoiding powers." *Id*. Stressing that "by tracking language already included in the substantive avoidance provisions, the amendment reinforces the connection between the inquiry under § 546(e) and the otherwise avoidable transfer that the trustee seeks to set aside." *Id*. at 895-96.

Likewise, the Supreme Court was not persuaded by Merit's argument that the inclusion of securities clearing agencies as covered entities under § 546(e), meant Congress intended to "protect intermediaries without reference to any beneficial interest in the transfer." *Id*. at 96. Merit's reasoning was that "a securities clearing agency is defined as, *inter alia,* an intermediary in payments or deliveries made in connection with securities transactions, see 15 U.S.C. § 78c(23)(A) and 11 U.S.C. § 101(48)." *Id*. The Supreme Court provided a different explanation,

> Reading § 546(e) to provide that the relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid under a substantive avoiding power, the question then becomes whether that transfer was "made by or to (or for the benefit of)" a covered entity, including a securities clearing agency. If the transfer that the trustee seeks to avoid was made "by" or "to" a securities clearing agency (as it was in *Seligson* ), then § 546(e) will bar avoidance, and it will do so without regard to whether the entity acted only as an intermediary. The safe harbor will, in addition, bar avoidance if the transfer was made "for the benefit of" that securities clearing agency, even if it was not made "by" or "to" that entity. This reading gives full effect to the text of § 546(e).

*Id*. at 896.

Finally, the Supreme Court emphasized the statutory purpose of enacting the safe harbor provision,

> Congress was concerned about transfers "*by* an industry hub" specifically: The safe harbor saves from avoidance certain securities transactions "made by or to (or for the benefit of)" covered entities. See § 546(e). Transfers "***through***" a covered entity, conversely, appear nowhere in the statute. And although Merit complains that, absent its reading of the safe harbor, protection will turn "on the identity of

the investor and the manner in which it held its investment," that is nothing more than an attack on the text of the statute, which protects only certain transactions "made by or to (or for the benefit of)" certain covered entities.

*Id*. at 897 (emphasis added).[12]

> ### ii. The Sixth Circuit's Mandate and Law of the Case Doctrine

The Court will now identify the issues properly before it on remand.

In determining the issues to address on remand, the Court is guided by the framework for the law of the case doctrine discussed in *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006). There the Sixth Circuit stated,

> The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Scott v. Churchill,* 377 F.3d 565, 569–70 (6th Cir.2004) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). The doctrine precludes a court from reconsideration of issues "decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition." *Hanover Ins. Co. v. Am. Eng'g Co.,* 105 F.3d 306, 312 (6th Cir.1997) (quoting *Coal Res., Inc. v. Gulf & Western Indus., Inc.,* 865 F.2d 761, 766 (6th Cir.1989)). Pursuant to the law of the case doctrine, and the complementary "mandate rule," upon remand the trial court is bound to "proceed in accordance with the mandate and law of the case as established by the appellate court." *Id.* (quoting *Petition of U.S. Steel Corp.,* 479 F.2d 489, 493 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973)). The trial court is required to "implement both the letter and the spirit" of the appellate court's mandate, "taking into account the appellate court's opinion and the circumstances it embraces." *Brunet v. City of Columbus,* 58 F.3d 251, 254 (6th Cir.1995).
>
> The law of the case doctrine precludes reconsideration of a previously decided issue unless one of three "exceptional circumstances" exists: (1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice. *Hanover Ins. Co.,* 105 F.3d at 312.

*Id.* at 538.

---

[12] In footnote two, the Supreme Court left open the question of whether a debtor or petitioner could qualify as a financial institution by virtue of its status as a customer under 11 U.S.C. § 101(22). This definition was mentioned in a footnote to Merit's brief, but not argued by the parties nor considered by the Supreme Court. *Id.* at 890, n.2.

After careful consideration, the Court concludes that it will limit its reconsideration to issues that are directly implicated by *Merit Management*. For the reasons explained below, the Court finds that it is unnecessary to reconsider the remaining issues because even after adopting the Court's predecessor's findings and conclusions, the Court holds that Defendants fail to satisfy the requirements of § 546(e).

The Court concludes that the first issue—identifying the relevant transfer to test in the § 546(e) inquiry--is directly implicated by *Merit Management*. The Supreme Court in *Merit Management* held that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." *Merit Mgmt. Grp., LP*, 138 S. Ct. at 893. Here, the Court's predecessor utilized the step transaction doctrine to similarly conclude that the 2005 Transaction must be viewed as a whole. Despite reaching the same legal conclusion, the court misapplied the legal conclusion to its analysis by considering a component part of the transaction. Namely the transfer from Merrill Lynch to the Defendants.[13] *Merit Management* makes clear that once the trustee identifies the transfer it seeks to avoid, and defendant does not object to such identification, the component parts are irrelevant to the analysis of the safe harbor provision.

The second issue, whether the 2005 Transaction was for Merrill Lynch's benefit, was not considered in the Opinion. The Opinion references Merrill Lynch's role in its discussion and conclusion that "the financial institution need not act in any particular role." Again, the Opinion declined to follow *In re Munford, Inc. Merit Management* contains a brief discussion of the parenthetical "(for the benefit of)." The Court will address this issue in light of that discussion.

---

[13] The Court went even further and held *sua sponte* that the "financial institution" requirement was additionally satisfied as the funds were transferred to Defendants' respective accounts with Chase Manhattan Bank and Comerica Bank, both of whom qualified as financial institutions. [ECF No. 685; p 31-32].

The third issue is the argument left open by footnote two of *Merit Management.* That is, whether Holdings can itself be deemed a financial institution as defined by § 101(22)(A) by virtue of its status as a customer of Merrill Lynch. It is the most challenging as it encompasses issues that were addressed by the Court's predecessor that now combine with new factual and legal issues. Section 101(22)(A) defines the term "financial institution" as:

> (A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer;

§ 101(22)(A). As discussed in part IV(a)(i) of this opinion, the Court's predecessor decided that Merrill Lynch was a financial institution, the challenged transfers were settlement payments, and the transfers were made in connection with a securities contract. These issues were not specifically addressed in *Merit Management.* Plaintiff urges this Court to reconsider these issues claiming they fall within the exceptions to the law of the case doctrine. Because the Court holds that Merrill Lynch was not acting as an agent or a custodian for Holdings (the other requirement of § 101(22)(A) that Defendants must establish), it is unnecessary to reconsider the issues already addressed and decided by the Court's predecessor.

*iii. Analysis*

1. Identifying the Transfer

Per *Merit Management*, the relevant transfer is the one that is identified by the trustee and is otherwise an avoidable transfer. Here, Plaintiff identifies the transfer it seeks to avoid as the transfer from Holdings to Defendants. Defendants do not argue that Plaintiff improperly identified the Holdings-to-Defendants transfer as the transfer to be avoided. Defendants attempt to argue that the 2005 transfers to them were made by Merrill Lynch, as a financial institution, with

29

Holdings being the mere conduit. Such a characterization is disingenuous.[14] The transfer cannot be identified as one from or by Merrill Lynch, as concluded by the Court's predecessor. Plaintiff could not avoid a transfer of Merrill Lynch's property as Merrill Lynch is not the debtor and its property is not property of the estate. *Merit Management* instructs that the "focus must remain on the transfer the trustee sought to avoid." Here, the transfer to be avoided is the one from the transferor (Holdings) to the transferee (Defendants). Per *Merit Management*, Merrill Lynch, Chase Manhattan Bank and Comerica Bank **(component parts of the 2005 Transaction) "are simply irrelevant to the analysis under § 546(e)**." *Merit Management*, 138 S. Ct. at 895. (Emphasis added).

Consequently, the 2005 transfers fall outside of the § 546(e) safe harbor. Neither party disputes that neither Holdings nor the Defendants, on their own, are a financial institution or other covered entity.

---

[14] In trying to distinguish *Merit Management* Defendants argue that in *Merit Management* the parties did not challenge the identification of the overall transfer sought to be avoided. Here, Defendants claim that the nature and scope of the overall transaction is contested. The Court disagrees. First, the parties in *Merit* disputed the identity of the transfer,

> The parties and the lower courts dedicate much of their attention to the definition of the words "by or to (or for the benefit of)" as used in § 546(e), and to the question whether there is a requirement that the "financial institution" or other covered entity have a beneficial interest in or dominion and control over the transferred property in order to qualify for safe harbor protection. In our view, those inquiries put the proverbial cart before the horse. **Before a court can determine whether a transfer was made by or to or for the benefit of a covered entity, the court must first identify the relevant transfer to test in that inquiry. At bottom, that is the issue the parties dispute in this case.**

*Merit Mgmt.,* 138 S. Ct. at 892. (Emphasis added). Second, in reviewing the record, the Court finds that there is no dispute that the transfer at issue is of Holdings' property.

Defendants alternatively argue that the 2005 Transaction was "for the benefit of" Merrill Lynch.[15]  Defendants assert that Merrill Lynch was not a mere intermediary, but rather an integral participant with many roles in the overall transfer, "serving as the underwriter, initial purchaser of the Senior Notes, the agent for the other purchasers of the Senior Notes, recipient of the note proceeds, … exchange agent, … and disbursing bank." [Def's Motion, ECF No. 782, p. 13]. Furthermore, Defendants stress that had the transaction not been concluded, Merrill Lynch would not realize the benefit of its bargain – various substantial fees and related compensation from the sale of the notes.

Plaintiff, however, contends that a transfer is "for the benefit of" an entity only if the benefit to that entity is "direct, ascertainable and quantifiable." *In re Int'l Mgmt. Assoc.,* 399 F.3d 1288, 1293 (11th Cir. 2005).  Furthermore, such benefit must also "correspond[  ] to the value of the property transferred or received." *Mack v. Newton*, 737 F.2d 1343, 1459-60 (5th Cir. 1984).  Here, Plaintiff points out that Defendants only suggest that Merrill Lynch, as a noteholder, had an interest in the "ongoing operations of the Casino," which the transfers to the Defendants helped to preserve. Plaintiff claims any such benefit, was indirect at best, unquantified, and lacks any correspondence to the value of the transfers at issue.

In reply, Defendants claim that Merrill Lynch received a significant, quantifiable benefit from participation in the 2005 Transaction and benefitted more than any other party. Defendants emphasize that Merrill Lynch made a significant investment in Holdings through the purchase of at least $160,000,000 in the Senior Notes, that carried an interest rate of 10.75%, a significant rate of return.  Defendants point to the Offering Memorandum which they claim confirms that several

---

[15] At this stage in briefing and arguments, the parties did not distinguish between the MLPFS or MLCC; rather they only identified Merrill Lynch.

millions of dollars in fees and expenses would be paid to Merrill Lynch out of the funds generated from the note sale and for the new credit facility.

As *Merit Management* explains, the addition of the phrase "for the benefit of" to the 2006 amendment to § 546(e) was intended to track the same language in the other substantive avoidance provisions. This ensured that the scope of the safe harbor matched the scope of the avoiding powers. *Id*. at 895-96. Accordingly, the Court will look to other avoiding provisions to determine the interpretation of the phrase "for the benefit of" in the scope of those avoiding powers. Defendants do not dispute the application of Plaintiff's cited cases addressing the phrase "for the benefit of" – they only argue that the standard has been met. Plaintiff's cited cases provide that the relevant phrase is typically applied in the context of an individual or an entity that is a creditor or guarantor of debtor's debt.

In reviewing the cited authority, the Court concludes that Defendants must establish that Merrill Lynch received a direct, ascertainable, and quantifiable benefit corresponding in value to the payments to Defendants. Both of Plaintiff's cases address the phrase "for whose benefit such transfer was made" in 11 U.S.C. 550(a)(1). The statute allows the trustee to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-- … the entity for whose benefit such transfer was made[.]" § 550(a)(1). In the first case, *Mack,* 737 F.2d at 1359–60, the Fifth Circuit held that "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received" is insufficient to satisfy the "for the benefit of" requirement of § 550. Subsequently, the Eleventh Circuit in *In re Int'l Mgmt. Assoc.* addressed whether recovery of a payment under "§ 550(a)(1) requires us to assess whether providing the unquantifiable key to a larger transaction can qualify a party as an 'entity for whose benefit' a putatively voidable transfer is made." *In re Int'l Mgmt.*

*Assoc.*, 399 F.3d at 1289. The court there concluded that under the facts presented, the bankruptcy court interpreted the term "benefit" too broadly to meet the requirements of § 550(a)(1),

> The overarching purpose of the transaction before us was to obtain a loan from Healthcare REIT to restructure the financing of the assisted living facilities and to provide capital for continued operations. A condition of that loan was that Reily be the sole owner of the stock of the debtor corporations. Therefore, the acquisition of the stock was in the interest of furthering the loan and the restructuring—goals which fulfilled Reily's purposes. Hence, Reily was "benefitted" in a larger sense when he obtained complete control of the debtors' assets and therefore fulfilled a necessary condition of obtaining the funds from Health Care REIT. This is the "benefit" that both the trustee and the bankruptcy court attributed to Reily in order to underpin liability. … However, *this sort of unquantifiable advantage is not the sort of "benefit" contemplated by 11 U.S.C. § 550(a).*

*Id*. (Emphasis added). The Eleventh Circuit instructed that "[t]he paradigm case of a benefit under § 550(a) is the benefit to a guarantor by the payment of the underlying debt of the debtor." *Id.* at 1292. The court explained that,

> The example of a debt and a guarantor affords some insight into the intention of Congress in enacting § 550(a). The fact that Reily attained complete control over the debtors' assets does not give rise to a quantifiable benefit or one bearing the "necessary correspondence to the value of the property transferred or received." *Mack v. Newton,* 737 F.2d 1343, 1359–60 (5th Cir.1984).[3]

*Id*. The Eleventh Circuit stressed that there needs to be a "direct benefit" that is tangible or quantifiable. *Id*.

The Court holds that Defendants failed to meet their burden to establish that Merrill Lynch received a direct, ascertainable, and quantifiable benefit corresponding in value to the payments to Defendants that Plaintiff seeks to avoid and recover. The fact that several millions of dollars in fees and expenses would be paid to Merrill Lynch out of the funds generated from the note sale and for the new credit facility is insufficient to establish the 2005 Transaction was "for the benefit of" Merrill Lynch. This is not to say that Merrill Lynch did not benefit from the 2005 Transaction. Of course, Merrill Lynch benefitted by receiving fees for services provided to Holdings. However,

the benefit it received is not the type of benefit contemplated by the phrase "for the benefit of." Rather, the fees associated with its services were a benefit that was incidental to the 2005 Transaction. Moreover, the fees associated with its services do not correspond in value to the 2005 transfers to the Defendants. Therefore, the Court concludes that the 2005 Transaction was not for the benefit of Merrill Lynch.

3. <u>Is Holdings by §101(22)(A) deemed to be a "financial institution" because Merrill Lynch was acting as agent or custodian for its customer Holdings in making the transfers?</u>

Lastly, as their third basis for relief Defendants raise footnote two of *Merit Management*. Defendants claim that Holdings is by § 101(22)(A) deemed to be a "financial institution" because Merrill Lynch was acting as an agent or a custodian for its customer Holdings when making the transfers. As noted, footnote two opens the door to another avenue for protection under the safe harbor provision. Section 101(22)(A) defines the term "financial institution" as

> **(A)** a Federal reserve bank, **or an entity that is a commercial or savings bank**, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity **and**, **when any such** Federal reserve bank, receiver, liquidating agent, conservator or **entity is acting as agent or custodian for a customer** (whether or not a "customer", as defined in section 741) **in connection with a securities contract** (as defined in section 741) such customer;

§ 101(22)(A). (Emphasis added). As previously stated, the Court will limit its analysis to the "acting as agent or a custodian" for a customer requirement of the definition.

a. Was Merrill Lynch an "Agent" of Holdings?

Defendants first claim that Holdings is by §101(22)(A) deemed to be a "financial institution" because Merrill Lynch was acting as an agent (underwriter and disbursing agent) for its customer Holdings in making the transfer. The Bankruptcy Code does not define the term "agent," thus, the parties urge the Court to look at the general common-law definition of agency. The parties dispute whether a fiduciary relationship is required to form an agency relationship.

34

To determine whether an agency relationship exists, Defendants rely on a test articulated by the Michigan Supreme Court in *St. Clair Intermediate School Dist. v. Intermediate Educ. Ass'n,* 458 Mich. 540, 557-58, 581 N.W.2d 707, 716 (Mich. 1998),

> Under the common law of agency, in determining "[w]hether an agency has been created," we consider "the relations of the parties as they in fact exist under their agreements or acts" and note that in its broadest sense agency "includes every relation in which one person acts for or represents another by his authority." *Saums v. Parfet*, 258 N.W. 235, 237 (Mich. 1935). We further recognized in *Saums* that "[t]he characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons." *Id*. at 235. Also fundamental to the existence of an agency relationship is the right to control the conduct of the agent, *Capitol City Lodge No. 141, FOP v. Meridian Twp*., 282 N.W.2d 383 (Mich. Ct. App. 1979), with respect to the matters entrusted to him. See *Int'l Longshoremen's Ass'n, AFL–CIO v. NLRB*, 56 F.3d 205, 211 (D.C. Cir. 1995) (citing 1 Restatement, Second, Agency, § 14, p. 60, and cases applying this principle).

*Id*. Under this test, Defendants assert that an agent does not have to be a fiduciary. While Defendants acknowledge that a fiduciary duty may arise out of an agency relationship, no such duty is required under Michigan law to determine whether an agency relationship has been created. Defendants additionally cite to the Second Circuit case *In re Tribune Co.,* 946 F.3d 66 (2nd Cir. 2019), which held that "a financial institution acted as an agent for its customer where that financial institution accepted funds as part of a securities transaction and further effectuated that transaction." [ECF No. 809, p. 12].

Plaintiff, however, contends that the federal common law—not Michigan law—governs the interpretation of a federal statute. Plaintiff claims that federal common law defines agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of

Agency §1.01 (2006). Plaintiff additionally cites to *Keating v. Peterson's Nelnet, LLC*, 615 Fed. Appx. 365, 372 (6th Cir. 2015); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322, 112 S. Ct 1344 (1992); and *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.,* 181 F.3d 759, 767 (6th Cir. 1999) (internal citation omitted) ("a party 'who contracts *to accomplish something for another or to deliver something to another,* but who is not acting as a fiduciary for the other, is a non-agent contractor. He may be anyone who has made a contract and who is not an agent.'").

Either way, Plaintiff claims that Michigan law endorses the same federal common law definition of agency, citing to *Leonardo Harper LLC v. Landmark Commer. Real Estate Servs*., 2017 Mich. App. LEXIS 446, *7–8 (Mich. At. App. Mar. 21, 2017) ("an agency relationship is a fiduciary relationship created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that other party by words or actions."). Furthermore, Plaintiff asserts that *St. Clair Intermediate Sch. Dist.,* relied on by Defendants, does not contradict the fiduciary requirement. Plaintiff emphasizes that *St. Clair Intermediate Sch. Dist.,* did not discuss what gives rise to an agency relationship, but rather held that, once agency is established, the principal has the right to control its agent. Moreover, Plaintiff maintains that even *In re Tribune* applied the fiduciary relationship requirement to its determination of whether an agency relationship existed. Plaintiff differentiates *In re Tribune,* arguing that in that case it was undisputed that Tribune was the customer of a financial institution it had hired to make distributions in connection with a securities contract. Here, Plaintiff maintains that there is no evidence that MLPFS was a financial institution or that Holdings was its customer in connection with its agreement to sell MLPFS Notes.

Finally, because § 546(e) is an affirmative defense, Plaintiff maintains that the burden is on Defendants to establish the elements of an agency relationship – mutual consent to a fiduciary

relationship in which the agent acts on the principal's behalf and under the principal's control. Plaintiff relies on *In re Grand Eagle Cos.,* 288 B.R. 484, 495 (Bankr. N.D. Ohio 2003). Furthermore, per *Beck-Wilson v. Principi*, 441 F.3d at 365, to prevail on summary judgment, Defendants must point to evidence "'establishing the defense so clearly that no rational jury could have found to the contrary.'" *Id.*

In reply, Defendants disagree with Plaintiff's interpretation of *In re Tribune* as requiring a fiduciary relationship for finding agency. Defendants argue that in making the agency determination, the *Tribune* Court looked at the following factors: (1) the principal manifests intent to grant authority to the agent to act on the principal's behalf and subject to the principal's control and (2) the agent manifests assent or otherwise consents to so act." *In re Tribune*, 946 F.3d at 79. Defendants claim that the Second Circuit found the agency requirement satisfied where the financial institution accepted the funds as part of the securities transaction and further effectuated the transaction. *Id.*

The Court concludes that the cited cases analyzing agency under either Michigan common law or federal common law both cite to the Restatement (Third) of Agency § 1.01 (2006),[16] which provides,

> [a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

---

[16] It is important to note that some referenced federal cases from the Sixth Circuit requiring fiduciary relationship as a prerequisite element for finding agency analyze Ohio law. See *In re Grand Eagle Cos.,* 288 B.R. 484, 495 (Bankr. N.D. Ohio 2003); *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.,* 181 F.3d 759, 767 (6th Cir. 1999); and *Eyerman v. Mary Kay Cosmetics, Inc.,* 967 F.2d 213, 219 (6th Cir. 1992).

*Id.* Under this definition, the fiduciary relationship is not a prerequisite for the finding of agency; rather, it is the result of such an agency relationship. Comment *e* to Restatement §1.01 explains that if an agency relationship exists, the agent owes a fiduciary obligation to the principal,

> The scope of an agency relationship defines the scope of an agent's duties to a principal and a principal's duties to an agent. If the relationship between two persons is one of agency as defined in this section, the agent owes a fiduciary obligation to the principal. The word "fiduciary" appears in the black-letter definition to characterize or classify the type of legal relationship that results if the elements of the definition are present and to emphasize that an agency relationship creates the agent's fiduciary obligation as a matter of law.

> As a general matter, the term "fiduciary" signifies that an agent must act loyally in the principal's interest as well as on the principal's behalf.

Restatement (Third) Of Agency § 1.01 (2006) (cmt. *e*). See also *Hollingsworth v. Perry*, 570 U.S. 693, 714, 133 S. Ct. 2652, 2667, (2013) ("'If the relationship between two persons is one of agency ..., the agent owes a fiduciary obligation to the principal.' 1 Restatement § 1.01, Comment *e*."). Thus, "[t]o establish that a relationship is one of agency, it is not necessary to prove its fiduciary character as an element." Restatement (Third) of Agency §1.01, cmt. *e*.

Noteworthy here, the Restatement's commentary also explains agency in the context of intermediaries stating,

> ***Many actors perform an intermediary role between parties who engage in a transaction. Not all are agents in any sense, and not all who are agents act on behalf of those who use the intermediary service provided.*** For example, an employee of a courier service who shuttles documents among parties who are closing a transaction among them is not the parties' agent simply because an intermediary function is provided.

> If an intermediary lacks authority even to negotiate on behalf of a party, characterizing the intermediary as an agent may not carry much practical import because the scope of the agency would be very narrow. But despite the narrowness of its scope, an agency relation imposes legal consequences when the agent's acts are within its scope. In some circumstances, an agent's inaction will have legal consequences for the principal.

Restatement (Third) Of Agency § 1.01, cmt. *h* (emphasis added). According to the Restatement, it is important to understand the relationship between the parties and the acts to be performed on behalf of the principal to determine whether an agency relationship exists and the scope of the agency.

*St. Clair Intermediate Sch. Dist*., relied on by Defendants for the definition of agency, focused on the characteristics of an agent as a business representative. There, the Michigan Supreme Court considered in relevant part whether the Michigan Employment Relations Commission ("MERC") correctly determined that the Michigan Educational Special Services Association ("MESSA") is an agent of the Michigan Education Association ("MEA"). The Public Employment Relations Act ("PERA"), patterned after the National Labor Relations Act ("NLRA"), "governs labor relations in public employment." *Id*. at 559, 581 N.W.2d at 717. Specifically, M.C.L. §423.210 "imposes a duty of collective bargaining on public employers, unions, and their agents." *Id*. at 550, 581 N.W.2d at 713. In interpreting the term agent, the court concluded "that the Legislature did not intend an expansive definition of agency in the PERA, but, rather, adopted the common-law principles of agency in use in federal labor law." *Id*. at 559, 581 N.W.2d at 717. The court held,

> Under the common law of agency, in determining "[w]ether an agency has been created," we consider "the relations of the parties as they in fact exist under their agreements or acts" and note that in its broadest sense agency "includes every relation in which one person acts for or represents another by his authority." *Saums v. Parfet,* 270 Mich. 165, 170–171, 258 N.W. 235 (1935). We further recognized in *Saums* that ***"[t]he characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons."*** *Id.* at 172, 258 N.W. 235. Also fundamental to the existence of an agency relationship is the right to control the conduct of the agent, *Capitol City Lodge No. 141, FOP v. Meridian Twp.,* 90 Mich.App. 533, 541, 282 N.W.2d 383 (1979), with respect to the matters entrusted to him. See *Int'l Longshoremen's Ass'n, AFL–CIO v. NLRB,* 312 U.S. App DC 241, 249, 56 F.3d 205 (1995), citing 1 Restatement, Second, Agency, § 14, p. 60, and cases[18] applying this principle.

39

*St. Clair Intermediate Sch. Dist.* at 557–58, 581 N.W.2d at 716 (emphasis added); *see also Wigfall v. City of Detroit*, 504 Mich. 330, 340, 934 N.W.2d 760, 765–66 (2019). In concluding that the facts of the case supported a finding of agency, the Michigan Supreme Court emphasized that it reached its conclusion "on the basis of the ***common law of agency as developed both by Michigan courts and federal administrative and judicial precedent.*** *Id.* at 562–63, 581 N.W.2d at 718 (emphasis added).

Further, the Court is not persuaded by the agency analysis in *In re Tribune Co.* as it does not distinguish between mere intermediaries contracted for the purpose of effectuating a transaction and agents who are authorized to act on behalf of their customers in such transactions. The Second Circuit in *In re Tribune Co.,* also cited to and relied on the Restatement (Third) of Agency §1.01's definition of agency. The sum and substance of the agency application states,

> Here, Tribune manifested its intent to grant authority to Computershare by depositing the aggregate purchase price for the shares with Computershare and entrusting Computershare to pay the tendering shareholders. Computershare, in turn, manifested its assent by accepting the funds and effectuating the transaction. Then, as the transaction proceeded, Tribune maintained control over key aspects of the undertaking.

*In re Tribune Co. Fraudulent Conveyance Litig.,* 946 F.3d at 80. Thus, by merely authorizing Computershare to accept funds as part of the securities transaction and further effectuating the transaction, the *Tribune* court found the first requirement of agency satisfied. Additionally, the *Tribune* court did not address any agreements between the parties in its agency analysis. As a result, this Court has no way of determining whether the pertinent language of any agreements between the *Tribune* parties is similar to the language of the relevant agreements in the present case as it relates to the relationship of the parties, their roles, duties, obligations, etc.

Under *Tribune's* analysis any intermediary hired to effectuate a transaction would qualify as its customer's agent. And consequently, if such an intermediary would be a financial institution, the debtor's status would transform to one of a financial institution itself. This would result in a complete workaround of *Merit Management*, which opined that the safe harbor provision does not insulate a transfer simply because a qualified intermediary acted as a mere conduit. *Merit Mgmt. Grp.,* 138 S. Ct. at 897 ("The safe harbor saves from avoidance certain securities transactions 'made by or to (or for the benefit of)' covered entities. . . . Transfers 'through" a covered entity, conversely, appear nowhere in the statute.") *Id.* To establish common law agency, there must be a finding that a principal authorized the agent to act on its behalf. Otherwise, any service provider would qualify as an agent.

Given the purpose of § 546(e), as examined by *Merit Management*, it is crucial to distinguish between agents as defined under common law and mere intermediaries. Not all actors who perform an intermediary role between parties who engage in a transaction … are agents in any sense, and not all who are agents act on behalf of those who use the intermediary service provided." Restatement (Third) of Agency § 1.01, cmt. *h.*

Accordingly, the Court holds that to prove agency Defendants must establish that (1) Holdings manifested assent to MLPFS and/or MLCC that MLPFS and/or MLCC shall act on Holdings' behalf; (2) subject to Holdings' control; and (3) MLPFS and/or MLCC manifest assent or otherwise consent so to act. Furthermore, for the first requirement, "to act on the principal's behalf" means to be "a business representative" with the ability "to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons." *St. Clair Intermediate Sch. Dist.*, 480 Mich. at 557–58, 581 N.W.2d at 716; Restatement (Third) of Agency § 1.01 (2006).

Generally, the existence of agency is a question of fact. *St. Clair Intermediate Sch. Dist.,* 458 Mich. at 556, 581 N.W.2d at 716 ("When there is a disputed question of agency, if there is any testimony, either direct or inferential, tending to establish it, it becomes a question of fact[.]"). Furthermore, the label or designation placed on the relationship by the parties is not determinative. *Universal Life Church, Inc. v. Comm'r of Lottery*, 96 Mich. App. 385, 388, 292 N.W.2d 169, 170 (1980); *Caldwell v. Cleveland-Cliffs Iron Co.*, 111 Mich. App. 721, 732, 315 N.W.2d 186, 191 (1981) ("While the label the parties place on their relationship is not determinative, the existence of an agency relationship and the scope of the relationship are questions of fact.").

However, the existence of agency is a question of law for the court "when the contract is in writing and there is no dispute or room for disputed inference as to the other documents, correspondence, and acts which might sometimes bear upon construction." *Texas Co. v. Brice*, 26 F.2d 164, 167 (6th Cir. 1928); *N.L.R.B. v. Int'l Bhd. of Elec. Workers*, 514 F.3d 646, 650 (6th Cir. 2008) ("Unless there is no genuine issue of material fact, the presence, or absence, of agency requires a factual analysis").

Under the facts of this case, the determination of the existence of an agency relationship is a question of law for the Court. Here, Defendants rely on numerous agreements in support of their argument that an agency relationship existed. The Flow of Funds Memorandum confirms that the parties acted in accordance with the agreements. As the Court's predecessor found, "[n]either party . . . contests the authenticity of any exhibit or disputes the occurrence or essential details of the transactions evidenced thereby. There are no genuine disputes as to any material facts, only as to how those facts should be construed and their legal consequences."

In support of their argument that MLPFS acted as Holdings' agent, Defendants claim three documents establish that MLPFS acted as Holdings' agent. They are: (1) the Engagement Letter

("Strategic Alternatives Letter"); (2) the Notes Purchase Agreement and (3) the New Credit Agreement.  Under these documents Defendants allege that MLPFS was responsible for (1) serving as the exclusive financial advisor; (2) representing Holdings before the Michigan Gaming Control Board; (3) arranging for, structuring and advising on the Senior Notes and the Senior Credit Facility; serving as underwriter, book runner, and syndication agent for the Senior Notes and Senior Credit Facility; and (4) acting as disbursing agent in the 2005 Transaction to distribute proceeds of the Senior Notes to various parties, including to the Papases and Gatzaroses. [ECF No. 809, p. 13].

In response, Plaintiff first argues that Defendants have not presented any evidence that MLPFS had an agency relationship with Holdings with respect to the Note Purchase Agreement.[17] In fact, Plaintiff stresses that the Note Purchase Agreement expressly disclaims that MLPFS was the agent or fiduciary for Holdings—"[t]he Issuers acknowledge[d] and agree[d] that . . . (ii) in connection with the offering contemplated hereby and the process leading to such transaction, the Initial Purchasers [we]re and ha[d] been acting solely as principals and *[we]re not the agents or fiduciaries of the Issuers*." [ECF No. 809-7; Exh. E; p. 2] (emphasis added).  Furthermore, Plaintiff

---

[17] Defendants do not argue that either Chase or Comerica acted as agent for Holdings.  However, Plaintiff adds:

> The record also contains no evidence that Chase ever acted as an agent for the Papases, or that Comerica did so for the Gatzaroses, in connection with a securities transaction, or otherwise. To the contrary, the record merely shows that Chase and Comerica provided ordinary banking services by receiving wire transfers. (Flow of Funds Memorandum, Dkt. 278, Exh. D at 2-5.). A banker is not generally an agent for its customer. "[T]he banker/customer relationship is one of creditor to debtor, which does not give rise to a fiduciary relationship." *Shahin v. Delaware Fed. Credit Union*, 602 F. App'x 50, 53 (3d Cir. 2015); *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993); *Miller v. Am. Nat. Bank & Tr. Co. of Chicago*, 4 F.3d 518, 520 (7th Cir. 1993). Here, all Chase and Comerica did was receive money into the Papases' and Gatzaroses' banking accounts. That does not constitute an agency relationship and, therefore, does not confer financial-institution status under the statute.

[ECF No. 788, p. 14].

asserts that "MLPFS owed money to Holdings for the Notes it had purchased. It was not holding funds as a fiduciary, but, rather, it had an obligation to pay Holdings for the Notes under the Note Purchase Agreement." [ECF No. 817, p. 17]. Thus, Plaintiff argues that when MLPFS transferred funds to Defendants it did so to satisfy its debt to Holdings for its purchase of the Notes, in the manner it and Holdings had mutually agreed under the Flow of Funds Memorandum. Plaintiffs further contends that MLPFS could not act as a "disbursing agent" simply by agreeing to pay money to Defendants, as Defendants argue, because it never agreed to act as Holdings' fiduciary. Plaintiff relies on *Soberay Mach. & Equip. Co.., 181 F.3d at 767* (A "party 'who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent contractor.'"). Accordingly, Plaintiff maintains there is no evidence that MLPFS was under the control of Holdings or was acting as a fiduciary for Holdings with respect to Holdings' assets.

Plaintiff provides three reasons that the Strategic Alternatives Letter does not evidence that MLPFS was the agent of Holdings with respect to a securities contract or with respect to the transfers to Defendants. First, Holdings was not a party to it. Next, the Strategic Alternatives Letter disavows any agency or fiduciary relationship between MLPFS and Holdings, stating that MLPFS is acting "solely as financial advisor" and "as an independent contractor." Lastly, at the time of the transfers, the Strategic Alternatives Letter was no longer in effect, having been superseded by the Note Purchase Agreement.

Finally, Plaintiff argues that the New Credit Agreement does not evidence an agency relationship between MLPFS and Holdings. Plaintiff contends that the New Credit Agreement is not a securities contract and, therefore, not relevant to the application of the definition of a "financial institution" or the safe harbor provision with respect to the transfers made to Defendants

under the Note Purchase Agreement as modified by the Flow of Funds Memorandum. Even if the Court considers the New Credit Agreement, Plaintiff maintains that under the New Credit Agreement, MLPFS was sole lead arranger, sole book runner and syndication agent with respect to the senior credit facility. In those capacities, Plaintiff argues MLPFS was acting on behalf of MLCapital ("MLCC"), not Holdings. Plaintiff further points out that Section 9.9 of the New Credit Agreement disavows any obligation or duty by MLPFS to Holdings (other than one that might arise if it became a Lender under the New Credit Agreement). [ECF No. 817-4; Exh., p. 129, §9.9].

In reply, Defendants reiterate the different roles MLPFS had in connection with Holdings' restructuring that would qualify it as Holdings' agent, and further provide that "Holdings granted authority to MLPFS to collect and distribute the proceeds of the note sale on Holdings' behalf. The Flow of Funds Memorandum shows that MLPFS disbursed those proceeds to various creditors and others as directed by Holdings." [ECF No. 819; p. 9]. Additionally, Defendants for the first time argue that MLCC also acted as Holdings' agent in connection with the restructuring. Defendants point to the Flow of Funds Memorandum which shows that (1) Holdings granted authority to MLCC to collect and distribute the proceeds of the loan; (2) MLCC agreed by disbursing millions of dollars to various creditors as directed; and (3) was therefore controlled by Holdings.

The Court concludes that Defendants failed to establish an agency relationship between Holdings and MLPFS or between Holdings and MLCC. None of the evidence Defendants have presented supports the crucial elements of an agency relationship. Here, the cited agreements govern the relationship of the parties.[18]

---

[18] The Court notes that the relevant agreements all contain a New York choice of law provision. See ECF No. 809-6, Exh. D – Strategic Alternatives Letter, ¶ 14; ECF No. 809-7 Exh. E, Purchase Agreement, § 15; ECF No. 817-4; and Exh. C, New Credit Agreement, p. 133, § 10.9. Neither party argues that New York law should govern the determination of agency relationship under these agreements.

Turning to the first element, after reviewing the documents, the Court concludes that Holdings did not authorize MLPFS to act on Holdings' behalf. MLPFS was merely authorized to perform contractual services. MLPFS was never authorized to conduct business on behalf of Holdings. The agreements do not establish that MLPFS was "a business representative" or could "bring about, modify, affect, accept performance of, or terminate contractual obligations between Holdings and third persons" as defined in *St. Clair Intermediate Sch. Dist.* In fact, MLPFS was on the other side of the transaction (Holdings as issuers and MLPFS as purchaser; Holdings as borrower and MLPFS as lender).

First, the Commitment Letter, entered into by Merrill Lynch Capital Corporation, identified as "Merrill Lynch" and Greektown Casino, L.L.C. ("Operating Company"), references the Strategic Alternatives Letter pursuant to which the "Operating Company has given MLPFS the mandate to arrange an offering of senior unsecured notes." [ECF No. 817-1; Exh. A]. The Commitment Letter makes clear that the obligations of MLPFS with respect to such mandate are set forth in, and governed by, the Strategic Alternatives Letter. *Id.*

The Strategic Alternatives Letter is an agreement between MLPFS, identified as "Merrill Lynch" and Greektown Casino, L.L.C. ("Greektown"). [ECF No. 809-6, Exh. C]. Under this agreement, MLPFS was "to act as exclusive financial advisor to . . . Greektown and Greektown Holdings, L.L.C. ('Holdings') in connection with exploring Strategic Alternatives" identified in the agreement from September 24, 2005 until July 31, 2006. Per this agreement Merrill Lynch was "retained to ***act solely as financial advisor*** to Greektown and the Greektown Entities. In such capacity, Merrill Lynch shall ***act as an independent contractor, and any duties of Merrill Lynch arising out of its engagement pursuant to this Agreement shall be owed solely***

46

*to Greektown and the Greektown Entities*."[19] [ECF No. 809-6; Exh. D; ¶ 7] (emphasis added).

According to this agreement, Greektown—not Holdings—authorized or retained MLPFS to act as a financial advisor. Thus, while Holdings may have benefitted from this agreement, the agreement does not evidence Holdings' assent that MLPFS act on its behalf or that MLPFS be subject to Holdings' control. It is not necessary for the Court to determine whether MLPFS in its capacity as a sole financial advisor was an agent, because even assuming it was, it would be an agent of Greektown and not Holdings, per the signed agreement. Moreover, the Strategic Alternatives Letter was superseded by the Note Purchase Agreement.

Furthermore, the Strategic Alternative Letter contemplates a separate agreement to engage Merrill Lynch to act in certain roles. During this exploratory period, if the Greektown Entities proposed to implement any Strategic Alternative,

> each of the Greektown Entities agrees . . . to cause the Tribe and the Authority to engage Merrill Lynch (or one or more of its affiliates as designated by Merrill Lynch) *as its sole lead administrative agent, sole lead bookrunning manager, sole lead managing underwriter, sole tender and placement agent, sole dealer-manager, sole lead arranger or principal counterparty or exclusive financial advisor*, as the case may be, in connection with any such transaction . . .

[ECF No. 809-6; Exh. D; ¶ 2] (emphasis added). The Strategic Alternatives Letter further clarifies that "any such engagement of Merrill Lynch *shall only become a commitment by Merrill Lynch to assume such engagement when such engagement is set forth and agreed to by Merrill Lynch in a separate underwriting, financing, placement agency, dealer-manager, commitment or other applicable type of agreement*." *Id*. (Emphasis added). Thus, this Strategic Alternatives Letter does not authorize MLPFS to act in any of the listed roles, it only

---

[19] In the Strategic Alternatives Letter, Holdings is identified as "Holdings," Greektown Entities is identified as "any respective direct and indirect subsidiaries" of Greektown, Holdings and Monroe Partners, L.L.C. [ECF No. 809-6; Exh. D; ¶ 1]. Moreover, the signature block of this agreement is signed on behalf of Greektown Casino, L.L.C.

contemplates the possibility of such engagement.  In addition, MLPFS did not assent to act in any of these roles.  Rather, it reserved the right to commit to act in those roles pursuant to terms set forth in a separate agreement.

The relevant agreement is the Note Purchase Agreement between Holdings (as Issuer) and MLPFS (as Initial Purchaser); it does not authorize MLPFS to act on Holdings' behalf. The preamble states,

> Greektown Holdings, L.L.C., a Michigan limited liability company, as issuer (the "Company") and Greektown Holdings II, Inc., a Michigan corporation, as co-issuer ("Greektown Holdings" and, together with the Company, the "Issuers") confirm their agreement with Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner, & Smith Incorporated ("Merrill Lynch") and each of the other Initial Purchasers named in Schedule A hereto (collectively, the "Initial Purchasers", which term shall also include any initial purchaser substituted as hereinafter provided in Section 11 hereof) for whom Merrill Lynch is acting as representative (in such capacity, the "Representative") with respect to the issue and sale by the Issuers and the purchase by the Initial Purchasers, acting severally and not jointly, of the respective principal amounts set forth in Schedule A attached hereto of $185,000,000 aggregate principal amount of the Issuers' 10 ¾ % Senior Notes due 2013 (the "Securities").
> . . .

[ECF No. 809-7; Exh. E; p. 1].

The pertinent language in this agreement provides,

> The Issuers acknowledge and agree that … (ii) **in connection with the offering contemplated hereby and the process leading to such transaction**, the **Initial Purchasers are and have been acting solely as principals and are not the agents or fiduciaries of the Issuers or any of their creditors, employees or any other party,** (iii) the **Initial Purchasers have not assumed and will not assume an advisory or fiduciary responsibility in favor of the Issuers with respect to the offering contemplated hereby or the process leading thereto** (irrespective of whether the Initial Purchasers have advised or are currently advising the Issuers on other matters) and the **Initial Purchasers have no obligation to the Issuers with respect to the offering contemplated hereby except the obligations expressly set forth in this Agreement**, (iv) the **Initial Purchasers and their affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Issuers** and (v) the Initial Purchasers have not provided any legal, accounting, regulatory or tax advice with respect to the offering contemplated hereby and the Issuers have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deeded appropriate.

48

[ECF No. 809-7; Exh. E; p. 2] (emphasis added). Pursuant to this agreement, MLPFS is now one of the initial purchasers and a representative of the other initial purchasers. In this capacity, MLPFS is, and was, acting solely as a principal and not an agent *or* fiduciary for Holdings. MLPFS further disclaimed any advisory or fiduciary responsibility in favor of Holdings (regardless of whether it previously served in such a role) and any obligations to Holdings (other than those set forth in the agreement). In fact, the agreement provides that MLPFS and its affiliates "may be engaged in a broad range of transactions that involve interests that differ from those of" Holdings. This language expressly contradicts the classic definition of agency. Defendants attempt to argue that this is not a global disclaimer, rather it is limited to the "offering." The Court disagrees. The plain language of the agreement provides that the above disclaimers are "***in connection with the offering contemplated hereby <u>and</u> the process leading to such transaction.***" *Id.* (Emphasis added).

Defendants reliance on designations in the New Credit Agreement to establish the authority of MLPFS or MLCC to act on behalf of Holdings is not persuasive. Specifically, the following paragraph designates the roles of MLPFS and MLCC under the agreement.

> Credit Agreement, dated as of December 2, 2005, among Greektown Holdings, L.L.C. ("Greektown Holdings") and Greektown Holdings II, Inc. ("Greektown Corporation"), as the Borrowers, various financial institutions, as the lenders, Merrill Lynch Pierce, Fenner and Smith Incorporated ("MLPFS"), as the sole Lead Arranger and the Sole Bookrunner, and the syndication agent, Merrill Lynch Capital Corporation, as the Administrative Agent ("MLCC"), and documentation agent(s) party thereto (the "New Credit Agreement).

[ECF No. 817-4; Exh. C, p. 13]. These designations without more are not dispositive on the issue of agency. Defendants do not cite the Court to any other provision that would support their position on the existence of an agency relationship. Plaintiff points the Court to section 9.9 of the New Credit Agreement,

> The Sole Lead Arranger, the Sole Book Runner, the Syndication Agent and the Co-Documentation Agents. The Sole Lead Arranger, the Sole Book Runner, the Syndication Agent and the Co-Documentation Agents ***hereunder shall not have any right, power, obligation, liability, responsibility or duty under this Agreement (or any other Loan Document) other than those applicable to it in its capacity as a Lender to the extent it is a Lender hereunder***. Without limiting the foregoing, the Lender so identified as the "**Sole Lead Arranger**" the "**Sole Book Runner**", the "**Syndication Agent**", and the "**Co-Documentation Agents**" shall not have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on the Lender so identified as the "**Sole Lead Arranger**" the "**Sole Book Runner**", the "**Syndication Agent**" or the "**Co-Documentation Agents**" in deciding to enter into this Agreement and each other Loan Document to which it is a party or in taking or not taking action hereunder or thereunder.

[ECF No. 817-4; Exh. C, §9.9] (emphasis added). Pursuant to this clause, MLPFS, in its capacity as the sole lead arranger, the sole book runner, the syndication agent, limited its role to that of a lender, to the extent it is a lender. MLPFS disclaimed any other right, power, obligation, liability, responsibility or duty. It further clarified that it did not have any fiduciary relationship with any other lender.

Finally, the Court concludes the Flow of Funds Memorandum does not contain any provision modifying MLPFS' relation to Holdings as provided in other agreements. Also dated December 2, 2005, the Flow of Funds Memorandum "sets forth the fund transfer procedures followed in connection with" the 2005 Transaction. [ECF No. 809-11; Exh. G; p. 1]. This Memorandum lists the principal documents related to the 2005 Transaction and the specific transfers that are deemed to have occurred simultaneously. [ECF No. 809-11; Exh. G; p. 2-3]. This includes the transaction expenses and account transfers. The account transfers section is limited to a chart that summarizes the actual net transfers that were made. [ECF No. 809-11; Exh. G; p. 6-7]. These net transfers list MLPFS and MLCC as transferors. However, this chart shows that MLPFS and MLCC merely effectuated the 2005 Transaction in accordance with agreements under which MLPFS disclaimed any agency relationship with Holdings and MLCC served as an

agent to other lenders. This is the only document Defendants offer to show that MLPFS disbursed the proceeds of the loan. Therefore, Defendants failed to prove the first element of agency—that Holdings manifested assent to MLPFS that MLPFS shall act on Holdings' behalf.

With respect to the second element, because the Court concludes that there is no evidence that Holdings authorized MLPFS to act on its behalf, it follows that MLPFS could not be subject to Holdings' control with regard to such nonexistent authorization.

For the same reason, Defendants cannot prove the third element. There is no evidence that MLPFS assented or otherwise consented to act as Holdings' agent. The contractual language of the Note Purchase Agreement expressly contradicts the classic definition of common law agency as cited by the parties. Not only does the language disclaim the existence of an agency relationship; it further disclaims any fiduciary duties that would result from such a relationship.

Similarly, the Court concludes that Defendants failed to show that Holdings authorized MLCC to act on its behalf. Under the New Credit Agreement, MLCC as the administrative agent was an agent of the lenders—not Holdings. Pursuant to § 9.1(a) and (b) of the agreement, each lender authorized MLCC to act on behalf of such lender under the agreement and other loan documents. Moreover, as with MLPFS, the Flow of Funds Memorandum merely evidences that MLCC disbursed the proceeds of the loan. It does not contain any provision modifying MLCC's relation to Holdings as provided in other agreements. Without more, this evidence is insufficient to establish that an agency relationship existed between Holdings and MLCC. Consequently, Defendants failed to prove the elements of an agency relationship between Holdings and MLCC.

b. Was Merrill Lynch a "Custodian" of Holdings?

Defendants alternatively argue that MLPFS was acting as a "custodian" for the benefit of its customer Holdings in connection with the Notes Offering, a securities transaction. Defendants urge the Court to look to securities law and regulations for guidance in interpreting the term

51

"custodian."[20]   Per the securities regulations, specifically 17 CFR §270.17f-4 (c)(2), the term "custodian" is defined as "a bank or other person that is authorized to hold assets for another in connection with a securities transaction."  [ECF No. 809, p. 14].   In support of their argument, Defendants point to the Flow of Funds Memorandum and section 2.b of the Notes Purchase Agreement, which provides that MLPFS was "authorized to accept delivery of . . .and make payment of the purchase price" of the Senior Notes. Thus, Defendants explain that "[t]he proceeds of the Senior Notes were advanced to and held by MLPFS for the benefit of the ultimate recipients, the Papases and Gatzaroses, pursuant to the terms of the Notes Purchase Agreement and Offering Memorandum."  [ECF No. 809, p.14].

Defendants also argue that MLPFS would also qualify as a "custodian" under the Bankruptcy Code definition of § 101(11)(C) that provides,

> (11) The term "custodian" means—
> ***
> (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

§101(11)(C).  Defendants argue that courts recognize this code definition to be descriptive, not exhaustive, citing to *In re Quality Laser Works*, 211 B.R. 936, 943 (BAP 9th Cir. 1997); *In re UTE Lake Ranch, Inc.*, 2016 WL 6472043, at *2 (Bankr. D. Colo. Sept. 14, 2016); and *In re Purner*, 2005 WL 6485179, at *2 (Bankr. S.D. Cal. 2005).  Defendants further maintain that this definition

---

[20] Defendants reason that,

> There do not appear to be any cases that have interpreted the word "custodian" in the context of section 546(e). Nevertheless, the overwhelming weight of authority calls for the interpretation of §546(e) in light of constructions and usages of securities law and practices in the securities industry. See, e.g., *QSI Holdings, Inc. v. Alford* (*In re QSI Holdings, Inc.*), 571 F.2d 545, 549-50 (6th Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc.* (*In re Resorts Int'l, Inc.*), 181 F.3d 505, 516 (3d Cir. 1999); *Kaiser Steel Corp. v. Charles Schwabb, Inc.*, 913 F.2d 846, 849-50 (10th Cir. 1990).

[ECF No. 809, p 14].

has been broadly interpreted, *In re Matter of Cash Currency Exchange, Inc.*, 762 F.2d 542 (7th Cir. 1985), to include an "agent under applicable law, or under a contract." Defendants rely on *In re Pine Lake Village Apartment Co.*, 17 B.R. 829 (Bankr. S.D.N.Y. 1982), which explicitly used the language "under a contract" as applied to "agent." Lastly, Defendants stress that a person or entity need not be acting for the benefit of all creditors in order to be a "custodian" within the meaning of the Bankruptcy Code, citing *In re Ohakpo*, 494 B.R. 269, 280 (Bankr. E.D. Mich. 2013) and *In re Skinner*, 213 B.R. 335, 340 (Bankr. W.D. Tenn. 1997).

In response, Plaintiff first claims that Defendants' position is contrary to the facts and fails to establish a custody arrangement. Plaintiff explains that MLPFS (1) was not "holding" any proceeds of a Notes Offering for Holdings; and (2) did not "advance" any funds to Defendants. Rather, Plaintiff argues that MLPFS was a debtor to Holdings for the Notes it was obligated to, and did, purchase. Plaintiff stresses that this obligation to pay Holdings was not contingent or conditional on its resale of the Notes, explaining that,

> When MLPFS bought the Notes at closing, it owed the net purchase price to Holdings. The Note Purchase Agreement obligated MLPFS to pay Holdings at a specified account. Holdings had no right to direct MLPFS to wire funds to any other party. But, at the request of Holdings, MLPFS agreed to wire the funds owed to Holdings to the parties identified in the Flow of Funds Memorandum. There is no evidence that MLPFS had custody of funds belonging to Holdings, was under Holdings' control or had any obligation to remit funds to Movants before it agreed to do so in the Flow of Funds Memorandum and received the Notes at closing.

[ECF No. 817, p. 19-20]. Therefore, Plaintiff contends that evidence establishes that MLPFS simply owed a debt to Holdings and paid it as Holdings requested—and not that MLPFS was "custodian" of the funds of Holdings.

Even were the Court to adopt Defendants' "custodial" characterization, Plaintiff asserts that the statutory definition of "custodian" in §101(11) controls and Defendants cannot meet this definition. Plaintiff argues that Defendants failed to provide any authority to dispute the

application of § 101(11)'s definition in this case. Per *Wysocki v. IBM Corp.*, 607 F.3d 1102, 1106 (6th Cir. 2010) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2010)), "if the meaning of [statutory] language is plain, then 'the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.'" Defendants do not argue that the statutory definition of the term "custodian" is either unclear or absurd. Plaintiff further provides that the definition of "custodian" was in the Bankruptcy Code at the time Congress added § 101(22), which uses the term "custodian". Had Congress intended that the statutory definition of "custodian" in § 101(11) not be used in § 101(22)(A), it could easily have written "whether or not a 'custodian', as defined in section 101(11)"—as it did with the word "customer." Accordingly, Plaintiff argues that § 101(11)'s definition of the term "custodian" controls. Lastly, Plaintiff maintains that even if 17 C.F.R. §270.17f4(c)(2) applied, it does not cover the role of MLPFS as it was never a custodian of its own debt to Holdings, and its payment of that debt as agreed is not evidence of a custodial relationship.

The Court holds that § 101(11) governs the interpretation of the term "custodian." When a statute "contains an explicit and multi-faceted definition of [a] term[,] … that definition must govern the resolution of this case; [the court is] not at liberty to put [its] gloss on the definition that Congress provided by looking to the generally accepted meaning of the defined term." *Tennessee Prot. & Advocacy, Inc. v. Wells*, 371 F.3d 342, 346 (6th Cir. 20040 (citing *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698 n.10, 115 S. Ct. 2407 (1995)).

> [I]it is well-settled law that when a statutory definition contradicts the everyday meaning of a word, the statutory language generally controls: judges should "construe legislation as it is written, not as it might be read by a layman." *Meese v. Keene,* 481 U.S. 465, 485, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). Only when following the literal language of the statute would lead to "an interpretation which is inconsistent with the legislative intent or to an absurd result" can a court modify

the meaning of the statutory language. *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir.1995).

*Tennessee Prot. & Advocacy, Inc.*, 371 F.3d at 349–50; *Wysocki*, 607 F.3d at 1106. Finally, the Court "will not interpret a statute in a manner that renders part of it irrelevant, particularly where, as here, the statute has an unambiguous meaning if we simply apply the definition provided in the statute itself." *Stanovsek v. Holder*, 768 F.3d 515, 519 (6th Cir. 2014) (internal citation omitted).

While it would be proper to analyze cases interpreting §101(11)(C)'s definition in other contexts, it is inappropriate to adopt and interpret a completely different definition, such as 17 CFR §270.17f-4(c)(2), especially when the language of the CFR's definition does not mirror the definition in the Bankruptcy Code. Defendants do not argue that the Bankruptcy Code's statutory definition of the term "custodian" is either unclear or absurd. Nor do Defendants argue that the statutory definition is ambiguous. Rather, Defendants merely argue that there is not much case law interpreting the statute in the context of the safe harbor provision. Defendants cite to no authority for the application of 17 CFR §270.17f-4(c)(2) instead of § 101(11).

Accordingly, the Court holds that the definition of the term "custodian" in § 101(11) governs.

The Bankruptcy Code provides:

> "custodian" means—
>
> (A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;
>
> (B) assignee under a general assignment for the benefit of the debtor's creditors; or
>
> (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

§ 101(11).

Under this definition, Defendants assert that MLPFS was a "custodian" under § 101(11)(C).

Section 101(11)(C) contains three requirements. Defendants must prove that: (1) MLPFS was a trustee, receiver or agent "under applicable law, or under a contract"; (2) MLPFS had been "appointed or authorized to take charge of the property of" Holdings; and (3) MLPFS was acting for the purpose of either "enforcing a lien against such property" or "general administration of such property for the benefit of Holdings' creditors."

The Court holds that the first requirement of § 101(11)(C) is descriptive, rather than exhaustive. Plaintiff argues that a custodian has to fit into one of the listed categories, relying on *Burgess v. United States*, 553 U.S. 124, 130, 128 S. Ct. 1572, 1574 (2008)) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392-93, n.10 (1979)), which provides that "[a]s a rule, [a] definition which declares what a term 'means' ... excludes any meaning that is not stated." Here, Plaintiff claims that there is no evidence that MLPFS was ever a trustee, receiver, agent, or assignee for Holdings under any circumstances listed in § 101(11). The Defendants' cited cases address the actual provision, including its legislative history. The Ninth Circuit Bankruptcy Appellate Panel in *In re Quality Laser Works,* provides in pertinent part,

> The legislative history of the definition indicates that Congress intended the term "custodian" to encompass a variety of prepetition agents who have taken charge of a debtor's assets. *Matter of Cash Currency Exchange, Inc.,* 762 F.2d 542, 553 (7th Cir.1985), *cert. denied Fryzel v. Cash Currency Exchange, Inc.,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985); *In re Redman Oil Co., Inc.,* 95 B.R. 516, 520 (Bankr.S.D.Ohio 1988). Senate Report No. 989 illustrates that the categories of custodians are descriptive rather than exhaustive:

> Paragraph [11] defines "custodian". There is no similar definition in current law. It is defined to facilitate drafting, and means a prepetition liquidator of the debtor's property, such as an assignee for the benefit of creditors, a receiver of the debtor's property, or a liquidator or administrator of the debtor's property. The definition of custodian to include a receiver or trustee is descriptive, and not meant to be limited to court officers with those titles. The definition is intended to include other officers of the court if their functions are substantially similar to those of a receiver or trustee. *Redman Oil,* 95 B.R. at 520 (quoting H.R.No. 95–595, 95th Cong. 1st Sess. 310 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6267); *see also Cash Currency,* 762 F.2d at 553.

56

*In re Quality Laser Works,* 211 B.R. 936, 943 (B.A.P. 9th Cir. 1997), *aff'd*, 165 F.3d 37 (9th Cir. 1998); see also *In re Ute Lake Ranch, Inc.*, No. 16-17054 EEB, 2016 WL 6472043, at *2 (Bankr. D. Colo. Sept. 14, 2016) (same); and *In re Purner*, No. 03-03932, 2005 WL 6485179, at *2 (Bankr. S.D. Cal. Dec. 19, 2005) (same). Defendants further argue that § 101(11)(C)'s definition includes an agent under *either* applicable law, or under a contract. *In re Matter of Cash Currency Exch., Inc.,* acknowledged "the unrestrictive language used in this definition," and found that since Congress did not refer specifically to administrative receivers in the legislative history[,]" the definition includes court-appointed and administrative receivers. *Id.* at 553. See also *In re Pine Lake Village Apartment Co.*, 17 B.R. 829 (Bankr. S.D.N.Y. 1982).

Even with a descriptive interpretation of the first requirement, the Court concludes that Defendants failed to establish the first requirement. They do not argue that MLPFS or MLCC was either a trustee or a receiver—whether authorized or appointed. It appears that Defendants claim that MLPFS and/or MLCC qualified as an agent under applicable law or contract. The Court already determined that Defendants failed to establish a common law agency relationship. Likewise, the Court finds that Defendants failed to establish that MLPFS and/or MLCC was an agent under contract. As discussed in the preceding section, MLPFS disclaimed any such agency relationship in the relevant agreements. Despite the list of categories in the first requirement being descriptive, Defendants still have not established they satisfy the first requirement.

As to the second requirement, while the parties dispute the characterization of MLPFS/MLCC's role in effectuating the transfer, the resolution of this dispute is not relevant to the Court's determination. That is, whether MLPFS/MLCC was "appointed or authorized" by Holdings "to take charge" of any property of Holdings or whether MLPFS/MLCC owed a debt to

Holdings for the purchase of Notes, which debt it paid by the transfers it made. Even adopting Defendants' characterization, the Court concludes that Defendants fail to meet the other necessary requirements to qualify as a custodian.

Finally, the Court concludes that Defendants fail to meet the third requirement. Defendants do not argue that MLPFS is enforcing a lien. Rather, citing to *In re Ohakpo*, 494 B.R. 269, 280 (Bankr. E.D. Mich. 2013) and *In re Skinner*, 213 B.R. 335, 340 (Bankr. W.D. Tenn. 1997), Defendants erroneously argue that a person or entity need not act for the benefit of all creditors to qualify as a "custodian" within the meaning of the Bankruptcy Code.

*In re Ohakpo* holds that a person or entity must be acting for the benefit of all creditors when acting for the purpose of general administration of such property. The *In re Ohakpo* court held that a court officer appointed and authorized by state court order "to take charge of personal property of [debtor] for the purpose of enforcing a lien against such property" was a custodian within under § 101(11)(C). *In re Ohakpo*, at 278. There, the debtors argued that the court officer was not a custodian "because his seizure of the Automobiles was only for the purpose of enforcing a lien against the Automobiles to pay the RBS judgment and not pay any of the [debtor's] other creditors." *Id*. After factually distinguishing cases relied on by the debtors, the *In re Ohakpo* court explained the statutory construction of § 101(11)(C),

> But, more fundamentally, the Court respectfully disagrees with their interpretation of § 101(11)(C), first because it is contrary to a well-established rule of statutory construction known as the rule of the last antecedent, and second because it is contrary to more persuasive case law on this issue.

> The Sixth Circuit Court of Appeals has explained the rule of the last antecedent as follows:

> > When a word such as a pronoun points back to an antecedent or some other referent, the true referent should generally be the closest appropriate word. Consistent with this principle, the courts ordinarily assume that "a limiting clause or phrase ... modif[ies] only

the noun or phrase that it immediately follows." Although not an "absolute" imperative, the "rule of the last antecedent" creates at least a rough presumption that such qualifying phrases attach only to the nearest available target.

*Carroll v. Sanders (In re Sanders),* 551 F.3d 397, 399 (6th Cir.2008) (quoting *Barnhart v. Thomas,* 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)) (other internal quotation marks and citations omitted).

The corollary to this rule is that a modifying clause separated by a comma is read to modify all preceding clauses instead of only the last antecedent. "[T]he last antecedent rule does not apply when the modifying clause is set off by a comma." *Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.,* 499 Fed.Appx. 559, 564 (6th Cir.2012). " 'The presence of a comma separating a modifying clause in a statute from the clause immediately preceding it is an indication that the modifying clause was intended to modify all of the preceding clauses and not only the last antecedent one, thus making the last-antecedent rule inapplicable.' " *Id.* (quoting 82 C.J. S. Statutes § 443). The Third Circuit Court of Appeals provides a helpful example of the rule and its corollary:

> Under the last-antecedent rule of construction, therefore, the series "A or B with respect to C" contains two items: (1) "A" and (2) "B with respect to C." On the other hand, under the rule of grammar the series "A or B, with respect to C" contains these two items: (1) "A with respect to C" and (2) "B with respect to C."

*Stepnowski v. Commissioner,* 456 F.3d 320, 324 n. 7 (3d Cir.2006) (citation omitted).

**The last antecedent rule means that the phrase "for the benefit of the debtor's creditors" attaches only to the immediately preceding clause of § 101(11)(C): "for the purpose of general administration of such property." The omission of a comma separating "for the benefit of the debtor's creditors" from the rest of the definition means that this modifying clause was not intended to modify all of the preceding clauses.** The Debtors' reading of the statute would be correct if there was a comma preceding the phrase "for the benefit of the debtor's creditors." But there is no comma.

*In re Ohakpo*, at 279–80. (Emphasis added). The court additionally found support for its interpretation of § 101(11)(C) in *Skinner v. First Union National Bank (In re Skinner),* 213 B.R. 335 (Bankr.W.D.Tenn.1997), which also "rejected the argument advanced by the Debtors in this case that one can only be a custodian if they have taken possession of a debtor's property for the

59

purpose of enforcing a lien on the property for the benefit of all of the debtor's creditors, and not just the judgment creditor that requested the issuance of a writ of execution on personal property." *Id*. at 280.

Accordingly, the Court holds that the phrase "for the benefit of the debtor's creditors" applies to a person or entity that is appointed or authorized to take charge of property of the debtor for the purpose of general administration of such property. The "for the benefit of the debtor's creditors" requirement is not necessary when a person or entity is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien. Plaintiff's cases further support this conclusion. See *Taylor's of St. Petersburg, Inc. v. Gugino* (*In re Taylor's of St. Petersburg, Inc.*), 110 B.R. 593, 596 (Bankr. M.D. Fla. 1990) and *Flournoy v. City Finance* (*In re Lewis*), 12 B.R. 106, 108 (Bankr. M.D. Ga. 1981).

Here, there is no evidence that Defendants had a lien on Note sale proceeds or that MLPFS and/or MLCC was enforcing it. The Defendants were creditors of Holdings' parent companies— not Holdings. Next, there is no evidence that MLPFS and/or MLCC was acting "for the purpose of general administration of such property for the benefit of the debtor's creditors." Defendants presented no evidence that MLPFS and/or MLCC administered Holdings' assets for the benefit of *all* of Holdings creditors. Consequently, the Court holds that Defendants' failed to establish that MLPFS and/or MLCC was a custodian within the meaning of §101(11)(C).

## V. CONCLUSION

For the foregoing reasons, the Court holds that per *Merit Management*, the relevant transfer is the one that is identified by the trustee and is an otherwise avoidable transfer. Here, Plaintiff identifies the transfer it seeks to avoid as a transfer from Holdings to Defendants. Because neither

the transferor (Holdings) or the transferee (Defendants), on their own, are a financial institution or other covered entity, the 2005 Transaction falls outside of the § 546(e) safe harbor.

Next, the Court holds that Defendants failed to meet their burden to establish that the 2005 Transaction was "for the benefit" of Merrill Lynch. Specifically, Defendants failed to show that Merrill Lynch received a direct, ascertainable, and quantifiable benefit corresponding in value to the payments to Defendants that Plaintiff seeks to avoid and recover.

Finally, the Court holds that Defendants failed to prove that Holdings is by § 101(22)(A) deemed to be a "financial institution" because Merrill Lynch was acting as an agent or a custodian for its customer Holdings in making the transfers. None of the evidence presented by Defendants establishes an agency relationship between Holdings and MLPFS and/or MLCC. Likewise, none of the evidence presented by Defendants proves that MLPFS and/or MLCC was acting as a "custodian" for Holdings within the meaning of § 101(11)(C).

Accordingly, Defendants failed to prove the 2005 Transaction is protected from avoidance by the § 546(e) safe harbor provision. Consequently, the Court denies Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Signed on October 19, 2020



/s/ Maria L. Oxholm

**Maria L. Oxholm**
**United States Bankruptcy Judge**